UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: EASYSAVER REWARDS LITIGATION | ) Civil No. 09-CV-2094-AJB(WVG)<br>)<br>) ORDER GRANTING IN PART<br>) PLAINTIFFS' MOTION TO COMPEL<br>) AND TO AMEND SCHEDULING ORDER<br>)<br>) [Doc. No. 183]<br>)<br>)<br>) |

    Plaintiffs seek to amend the Court's June 24, 2011, scheduling order and to compel Defendants to further respond to discovery requests. After full briefing, the Court finds this motion suitable for decision without oral argument. S.D. Cal. Civ. L. R. 7.1. The Court grants-in-part the motion as to the scheduling order; an amended scheduling order has been issued separately. The Court also grants-in-part the portion of the motion regarding providing email messages. The motion is denied in all other respects.

/ / /

/ / /

/ / /

/ / /

**A.     Dispute Over Discovery Ordered Produced on June 30, 2011**

Plaintiffs claim that EMI has failed to comply with the Court's June 30, 2011, Order that compelled additional discovery responses from EMI. They claim EMI continues to possess responsive documents that have not been produced. The Court briefly addresses each request to compel in turn.

### 1.     EMI's Membership Database

On June 30, 2011, the Court ordered EMI to produce documents in response to RFP Nos. 20 and 21. The two RFPs are related, with RFP No. 21 being the more critical and labor-intensive inquiry from EMI's perspective. RFP No. 20 asked for documents showing the total number of customer complaints, while RFP No. 21 requested the actual complaints. In response to RFP No. 20, EMI informed Plaintiffs that 1,067,990 people cancelled their memberships, almost 250,000 received full refunds, and another group received partial refunds. This information is sufficiently responsive for purposes of class certification discovery, especially in light of EMI's production to RFP No. 21.

RFP No. 21 was a request for a copy of each document "constituting or related to a customer complaint." EMI produced nearly 15,000 pages of written complaints and requests for refunds. Plaintiffs now ask, "*Where are the records of the other million?*" (emphasis in original.) Plaintiffs aver that EMI maintains a database that contains information for over one million Easysaver members, complainants, or both. They want EMI to produce complaint documents from this database. EMI objects that this request would, *inter alia*, entail producing millions of pages of documents. This request to compel is denied at this time.

Even assuming that only a single-page document exists for each of these individuals, EMI's production would encompass at least one million pages. Such a voluminous production would impose an undue burden on EMI <u>at this stage</u> of the case in light of the documents' utility.

Based on the Court's review of the deposition transcript and Plaintiffs' argument, these additional documents will add only marginal utility to class certification. Plaintiffs themselves explain that they seek the membership database records so they may <u>confirm</u> the numbers EMI has already given them:

> Plaintiffs requested the number of complaints in total because that would form the "baseline" from which to measure the complaints as a whole. The database records themselves are "sufficient to show" the number of complaints. Plaintiffs are further entitled to see the **text** of the complaints and should not have to rely on EMI's self-serving assessment of which [c]omplaints are relevant and which are not.

(Plaintiffs' Reply at 4:26-5:3 (emphasis in original).) In light of this explanation, the burden on EMI will be significant.

When the Court originally ordered a response to RFP Nos. 20 and 21, the Court did not have information on the number of documents potentially responsive to these RFPs. EMI has already produced discovery that summarizes the number of complaints, which is "sufficient to show" the number of complaints and which was not burdensome to produce at this stage as to RFP No. 20. However, as to RFP No. 21, producing millions of pages of documents that show the text of individual complaints over and above the approximate 15,000 pages already produced is burdensome. Balancing this burden against the documents' utility, the Court declines to compel EMI to produce these documents <u>at this time</u>.

**2.  Customer Service Materials ("Scripts")**

This request to compel is denied.  EMI has represented to the Court that it has searched its files and has already produced all responsive documents it has been able to locate.

**3.  "Code-Related Emails"**

Before any disputes were brought to the Court's attention, EMI ventured down the rabbit hole of producing its source codes to Plaintiffs.  Once the resulting disputes were brought to the Court's attention, the Court proceeded on the basis that EMI had already agreed to produce, and indeed had produced, some or all of its source code.  At that point, whether the source codes bore on class certification or the merits was less important in the Court's calculus than the fact that EMI had already begun to produce them.  Plaintiffs now request that EMI be compelled to produce internal EMI email messages regarding changes to the source code EMI previously produced.  This dispute is not unrelated to the previous source code dispute; it is just a deeper level in the same rabbit hole.

EMI has produced various versions of its source code while other versions apparently have not been located for production.  However, EMI's PMK testified that internal email messages often discussed source code changes.  These emails apparently will fill in gaps where source code is not available.  Previously, the Court largely denied Plaintiffs' motion for reconsideration on the source code issue on the basis that EMI had averred, pursuant to Rule 11, that all versions of the code in its possession had been produced.  (Doc. No. 175 at 5-6.)  However, emails that discuss source code changes are different than the source code itself, and the Court does not believe EMI's previous representations violated Rule 11.

However, the Court will grant Plaintiffs' request because email messages can shed light on issues regarding the missing source code. Moreover, unlike the million or so pages of membership database documents, emails will likely be far less cumbersome and costly to produce. EMI indicates that the request is vague and it does not understand what Plaintiffs are seeking when they ask for "code related emails." The Court believes Plaintiffs' request is understandable on its face, particularly when considered within the context of this litigation. Also, sufficient context exists in Mr. Klein's PMK deposition to inform EMI precisely what Plaintiffs seek.

EMI shall identify persons who reasonably may have communicated about the source code changes and produce email messages that discussed this subject. The timeframe guidelines in the Court's June 30, 2011, Order continue to apply to this production. EMI shall complete the production no later than November 14, 2011.

**B.    EMI's Rule 30(b)(6) Witnesses**

Plaintiffs claim that EMI's corporate entity witnesses had not prepared for their deposition, lacked knowledge, and "answered an incalculable number of questions with 'I don't know' or 'I don't recall.'" EMI claims they produced two knowledgeable witnesses who were prepared by counsel over nearly a two-day period and who where deposed for a total of 18 hours. The Court declines to compel EMI to produce additional Rule 30(b)(6) witnesses.

This dispute does not warrant a drawn out discussion because Plaintiffs have not shown the Court that Mr. Klein or Mr. Tucker were unable to sufficiently testify on behalf of EMI. The Court painstakingly reviewed Plaintiffs' citations to the deposition transcripts. Plaintiffs essentially provided citations to pages

that either provided very weak support for their representation that the deponents were unable to answer an incalculable number of questions,[1] provided no support whatsoever,[2] or provided examples where the deponent did not know answers to very specific questions.[3] Moreover, those pages also show Mr. Klein answering many other specific questions. As to Mr. Tucker, Plaintiffs point to a few select pages from a rough transcript that is at least 170 pages long to support their request. Simply put, none of Plaintiffs' citations support their representation that the Rule 30(b)(6) witnesses were inadequate such that additional depositions are necessary. As a result, the Court declines to order EMI to produce additional Rule 30(b)(6) witnesses.

**C.   Data Underlying Provide Commerce's Database**

Although Rule 34(b)(2)(E)(ii) allows Plaintiffs to specify the form of electronic document production, Rule 34(b)(2)(D) permits Provide Commerce to object to Plaintiffs' requested format and state the format in which it intends to produce documents. Provide Commerce accordingly stated it objected to Plaintiffs' request to produce in native format, specified it would produce documents in TIFF format, and began producing responsive documents in TIFF format

---

[1] For example, on page 179 of the Klein transcript, Mr. Klein answered "I don't know" one time, but continued on to give a short explanation. Moreover, this response was to the question, "Anything else?", after Mr. Klein had already answered counsel's question.

[2] For example, pages 190–192, 209–211, and 214–215 of Mr. Klein's deposition contain <u>no</u> instance where he answered a question with "I don't know" or "I don't recall." Based on the Court's review, Mr. Klein ably answered all or substantially all of the questions asked in these excerpts.

[3] For example, on page 201 of the Klein transcript, Mr. Klein answered he did not know whether it was EMI or Provide Commerce who drafted a specific term in an agreement between them. This appears to seek highly specific information from a contract negotiation that Mr. Klein cannot be faulted for not knowing. Even if he had engaged in pre-deposition preparation, as Plaintiffs claim he did not, he likely would still not know such minutia.

1  on April 20, 2011. If Plaintiffs object to the TIFF format, it was
2  their burden to notify the Court in a timely manner.
3       In general, if a dispute arises once discovery commences, the
4  Court's Chambers Rules require that any dispute over written
5  discovery be brought to the Court's attention for informal resolu-
6  tion or briefing within 30 days of the service of the response.
7  Chambers Rules at IV(D), IV(F). Accordingly, once Provide Commerce
8  began to produce the TIFF files, Plaintiffs objected, and the
9  parties began to meet and confer to resolve the dispute. However,
10 Plaintiffs did not raise the "TIFF versus native format" issue when
11 they presented numerous other disputes to the Court on June 7, 2011.
12 (See Doc. No. 118.) Plaintiffs first raised the issue on September
13 14, 2011, in the instant motion. The Court acknowledges, but does
14 not accept, Plaintiffs' representation that they relied on Provide
15 Commerce's representation that the database could only be produced
16 in TIFF format.[4] As a result, this dispute is untimely, and the
17 Court denies it on that basis. However, while this basis is itself
18 sufficient, the Court would also deny Plaintiffs' request on the
19 merits.[5]

---

[4] The testimony Plaintiffs cite does not support their assertion that they justifiably relied on Provide Commerce's representation that the database could not be produced in any format other than TIFF. Rather, the testimony merely establishes that the database is searchable in its native format. This is not news; by their very nature, databases are searchable. Plaintiffs' deposition citation does not address TIFF versus native format, much less rebut what they describe as Provide Commerce's "inaccurate representations that the records could only be produced in a static TIFF or pdf format." As a result, Plaintiffs have not established that Provide Commerce misled them and that their delay in bringing the dispute to the Court's attention was justified as a result.

[5] One basis for this is Provide Commerce's representation that it originally produced TIFF files that were rendered searchable after OCR conversion. Such files can readily be loaded into software such as Concordance or Summation for review. As a result, these TIFF files were not static and unusable.

**D.     Extension of Deadlines**

Although Defendants are correct that Plaintiffs' discovery disputes do not warrant a 90 day extension of the Court's scheduling order, the fact remains that there are multiple motions pending before Judge Battaglia. The outcome of those motions may necessitate very limited additional discovery and certainly may impact the class certification motion. Whether those motions have merit are immaterial to the Court's decision here, as that decision is completely within Judge Battaglia's province. In the end, pending motions that may impact the class certification motion constitute extremely high good cause, and the Court has the discretion to amend the scheduling order as the then-existing circumstances of each case require. The Court therefore grants Plaintiffs' request to extend some of the deadlines in the scheduling order so that the pending motions may be resolved. However, as the deadline to conduct fact discovery passed on September 14, 2011, that deadline shall remain unchanged. The Court may grant leave to engage in additional, limited fact discovery if Judge Battaglia's rulings necessitate as much.

IT IS SO ORDERED.

DATED: October 25, 2011

Hon. William V. Gallo
U.S. Magistrate Judge