Bruce W. Steckler (Pro Hac Vice)
Mazin A. Sbaiti (SBN 275089)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Tel:  (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com
msbaiti@baronbudd.com

***Co-Lead Interim Counsel For the Plaintiffs***
**[Additional Counsel Listed On Last Page]**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
## IN SAN DIEGO

|  |  |
|---|---|
| **IN RE: EASYSAVER REWARDS LITIGATION** | § § § § § § § § § § § § § § § § § § | Case No. 09-cv-02094-AJB (WVG)<br><br>**Newly-Added Plaintiffs' Joint Response to Defendants' Motions To Dismiss**<br><br><br>Hearing Date:  April 13, 2012<br>Hearing Time:  1:30 PM<br>Presiding Judge:  J. Battaglia<br>Courtroom:  Room # 12 |

**TO THE JUDGE OF THIS HONORABLE COURT:**

Plaintiffs Jennifer Lawler, John Walter, Daniel Cox, and Christopher Dickey ("Plaintiffs") respectfully submit this response to Defendant Encore Marketing, International's *Motion to Dismiss Fourth Amended Complaint* (Doc.# 227-1, the "EMI Motion") and to Defendant Provide Commerce, Inc.'s *Motion to Dismiss Fourth Amended Complaint* (Doc.# 228-1, the "Provide Motion").  Plaintiffs contemporaneously move this Court to decide the Provide Motion and the EMI Motion as Motions to Dismiss under Rule 56.

# <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** **3**

**POSITION SUMMARY** **5**

**MEMORANDUM OF POINTS AND AUTHORITIES** **6**

I.     THIS COURT HAS ALREADY DECIDED THESE VERY ISSUES: THEREFORE THE MOTIONS SHOULD BE DENIED UNDER THE LAW OF THE CASE DOCTRINE     **6**

II.    THE FACTS: THIS CASE IS ABOUT AN ENROLLMENT PROCESS AND THE "AD" WHERE IT ALL BEGAN     **12**

III.   THIRTY YEARS OF NINTH CIRCUIT PRECEDENT HOLDS THAT THE LACK OF A PROMINENT TRUTHFUL DISCLOSURE IN THE AD IS DECEPTIVE AS A MATTER OF LAW     **18**

IV.    FIFTY YEARS OF BINDING PRECEDENT DICTATES THAT PLAINTIFFS CANNOT BE BOUND BY THE "DISCLOSURES" AS CONTRACT TERMS IN LIGHT OF THE "AD"     **22**

V.     *VISTAPRINT* AND ITS PROGENY ARE OUTLIERS AND REST ON UNSOUND APPLICATION OF PRECEDENT     **26**

VI.    PLAINTIFFS' THEORY OF LIABILITY IS SO PLAUSIBLE THAT THE CONGRESS HAS SINCE MADE IT A FEDERAL CRIME TO ENGAGE IN DEFENDANTS' SCHEME ON THE INTERNET     **32**

VII.   PLAINTIFFS' HAVE PLED SUFFICIENT FACTS TO ASSERT CLAIMS AGAINST EMI UNDER THE UCL AND CLRA ON BEHALF OF NON-CALIFORNIA RESIDENT PLAINTIFFS AND CLASS MEMBERS     **33**

VIII.  THE ROSCA VIOLATIONS ARE ACTIONABLE VIA INCORPORATION     **37**

IX.    MARYLAND LAW INDEED RECOGNIZES AN ACTION FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING AS A SPECIES OF CONTRACT CLAIM     **39**

# TABLE OF AUTHORITIES

**CASES**

*Agostini v. Felton*, 521 U.S. 203, 236 (1997).................................................................................................. 9

*Alaska Airlines v. Stephenson*, 217 F.2d 295, 298 (9th Cir. 1954) ........................................................ 24

*Baxter v. Intelius*, No. 09-1031, 2010 U.S. Dist. LEXIS 104218 (C.D. Cal. Sept. 16, 2010)............ 26, 31

*Berry v. Webloyalty.com, Inc*., 2011 U.S. Dist. LEXIS 39581, (S.D. Cal., Apr. 11, 2011).............. 26, 30

*Cel-Tech Communications, Inc. v. LA Cell. Tel. Co*., 20 Cal.4th 163 (1999)..............................35

*Chandler v. Aero Mayflower Transit Co*., 374 F.2d 129, 132 (4th Cir. 1967),................................. 22, 27

*City of Redondo Beach*, No. 06-55750, 2011 U.S. App. LEXIS 19212, *12-13 (9th Cir.) .................... 14

*Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956) ................................................................23

*Donovan v. RRL Corp*., 27 P.3d 702, 716 (Cal. 2001)........................................................................... 24

*Educational Testing Service v. Hildebrant*, 923 A.2d 34, 41 (Md. 2007). .................................38

*Ferrington v. McAfee, Inc*., 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5, 2010).................... 10, 21

*FTC v. Brown & Williamson Tobacco Corp*., 778 F.2d 35 (D.C. Cir. 1985). ........................... 18, 21, 26

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006), ........................................ 17, 21, 26

*FTC v. Grant Connect LLC,* 2011 U.S. Dist. LEXIS 123792 (D. Nev., Oct. 25, 2011).............. 10, 20, 21

*Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1023 (C.D. Cal. 2009) ...................................... 14

*Harmsen v. Smith*, 693 F.2d 932, 946-947 (9th Cir. 1982)........................................................34

*Hook v. Intelius, Inc*., 2011 U.S. Dist. LEXIS 31879 (M.D. Ga. Mar. 28, 2011) .............................. 26, 31

*Keilholtz v. Lennox Hearth Prods.,* 268 F.R.D. 330, 340 (N.D. Cal. 2010) ...............................36

*Keithly v. Intelius Inc*., 764 F. Supp. 2d 1257, 1267 (W.D. Wash. 2011)............................. 10, 19, 20, 21

*Kyocera Corp. v. Prudential-Bache Trade Servs*., 299 F.3d 769, 783 (9th Cir. 2002)........................... 24

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ...................................23

*In re Easysaver Rewards Litig*., 737 F. Supp.2d 1159 (S.D. Cal. 2010) ......................................... *passim*

*In re EasuSaver Rewards,* 2011 U.S. Dist. LEXIS 85237 (S.D. Cal., Aug. 3, 2011)..................10, 26, 30

*In re Mattel, Inc*., 588 F. Supp. 2d 1111 (C.D. Cal. 2008) .........................................................34

*In re Vistaprint*, 2009 U.S. Dist. LEXIS 77509, *5-6 (S.D. Tex. Aug. 31, 2009) ........................... *passim*

*Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005)...................................................................... 9, 10

*L. Qiy Am Pogue v. Woodford*, 2009 U.S. Dist. LEXIS 75943 (E.D. Cal. Aug. 25, 2009) .................... 11

*Magnetti v. Univ. of Maryland*, 909 A.2d 1101, 1105 (Md. 2005)...............................................38

*Murillo v. City of Woodland*, 2011 U.S. Dist. LEXIS 55899 (E.D. Cal. May 23, 2011)........................ 15

*Nordberg v. Trilegiant Corp*., 445 F.Supp.2d 1082, 1101 (N.D. Cal. 2006) .................................... 10, 21

*Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999), .........................35

*Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984)...................................... 23

*Pacholec v. Home Depot USA, Inc*., 2007 U.S. Dist. LEXIS 99338 (D.N.J., July 24, 2007)............ 27-29

*Phillips Petroleum Corp. v. Shutts*, 472 U.S. 797 (1985) ............................................................. 33

*Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*, 146 F.3d 1088, 1093 (9th Cir. 1997) ................................ 9

*Reid v. Landon*, 166 Cal. App. 2d 476 (Cal. App. 2d Dist. 1958)........................................................ 24

*Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975)............................................ 19

*Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785
    (D. Md. 2002)...............................................................................................................39

*Tarallo-Brennan v. Smith Barney*, 1999 U.S. Dist. LEXIS 6787, (S.D.N.Y., May 10, 1999)............ 27-29

*Tehama-Colusa Auth. v. U.S.DOI*, 2011 U.S. Dist. LEXIS 83497 (E.D. Cal. Jul 29, 2011) .................. 24

*Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618 (N.D. Cal. 2011)............................................. 35

*Washington Mut. Bank, FA v. Superior Court*, 75 Cal. App. 4th 773, 787 (1999)..................... 34

*United States v. Schaff*, 948 F.2d 501, 506 (9th Cir. 1991).................................................... 12

**STATUTES**

Cal. Bus. & Prof. Code § 17500. *See* Cal. Bus. & Prof. Code § 17200.....................................34

Cal. Bus. & Prof. Code § 17500. *See* Cal. Bus. & Prof. Code § 17500.....................................34

Cal. Bus. & Prof. Code § 17500. *See* Cal. Bus. & Prof. Code § 17509.....................................35

Restore Online Shoppers's Confidence Act, Pub. L. No. 111-345, 124 Stat. 3618 (2010) ..............32

**OTHER SOURCES**

Restat 2d of Contracts, § 153 .............................................................................................. 24

Restat 2d of Contracts, § 164 .............................................................................................. 24

## POSITION SUMMARY

Before the Court are a very familiar set of arguments raised by the Defendants in the Motions to Dismiss the Fourth Amended Complaint: these are the same arguments that Defendants *unsuccessfully* raised in the fall of 2009, August 2011, and last December. The Fourth Amended Complaint's allegations are materially identical to those in prior Complaints that were upheld, save for two categories: (1) The individual allegations of each of the newly-added Plaintiffs which this Court ordered were appropriate to intervene into the existing claims; and (2) the allegations raised to conform to the evidence produced by Defendants through discovery thus far. Yet, ***none*** of the Defendants' arguments attack either of these sets of allegations. Defendants' strategy is plainly and tiresomely designed to delay, impose greater litigation costs on Plaintiffs, and worst of all, waste the Court's precious time, energy and resources. This is precisely what the law of the case doctrine was designed to overcome and avoid, and it is the perfect basis to deny the Motions now.

Moreover, substantively, the motions are frivolous because:

1. The key factual allegation is the "Ad" offering a free "Thank You" coupon for $15 Off The Next Proflowers.com purchase," and the disclosures did not come until the next page, where the offer was prominently reiterated, while the disclosures were buried at the bottom corner;

2. Defendants' own documents prove that they knew this was going to be, and ended up being, deceptive to customers who enrolled unwittingly in droves;

3. Thirty years of Ninth Circuit precedent holds that it is actionable deception to prominently advertise an untrue benefit *even* if a "truthful disclosure" is made on the face of the ad; and

4. Fifty years of binding precedent holds that one cannot be bound to the terms of a contract if she "signed" it reasonably believing it was something else entirely.

The rest of EMI's throwaway arguments—briefed on less than two pages apiece—fail primarily because the cases EMI cites neither say what EMI claims nor support EMI's legal conclusions. For these reasons, Plaintiffs respectfully request that the Motions to Dismiss be denied in their entireties.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. THIS COURT HAS ALREADY DECIDED THESE VERY ISSUES; THEREFORE THE MOTIONS SHOULD BE SUMMARILY DENIED UNDER THE LAW OF THE CASE DOCTRINE

Defendants' Motions each turns on the premise that because there were disclosures on the "enrollment page" on which each Plaintiff landed, *see* Provide Motion at p. 5, 9-15; EMI Motion at 11-17, that those disclosures were legally sufficient, and that, therefore, they had actual or constructive notice as a matter of law of the terms of the EasySaver Rewards Program. *See generally*, Docket Nos. 227-1 and 228-2. We have been down this road three times already, and Defendants lost each time.

### A. THIS COURT HAS ALREADY UPHELD PLAINTIFFS' LEGAL THEORY AND CHALLENGED PLEADINGS IN ITS PRIOR RULINGS

The primary issue presented by the Defendants in the first motion to dismiss briefing, was that a plaintiff "could not have been deceived [by the enrollment process] because by clicking on the acceptance button, [plaintiff] is bound by the statement that she 'read and accepted' the Offer Details." *See In re Easysaver Rewards Litig.*, 737 F. Supp.2d 1159, n.9 (S.D. Cal. 2010) That is the exact issue Defendants seek dismissal on today.

Although this Court did not address the particular screenshots submitted by the Defendants, this Court nonetheless determined that the pleadings were sufficient to state the claims they purported to support *despite* declining to take judicial notice of the screenshots. *See In re Easysaver*, 737 F.Supp.2d at 1170 (noting that "the Court was able to decide the motions to dismiss without reliance on" passages that implicated the screenshots).

This Court observed that Plaintiffs' Complaint expressly set forth that EMI's enrollment page included the very disclosure that both Defendants ask this Court to acknowledge. *Id.* at 1165 (citing *Amended Complaint* at ¶ 21). The Fourth Amended Complaint likewise recounts that disclosure. *See Fourth Amended Complaint*, Docket No. 221, at pp. 8, ¶ 26. This Court furthermore acknowledged that EMI's cited language was "identical" to the language quoted in the complaint, thereby obviating the need for recognition of the screenshots. *In re Easysaver*, 737

F.Supp.2d at at 1169 (citing EMI Mot. to Strike at 2-3). And, perhaps most significantly, this Court recognized that "Plaintiffs have not hidden the weakness in their case. The Complaint reveals that the 'offer details' disclosed that clicking a green accept button would result in an activation fee charged to the financial account the customer used to purchase flowers." *Id.*

In reaching its conclusion to deny the motions to dismiss, this Court took into consideration the allegations that Deanna Hunt "'did not even realize that she had been redirected away from ProFlowers' website to Encore's website due to the deceptive nature of EasySaver Rewards marketing scheme.' *First Consolidated Class Action Complaint* ¶¶ 28, 31. Rather, she believed the information was necessary to complete her ProFlowers transaction." *See In re Easysaver*, 737 F.Supp.2d at 1164. This Court dismissed Defendants' challenges to Plaintiffs' claims on the grounds that:

> The reasonableness of a particular customer's expectations about shopping on the internet and dealing with pop-up windows offering a thank you gift cannot be determined from the face of this Complaint. . . . [T]he Court accepts as true, and as plausible, the Plaintiffs' allegations that they were deceived into authorizing separate charges to their debit cards simply by typing in their e-mail address for a complimentary gift.

*Id.* at 1172. The Court also found that even if a plaintiff had entered her email address and zip code on the Offer Page, that left open the question of whether that created an enforceable contract or agreement with EMI in the first place, despite the presence of the "express terms of the offer" on that page. *Id.* at 1174. The Court, moreover, noted that:

> EMI argues, as a matter of law, that [plaintiff] could not have been deceived because by clicking the acceptance button, she is bound by the statement that she 'read and accepted' the Offer Details. That text is not in the Complaint, ***but even if the Court had not stricken the exhibit***, the Court would deny the Rule 12(b)(6) motion. Hunt's alleged confusion is plausible.

*Id.* at n.9 (emphasis added). This Court furthermore found the Rule 9(b) challenges meritless. *Id.* at 1775-78. The Court enumerated the allegations in the Complaint that satisfied 9(b). *Id.* at 1776-77. The Court noted that, contrary to Defendants' arguments that there were "disclosures" that should have apprised an enrollee of the terms of the membership program:

> The Court is not persuaded this additional language would dispel the confusion Plaintiffs claim they experienced when the pop-up window appeared on ProFlowers' webpage. For the purpose of this motion, the Court accepts the truth of the allegations that customers thought they were dealing with ProFlowers as they completed their purchase of flowers and offered a coupon on their next purchase.[1]

*Id.* at 1777, n.10.

EMI cannot seriously contend that Rule 9(b) supports dismissal. The Fourth Amendment Complaint specifically attributes misstatements and omissions in the fraud count to EMI. *See, e.g.,* Fourth Amended Complaint, ¶¶ 100-105. EMI thus cannot argue that Plaintiffs have not specifically named it to the misrepresentations in the Ads alleged to have been made by Provide Commerce. Similarly, Provide Commerce's claims that it cannot be liable for EMI's breaches of contract, since it was not an express party to those contracts with consumers, or for EMI's other wrongful acts, were rightly rejected by this Court. *In re EasySaver Rewards*, 737 F.Supp.2d at 1173 ("As to Provide's related argument that it cannot be held accountable for any breach by EMI of the EasySaver Rewards program, the Complaint contains sufficient allegations to defeat the Rule 12(b)(6) motion.").

This Court also noted the close identity maintained by both Defendants in rejecting EMI's contention that it could not be held liable for EMI's misdeeds. *Id.* And whatever the new allegations were added to the Fourth Amended Complaint they were all set forth in Plaintiffs' *Motion to Amend To Conform to the Evidence* included in their Omnibus Filings, October 6, 2010 Docket No. 192 (filed under seal) ("Omnibus Filing") at pp. 23-24, *and in* Exhibit A thereto, *Proposed Fourth Amended Consolidated Class Action Complaint*. There, Plaintiffs submitted Defendants' own evidence to substantiate the allegations. This included evidence that EMI and Provide were liable for each other's misstatements and omissions because, as EMI's

---

[1] Indeed, this allegation is amply supported by the evidence: According to Steven Klein, EMI's president and corporate representative, no matter who was enrolled, they all had to click on the "Ad," what he called the "slider," first. *See* Sbaiti Declaration in Support of Omnibus Filings, filed under seal, October 6, 2011, at Exhibit 2 REDACTED

].

own senior executives testified under oath, the EMI/Proflowers.com project was "highly collaborative" as between the two companies, they designed the Ads and landing pages together, used metrics together, tracked and maintained customer complaints together, and optimized for profitability together. *Compare Fourth Amended Complaint*, Docket No. 221, at ¶¶ 2, 20-22, 25, 29, 72, 86, 89, 100, 127, 134, 141, 160, 163, 169 *with* Omnibus Filings, at pp. 23-24, *and record citations therein; and with* Exhibit A thereto, *Proposed Fourth Amended Consolidated Class Action Complaint.*

Defendants also should not get any further with their position that new CLRA notices should have been filed, than they did before. Plaintiffs served notice on defendants on September 24, 2009. *See* Fourth Amended Complaint ¶ 137. This Court already rejected the argument that the CLRA claims had to be dismissed on the grounds of a failure to send sufficient notice on behalf of subsequently-added plaintiffs. *See In re Easysaver Rewards Litig.*, 737 F. Supp. 2d at 1178-79 ("The purpose of the rule has been satisfied. When this putative class action commenced, Provide was notified that Sledge was complaining on her own behalf and all others similarly situated."). The Court observed that the purpose of the rule is to "give defendants 'sufficient notice of alleged defects to permit appropriate corrections.'" *Id.* at 1179 (citing *Stickrath*, 527 F. Supp. 2d at 1001-02). The court held that that purpose was satisfied in this case. This case has been going on since 2009, fifteen depositions have been taken in preparation for class certification—how can either Defendant claim not to have "sufficient notice" under the CLRA of the bases for the CLRA claims? EMI fails to cite any case on point where, as here, there were additional plaintiffs added to plaintiffs who were admitted to have satisfied the requirement.

## B. THE MOTIONS ARE INVALID MOTIONS FOR RECONSIDERATION

As discussed at length above, the "issue" of whether the disclosures vitiate Plaintiffs' claims of misrepresentation and deception were resolved against Defendants, as was the sufficiency of the pleadings under Rule 9(b). *See In re Easysaver*, 737 F.Supp.2d at 1170-72. The allegations made by Hunt and the New Plaintiffs are *identical*; the issues raised in the motions to dismiss against Hunt and against the New Plaintiffs are *identical;* even the principal cases

advanced by Defendants are *identical*. Therefore, whether the Court takes judicial notice of the Landing Pages is irrelevant because the issues—the allegations and the legal issues—have not changed since this Court rendered its decision in 2010.

The purpose of the law of the case doctrine is to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18B Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 4478, at 637-38. Thus, a court must not reopen issues decided in earlier stages of the same litigation without a showing of "good cause." *See Agostini v. Felton*, 521 U.S. 203, 236 (1997); *Rebel Oil Co., Inc. v. Atlantic Richfield, Co*., 146 F.3d 1088, 1093 (9th Cir. 1997).

The party seeking reconsideration has the burden of demonstrating that: (1) the earlier decision was "clearly erroneous;" (2) an "intervening change in the law" has since been rendered; (3) newly discovered facts materially alter the grounds for the prior decision; (4) other changed circumstances justify revisiting the prior decision; or (5) altering the prior decision is necessary to avoid manifest injustice. *See Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005).

None of the criteria for reconsidering this Court's prior rulings are present here.

**_First_**, not only do Defendants fail to argue that the Court's denial of their earlier motion to dismiss was clearly erroneous, EMI's and Provide Commerce's motions are conspicuously *silent* on the previous decision. Moreover, several other cases accord with Plaintiffs' legal theory. *See Keithly v. Intelius Inc*., 764 F. Supp. 2d 1257, 1267 (W.D. Wash. 2011); *Nordberg v. Trilegiant Corp*., 445 F.Supp.2d 1082, 1101 (N.D. Cal. 2006); *Ferrington v. McAfee, Inc*., No.: 10-CV-01455, 2010 U.S. Dist. LEXIS 106600 *17-18 (N.D. Cal. Oct. 5, 2010). More recently, the District of Nevada also found that disclosures on the second page to which customers were directed that described the club membership were insufficient as a matter of law, and *denied summary judgment. See FTC v. Grant Connect LLC,* 2:09-cv-01349, 2011 U.S. Dist. LEXIS 123792, *50-51 (D. Nev., Oct. 25, 2011).

**_Second_**. Defendants identify no "intervening change in the law." An intervening change in the law means that binding precedent was set. *Ingle*, 408 F.3d at 595. Defendants' Motions attempt

to steer this Court to several decisions from other district courts who were reviewing the particular allegations and pleadings before them. None of these are binding precedent, nor even persuasive precedent, as this Court has already noted. *See In re EasySaver Rewards*, 2011 U.S. Dist. LEXIS 85237 * 8 (S.D. Cal., Aug. 3, 2011) (Battaglia, J.) (finding that decision in *Webloyalty* or related appeal irrelevant to this case and not grounds to stay); *accord Ingle*, 408 F.3d at 595 (finding that opinions from other district courts are not binding). Moreover, all of the cases Defendants relied on were predicated on the *Vistaprint* decision, which this Court rejected as precedent. *See In re EasySaver,* 737 F. Supp. 2d at 1171-72 (Anello, J.) (rejecting application of *Vistaprint* decision to instant case). Therefore, none of the cases raised in the Motions count as "intervening changes in the law."

    ***Third****,* there are no materially different facts or allegations being challenged. A review of the prior pleadings reveals that, except for the 28-day vs. 'monthly' charge allegations and legal theories, none of the substantive allegations regarding the challenged claims or their grounds changed between the First Amended Consolidated Class Action Complaint and the Fourth Amended Consolidated Class Action Complaint. *See Fourth Amended Complaint,* ¶¶ 72, 81, 104, 163, 179. The fact that an amended complaint was filed, even on behalf of additional Plaintiffs, in and of itself does not warrant repetitive motions to dismiss where, here, all of the *issues* sought to be litigated are the same. *See L. Qiy Am Pogue v. Woodford*, No. 05-1873, 2009 U.S. Dist. LEXIS 75943 *7 (E.D. Cal. Aug. 25, 2009) (holding law of the case doctrine precluded defendants moving to dismiss the same allegations in new amended complaint that existed in previous complaint); *United States v. Schaff*, 948 F.2d 501, 506 (9th Cir. 1991) (holding that defendant precluded from seeking dismissal on legal theory that had previously been litigated and lost by codefendant). Notably, Defendants have not moved to dismiss the allegation or legal theory that, because Defendants charged customers every 28 days as opposed to "monthly," or every 30 or 31 days, they are liable for the unauthorized charges.

    ***Fourth***, Defendants identify no other "changed circumstances" or "manifest injustice" that would compel this Court to revisit its prior ruling.

1    Therefore, this Court has an easy decision and can stop reading here if it chose to and

2    simply deny the Motions. This Court has already decided all of the legal issues raised in

3    Defendants' twin motions, and agreed with Plaintiffs that their legal theory was valid, and that the

4    complaint satisfied Rule 9(b).

5    **II.    THE FACTS: THIS CASE IS ABOUT THE ENROLLMENT PROCESS**

6    **AND THE "AD" WHERE IT ALL BEGAN**

7    The gravamen of Plaintiffs Fourth Amended Complaint is the allegation that the initial

8    pop-up advertisement (the "Ad" or the "slider") is the key, first domino in the enrollment

9    process, which culminated in people's enrollment without their knowledge.

10    **A.  THE "AD" IS THE CRUX OF THE ENROLLMENT PROCESS**

11    Plaintiffs' Fourth Amended Complaint—like every other complaint filed before it,

12    unambiguously  alleges that the focal issue was the transition from completing the purchase on

13    Proflowers.com (or a sister website), to somehow signing up for a completely unrelated

14    "membership club" for $14.95 fee:

15           [W]hen a customer completed a transaction on a Provide-Commerce site,
             Provide-Commerce seemingly offered a coupon, gift code, or other savings
16           gifts to its customers as a "Thank You" for shopping at its store.  When the
             customer tried to obtain their "gifts," they were directed to a webpage
17           operated by Encore. Customers are then asked to provide their email address
             and zip code and click a large green "Accept" button in the center of the
18           page to claim their coupon or gift code.

19

20    *See Fourth Amended Complaint*, at ¶¶ 2,3, 6, 25, 28, 33-36, 44, 47. This is a critical feature of the

21    claims against the Defendants. Meanwhile, neither Defendant challenges the fact that the entire

22    enrollment process begins when a customer clicks on the "Ad" or that *every* customer who became

23    enrolled necessarily clicked on an Ad, and they all looked relatively the same - something like

24    this: [2]

25

26           [2] Plaintiffs request that if the Court takes judicial notice of the screenshots offered by Defendants of the
       enrollment page(s), then it should also take notice of this screenshot. It is Pro-Rom_0071778, which was produced by
27     Defendant Provide Commerce, and offered as Exhibit 4 to Gina Bailey at her deposition. A true and correct copy is
       attached as Exhibit B to Sbaiti Decl.  Each Plaintiff has testified that this appears to be or precisely similar to what they
       remembered clicking on. *See* Appendix A, Affidavits of New Plaintiffs.

28



Defendants *concede* the veracity of Plaintiffs' claim and even verify the bases we cite. Hannah Blum, Provide Commerce's senior executive on the EasySaver project, provided an overview of the process consistent with Plaintiffs' explanation. *See* Decl. of Hannah Blum ISI of Provide Motion, Docket No. 228-4, at p. 1-2. Provide Commerce also listed several iterations of the Ad in its Request for Judicial Notice, Docket No. 228-2, Exs. 1 through 4. Notably, these confirm, not negate, Plaintiffs' thesis.

And as alleged in the Fourth Amended Complaint and shown by Defendants' own documents submitted with their motions, the "Ad" (a) has the ProFlowers logo; (b) the same color scheme and font as the Proflowers website behind it; and (c) even has the same picture from the website. *See* Provide Commerce Request for Judicial Notice, Doc. 228-2, Exs. 1-3. The "Ad" clearly and prominently states that it is a "Thank You" from ProFlowers for a "$15 Off Your Next Purchase At ProFlowers.com." *Id.* One must click "Continue" to "Claim Your $15 Gift Code." *Id.* The obscure "Rewards Partner" hyperlink is barely noticeable, and says nothing of the ensuing transaction or its face, that would alert someone to the need to click on it.

But, the "Ad" omits key, material facts related to the EasySaver Rewards program, and on its face says absolutely nothing about:

- EasySaver Rewards;
- That the coupon offer is being offered for the purpose of inducing enrollment into EasySaver Rewards;
- That the offer is *conditioned* on signing up for EasySaver Rewards;
- That EasySaver Rewards costs $14.95 per month;
- What benefits EasySaver Rewards offers the customer;
- That EasySaver does not even belong to, and is not run by, Proflowers.com;
- That claiming the discount coupon triggers a $1.95 fee automatically;
- That EasySaver Rewards' discounts can only be claimed through a time-consuming process and can take weeks.

On its face the Ad is, well, an *Ad.* It says "Click Here To Claim Your $15 Gift Code." It is only *after* someone saw the "Ad," read it, accepted the discount offer and clicked on "Continue" that one was even taken to the enrollment page where the so-called "disclosures" were potentially viewable. *See id.;* Blum Decl. at 1.

Each of the New Plaintiffs was led to believe he or she was being offered $15 off the next Proflowers.com purchase by clicking on the "Ad." *See Fourth Amended Complaint*, at ¶¶ 2,3, 6, 25, 28, 33-36, 44, 47. None had any way of knowing that they would be directed to the enrollment page, that they would be asked to sign up for a membership club, that the club would be called "EasySaver Rewards," or that it would cost $14.95 a month until they cancelled. *Id.*

In fact, it was not until *after* they clicked on the Ad that a consumer would be presented with a page initially telling them to enter their email and zip code to claim their offer code *See id.;* Blum Decl. at 1. . At that point, if they put in their email address and zip code to claim their "$15 Off Gift Code," EMI and Provide Commerce would "pass" their account data for enrollment, whether the customer wanted that or not. *See, e.g., Fourth Amended Complaint* ¶¶ 1, 3, 51. This was called "data pass."

Defendants' Motions to Dismiss are bereft of even a salutary discussion of why these allegations are insufficient.

**B. Defendants' Own Evidence Shows That The Enrollment Process Was Deceptive, And They Knew It**

Defendants' Motions suggest that not only do the disclosures rebut any claim of deception as a matter of law, but that they could not legally be deceptive. But the allegations are otherwise, and Defendants' own documents and testimony disprove that notion entirely—which this Court can and should entertain as a part and parcel of deciding these Motions. *See City of Redondo Beach*, No. 06-55750, 2011 U.S. App. LEXIS 19212, *12-13 (9th Cir. 2011) (holding that evidence submitted to rebut motion to dismiss should be deemed incorporated into complaint via constructive amendment); *Grisham v. Philip Morris, Inc.*, 670 F.Supp.2d 1014, 1023 (C.D. Cal. 2009) (treating evidence raised in opposition to motion to dismiss as constructive amendment because "court will not dismiss the action because of plaintiff's failure to formalistically conform her pleadings to later discovered evidence"); *See also Murillo v. City of Woodland*, 2011 U.S. Dist. LEXIS 55899, *68-69 (E.D. Cal., May 23, 2011) (same). Therefore, this Court can and should consider the following evidence in denying Defendants' Motions:

No matter who was enrolled, *everyone* who enrolled had to click on the Ad or the Slider. But the Ad or slider said absolutely *nothing* about EasySaver Rewards, $14.95 per month fees, or any membership. *See Sbaiti Declaration ISO Omnibus Filings*, filed under seal, October 6, 2011, ("Sbaiti Decl.")[3] at Ex. 2 [Klein Tr. at 299:23-301:5].

In REDACTED

REDACTED

at Ex. 2 [Klein Tr. at 299:23-301:5].

---

[3] The documents cited herein were previously filed under seal with Plaintiffs' Omnibus Filings on October 6, 2011. In order to conserve space, hassle of re-filing under seal, we have referred to the Declaration and Exhibits thereto as "Sbaiti Decl." in this filing.

At its inception, EMI recommended data pass knowing that it would result in █████████ ██████████████████████████████ but both Defendants pursued it anyway because it ████████ ████████████████████████

█████████████ REDACTED ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

*See* Sbaiti Decl. at Ex. 6 [Bransfield Tr., Ex. 2, 8/16/06 Email and Presentation (Pro-Rom-0027743 et seq.,) at pp. 18-21]. Despite that, ████████████████████████████████████████ ███████████████████████████████████████. Yet, ████████████████████████████ ███████████████ ████ ████████████████████████████████████ ██████████████████████████, and did not require customers to input their payment information. *See* Sbaiti Decl. at Ex. 2 [Bransfield Tr., Ex. 2 at pp. 18-20].

Stephen Klein, EMI's President, testified that ████████████████████ ████████████████████████████████████████. *See* Sbaiti Decl. at Ex. 2 [Klein Tr. 236:14-19 (████████████████████████████████████ ████████████████████████████████████████ ███████████)]. In other words, ████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████

One of Provide Commerce's customer service representatives assigned to handle EasySaver complaints, noted that:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

Sbaiti Decl. at Ex. 3 [Blum Tr. at 109:18 to 110:11, and Ex. 9 thereto (PRO-ROM-0028223-0028230)*10/18/2007 E-mail from J.C. Boissy to Hannah Blum*].

Another senior customer service representative likewise was disturbed by the number of 

(emphasis added). Sbaiti Decl. at Ex. 4 [Sills Tr. at 207:3 to 207:5; Ex. 9 thereto, (PRO-ROM-0002625) 10/18/2007 E-mail from Marc Schneider to Hannah Blum]. In reaction to this phenomenon, Hannah Blum, Provide Commerce's senior executive on the EMI project, rather than fighting to make sure people were not being deceived into enrolling, opined that:



Sbaiti Decl. at Ex. 3 [Blum Tr.at 95:6-95:17, Ex, 7 thereto, (PRO-ROM-0056668-056681) *4/20/07 E-mail from Hannah Blum to Mark Sottosanti*].

Indeed, neither EMI nor Provide Commerce did what was right for their customers. If the EasySaver Rewards program was so beneficial, then why did they not simply advertise it on the

"Ad" or "Slider"? *Cf. Keithly*, 764 F. Supp. 2d 1257, 1267 n.10 (noting that failure to advertise membership club's value and benefits supported allegation that scheme was intentionally deceptive and misleading).

Accordingly, Defendants' own documents decimate their primary dismissal grounds.

### III. THIRTY YEARS OF NINTH CIRCUIT PRECEDENT HOLDS THAT THE LACK OF PROMINENT TRUTHFUL DISCLOSURES IN THE AD IS DECEPTIVE AS A MATTER OF LAW

Thirty years of prominent circuit court precedent—one in particular was written by Antonin Scalia and Robert Bork—stand for the proposition that an advertisement that states a claim or an offer is deceptive if the terms that materially alter or qualify the advertisement are not set forth *as conspicuously as the primary claim or offer*.

#### *FTC v. Cyberspace*

In *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006), the Ninth Circuit addressed whether the FTC had stated a claim for unfair and deceptive marketing practices under section 5 of the FTCA. The defendants had mailed $3.50 checks accompanying advertisements for web service; and when someone cashed the check, it triggered a recurring monthly fee of $19.95 or even $29.95 per month on their telephone bill. *Id.* at 1198-99. The monthly fee was disclosed on the back of the $3.50 check, written on paper in each plaintiff's hands, and the defendant claimed that the disclosures gave binding notice of the terms as a matter of law. *Id.*

The Ninth Circuit found that the $3.50 check discount offer was prominently advertised to be a refund or rebate, but that nothing on the face of it would have alerted consumers that they needed to read the *back* of the coupon to determine whether they were going to be enrolled in a monthly-fee club. *Id.* at 1200-01. The court rejected defendants' contention that the disclosures sanitized the offer completely. It held that even if "a solicitation also contains truthful disclosures," it could still be misleading if "the net impression it creates" is misleading. *See id.* at 1200.

The circuit court found that the net effect was deceptive because:

> The front of the check and invoice lacked any indication that by cashing the check, the consumer was contracting to pay a monthly fee.
>
> …
>
> [T]he misleading impression the solicitation created – that the check was merely a refund or rebate – clearly made it more likely that consumers would deposit the check and thereby obligate themselves to pay a monthly charge for internet service.

*Id.* at 1201. In arriving at that conclusion, the Court analyzed multiple cases likewise finding that where the more prominently displayed claim or offer was misleading, less prominently displayed disclosures could not be said to cure the deception. *Id.* at 1200 (collecting cases). The Court found the disclosures ineffectual if not made part of the prominent message because "under the circumstances, consumers were unlikely to read the fine print[.]" *Id.*

### *FTC v. Brown & Williamson Tobacco Corp*.

One case relied upon by the Ninth Circuit in *Cyberspace* is the D.C. Circuit's decision in *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985). There, Judges Robert Bork, Antonin Scalia, and Harry Edwards unanimously affirmed the district court's finding that a tobacco advertisement for healthy cigarettes was deceptive even though the product feature advertised—the amount of tar in the cigarette—was clarified in a truthful disclaimer on the *face* of the advertisement, but which was in small print in one corner of the page. *Id.* at 41-43.

The D.C. court asked whether, given the advertised claim's prominence, what disclosure could even hypothetically "eliminate the deception," and held that "no disclaimer can have that effect" because the primary claim—the absence of more than 1 mg of tar—"appears more visibly than the legend[.]" *Id.* The Court agreed with the district court that placing the disclaimer in the corner of the page, when the primary claim was elsewhere rendered it "inconspicuous" and therefore, unlikely to be read. *Id.*

### *Resort Car Rental Sys., Inc. v. FTC*

In 1975, the Ninth Circuit held that "[a]dvertising capable of being interpreted in a misleading way should be construed *against* the advertiser." *Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975). There, the circuit court affirmed the finding of a deceptive advertising by the Federal Trade Commission related to the slogan "Dollar-a-Day" car rental which actually cost more than $1 per day. The court noted that the determination of what is deceptive requires "inference and pragmatic judgment" and could not be determined as a matter of law. *Id.* at 963 (citation omitted). It held that even though the defendant clarified the price once a customer made a reservation, that was insufficient to cure the deceptive nature of the slogan as a matter of law as there was no reason to believe that that was sufficient. *Id.*

### *Other District Court Decisions Have Been Fully Consistent*

Recent district court cases are in absolute accord with these courts' and Plaintiffs' position. For example, in *Keithly v. Intelius*, 764 F. Supp. 2d 1257, 1267 (W.D. Wash. 2011), the court addressed a motion to dismiss claims of deception where, as here, there was an initial advertised offer, the enrollment in which triggered a monthly fee for a membership club. *Id.* The court astutely found it telling that the Defendants claimed their membership club was "valuable" yet never advertised the benefits of the club:

> This particular technique is telling. ***Rather than touting the benefits*** of Identity Protect and making an effort to convince the consumer that he wants, if not needs, this service, ***Intelius uses the bare promise of a price reduction to slip Identity Protect into the consumer's cart***. Had Intelius been attempting to identify customers who would knowingly choose to purchase Identity Protect, the solicitation would have been formatted very differently to highlight the service that was being offered and ensure a knowing selection of the service. Instead, Intelius developed a multi-step system through which there was a significant likelihood that consumers, having unknowingly added Identity Protect to their carts, would not take the necessary steps to remove it, resulting in the purchase of an unwanted item. *Id.* at n.10 (emphasis added).

The district court denied the motions to dismiss the legal theory.

More recently, in *FTC v. Grant Connect LLC,* 2:09-cv-01349, 2011 U.S. Dist. LEXIS 123792 (D. Nev. Oct. 25, 2011), the Nevada District Court found that a similar online club membership was deceptive as a matter of law. *Id.* at 50-52. Defendants advertised their online shopping club, like EasySaver, via a banner ads that induced customers to click; but the ads said "nothing about an online shopping store" which was only disclosed "in compact print at the bottom of the [landing] page, where the consumer has to scroll down to see them." *Id.* at 51.

The court found that it was deceptive as a matter of law because (1) "The consumer is likely not looking for newly added terms and conditions on the [landing page]"; (2) "The consumer is not permitted to view the online store before submitting payment information;" (3) "The high number of cancellations [94%] refunds, and chargebacks suggest the fact  that consumers were deceived about what they were ordering"; and (4) because of the "exceptionally low orders from the store in comparison to the number of people who signed up for the offer." *Id.* at 52-54.  *See also Nordberg v. Trilegiant Corp.*, 445 F. Supp.2d 1082, 1101 (N.D. Cal. 2006); *Ferrington v. McAfee, Inc.*, No.: 10-CV-01455, 2010 U.S. Dist. LEXIS 106600 *17-18 (N.D. Cal. Oct. 5, 2010) (describing deceptive conduct stemming from enrollment process, and placement and design of the ads and web pages involved).

Accordingly, under *Cyberspace* and *Brown*, *Resort Car Rental System*, *Keithly, Grant Connect,* and the others*,* the Ad is the crucial piece, and it is the actionable misrepresentation. The later disclosures that by accepting the coupon, one was in fact signing up for a $14.95 monthly membership fee are more than mere "terms of the transaction." They create an ***entirely different transaction*** than the one promoted on the "Ad." The consumer goes from a free "$15 Off Thank You Discount" to a "$14.95 monthly fee" for an unknown membership club.

Tellingly, Defendants do not, indeed cannot, explain how the foregoing allegations do not set forth a plausible claim for deception or fraud. As discussed below, none of the decisions Defendants rely on, *Vistaprint*, *Webloyalty*, *Baxter, etc.,*  even attempts to discuss the common-sense phenomena articulated in the foregoing decisions, or the reality that there is a consumer behavior upon which Defendants' seize in structuring their website and enrollment programs.

## IV. OVER FIFTY YEARS OF BINDING PRECEDENT DICTATES THAT PLAINTIFFS CANNOT BE BOUND TO THE "DISCLOSURES" AS CONTRACT TERMS IN LIGHT OF THE "AD"

Defendants' defenses turn on characterizing this case as one of "contract" as opposed to mere advertising. In other words, that a "contract" was created when Plaintiffs inputted their email and zip code and clicked "submit" on the landing page; that the terms of that contract were set forth on the landing page, and included the authorization for the EasySaver Rewards membership and fees; and that the failure to read the terms is a plaintiff's fault, because he is charged with reading the terms of every contract he signs.

### A. DEFENDANTS' THEORY THAT THE CHARGES WERE AUTHORIZED IN A CONTRACT IS REBUTTED BY A HALF-CENTURY OF PRECEDENT

Plaintiffs have repeatedly alleged and represented that because of the "Ad," no-one who lands on the "landing page" knows that they are about to enroll in an online membership club for $14.95 a month. The "Ad" nowhere says anything about that, nor even that there is a contract of any kind forthcoming. The person who clicks on the Ad is only thinking precisely what the Ad says: by Clicking "Continue" they are claiming their $15 gift code."

***Courts Have Held That Where Material Terms Purport To Embody a Previously Agreed Upon Transaction, the Misled Party Is Not Bound.*** A long line of well-established precedent that holds that when one putatively signs a document, even with all the terms are written therein, the document is unenforceable as a contract if the nature of the transaction was misrepresented or obscured to the putative signer:

***Chandler v. Aero Mayflower Transit Co.***

In *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 132 (4th Cir. 1967), plaintiff brought an action to recover damages for household property destroyed by fire while defendant was shipping them on plaintiffs' behalf. The case reached trial, but the defendant requested a directed verdict, which the district court granted, on the grounds that the contract contained a liquidated damages provision of "30 cents per pound." The Fourth Circuit reversed, holding that the provision in the agreement was not enforceable because plaintiff had not read it; when he was

originally asked to sign the agreement he was not told that he was signing new contract terms, he thought he was signing packing receipts. *Id.* at 136.

The circuit court held that there could be no contract because there had not been a *meeting of the minds*, and that:

> Ordinarily, one who signs a contract cannot avoid it on the ground that he did not read it or that he took someone else's word as to what it contained. But an agreement signed without negligence under the belief that it is an instrument of a different character is void, and **the failure to read an instrument is not negligence per se but must be considered in light of all surrounding facts and circumstances**.
>
> …
>
> If one's signature is obtained by trick or artifice, unquestionably the alleged contract may be invalidated.

*Id.* (internal citations omitted) (emphasis added). The circuit court invoked Professor Williston's recognition that one could be mistakenly sign a "contract or legally operative document" under the impression that it was actually something else; or that one could sign a contract believing it was a contract for an entirely different transaction. *Id.* (citing 1 Williston, Contracts § 95A, at 351-52 (3d ed. 1957)).

As Professor Williston rightly observed, one who signs a document not realizing it is a contract would not reasonably "be expected to exercise that caution which he would if he knew that he was signing what purported to be a legal document;" and that one who signs a contract without reading it is typically induced by some kind of "fraud." *Id.* He concluded that "the situation is possible without actual fraud, and if it occurs whether induced by fraud, or without it, no contract is formed." *Id.*

The Fourth Circuit in *Chandler* thus concluded that presence of written terms in the agreement was insufficient to dispose of the plaintiff's claim as a matter of law because it was a question of *fact* whether the plaintiff "knew at the time he signed the papers … that they were in fact contractual documents" and if so, whether "his failure to read them and ascertain their true nature [was] excusable under all of the circumstances[.] *Id.* at 136. *See cf. In re Apple Computer*

*Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) (holding that material omissions are not "rendered immaterial by the fact that the omitted facts are otherwise available to the public"); *Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956) (observing that the "availability elsewhere of truthful information cannot excuse untruths or misleading omissions").

### *Operating Engineers Pension Trust v. Gilliam*

The Ninth Circuit similarly held in *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984), that a defendant who signed what he was told were "standard forms" he had to fill out to get work, but which turned out to be a union agreement was not bound by the terms in those agreements to pay union benefit contributions, *even though the terms were right there on the pages above his signature*. *Id.* at 1504-05. The Court concluded that the defendant "reasonably and justifiably thought the documents involved only an application for union membership and his signing of the short-term agreement did not create a binding collective bargaining agreement." *Id.* This Court reasoned that:

> We recognize that ***a party who signs a written agreement generally is bound by its terms***, even though he neither reads it nor considers the legal consequences of signing it. This proposition, however, is qualified by the principle that ***he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms*** of the document. For example, ***one who signs a promissory note reasonably believing he only gave his autograph is not liable on the note***.

*Id.* at 1504 (bold added). The court further held that defendant continued to rely on the prior misrepresentation of what the documents were, thus the fact that he was mailed copies of the contracts likewise absolved him from opening and reading them. *Id.* at n.2.

### *Reid v. Landon*

Courts have found that where the material terms of a writing that purported to embody a previously agreed upon transaction, the misled party is not bound by those different terms. For example, in *Reid v. Landon*, 166 Cal. App. 2d 476 (Cal. App. 2d Dist. 1958), the court of appeal found that a defendant party to a written agreement would not be held to certain terms contained

therein, where defendant signed the agreement without reading it "believing plaintiffs' representations that the document embodied the terms originally agreed upon." *Id.* at 484. It mattered not that the agreement was in writing, printed on paper, and could have been read by defendant when it was presented to her—under the circumstances, she was justified in believing that it was what plaintiffs had purported it to be.

**B.** **THE RESTATEMENT 2D OF CONTRACTS ALSO REBUTS DEFENDANTS' POSITION**

The principle espoused by Plaintiffs here has been encapsulated by the Restatement (Second) of Contracts.[4] The Restatement Section 153 provides that a party who signs a written agreement that purports to embody the parties' previously negotiated transaction, is not bound by a signed writing if it materially alters the contemplated transaction whether by addition or omission. *See* Restat. 2d of Contracts, § 153 ("Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or (b) the other party had reason to know of the mistake or his fault caused the mistake."). This Section was adopted to avoid the unfair and unconscionable result "where the other party actually knew or had reason to know of the mistake at the time the contract was made or where his fault caused the mistake." *Id.* cmt. a.

The Restatement Section 166 further dictates that a misrepresentation as to a contemplated transaction voids a written agreement later signed by one of the parties, if that party can show they were misled as to the nature or material terms of the transaction. *See* Restat 2d of Contracts, § 166. Section 166 of Restatement was adopted to ensure that a verbal offer and acceptance is enforceable, even if was reduced to writing if the latter materially alters the former. *See id.*, cmt. a,

---

[4] The Second Restatement of Contracts has been widely cited as an authoritative source of common law contract doctrine. *See Kyocera Corp. v. Prudential-Bache Trade Servs.*, 299 F.3d 769, 783 (9th Cir. 2002) (recognizing that California courts apply Restatement (2d) of Contracts); *Alaska Airlines v. Stephenson*, 217 F.2d 295, 298 (9th Cir. 1954) (applying Restatement of Contracts where there is unclear precedent under state's court opinions); *see also Donovan v. RRL Corp.*, 27 P.3d 702, 716 (Cal. 2001) (expressing opinion that Restat. (2d) more accurately states common law regarding misrepresentation or mistake); *Tehama-Colusa Canal Auth. v. United States DOI*, No. 1:10-cv-0712, 2011 U.S. Dist. LEXIS 83497, at n.12 (E.D. Cal. July 29, 2011) (noting that federal courts look to Restatement (2d) of Contracts to determine common law contract doctrine for federal law).

Ill. 1-2. a writing that purports to be an embodiment of the agreement cannot contain any term that substantively alters the material terms of the transaction. *Id*.

### C. SUMMARY

It is significant that the courts in *Chandler*, *Operating Engineers*, and *Reid* as well as the Restatement of Contracts (the "*Chandler* line of cases") do not support the argument that plaintiffs were charged with knowing the contents of the agreements, even though they could have read the agreements, printed on paper, that were right in there hands. Instead, this authority consistently excused the failure to do so because that failure was induced during the formation of the agreements. Plaintiffs' allegations are no different. Like the plaintiffs in *Chandler*, *Operating Engineers*, and *Reid*, Plaintiffs here were induced to click on the Ad, and entered their personal information on the enrollment page as their "e-signatures" to "Claim [Their] $15 gift Code," but they did so under the mistaken belief that that was what the enrollment page was for.

## V. *VISTAPRINT* AND ITS PROGENY ARE OUTLIERS AND REST ON UNSOUND APPLICATION OF PRECEDENT

Defendants continue to press a series of cases resting on the opinion in *In re Vistaprint*, 2009 U.S. Dist. LEXIS 77509, *5-6 (S.D. Tex., Aug. 31, 2009) ("*Vistaprint*") and a cacophony of later decisions following *Vistaprint*, for the proposition that the disclosures' existence is *per se* sufficient to dispose of the entire Complaint. *See In re Vistaprint*, 2009 U.S. Dist. LEXIS 77509, *5-6 (S.D. Tex. Aug. 31, 2009); *see also Hook v. Intelius, Inc.*, 2011 U.S. Dist. LEXIS 31879 (M.D. Ga. Mar. 28, 2011); *Berry v. Webloyalty.com, Inc.*, 2011 U.S. Dist. LEXIS 39581, *5-8, *12-13 (S.D. Cal., Apr. 11, 2011); *Baxter v. Intelius*, No. 09-1031, 2010 U.S. Dist. LEXIS 104218 (C.D. Cal. Sept. 16, 2010).

This Court clearly distinguished and properly rejected *Vistaprint* and *Berry v. Webloyalty*, on two separate occasions. *See* Omnibus Br. at 42 (citing *In re EasySaver*, 737 F. Supp. 2d at 1171-72 (Anello, J.) (rejecting application of *Vistaprint* decision to instant case); 2011 U.S. Dist. LEXIS 85237 (S.D. Cal., Aug. 3, 2011) (Battaglia, J.) (rejecting stay of proceedings pending outcome of *Webloyalty* opinion to instant case)). Today, this Court has no cause to revisit its prior

orders, and every decision resting on *Vistaprint* should thus be rejected as well.

**A. *VISTAPRINT* AND ITS PROGENY ARE INCONSISTENT WITH THE *CYBSERSPACE* AND *CHANDLER* LINES OF CASES CITED ABOVE**

As the last two sections show, there is 30 years of Circuit Court precedent outlining exactly when someone is bound by the disclosures in an advertisement or the buried terms of a contract—in neither case is someone bound by terms or disclosures that are not prominently displayed, but which modify or completely contradict the prominently advertised claim or offer.

Specifically, *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, is directly on point: a discount offer in the form of a check, the specific terms were *right on the back of the piece of paper* stating that cashing the check was authorization for the monthly membership fee. The Ninth Circuit found that deceptive as a matter of law – it did not matter that all the consumer needed to do was turn the piece of paper over and read. Even more compelling is *Brown & Williamson*, where conservative judges Antonin Scalia and Robert Bork held that an advertisement, although it contained disclosures that materially changed the prominently advertised benefit, was deceptive even though the disclosures were *on the front of the same advertisement*, because placing it off to the side and in smaller print, made it "inconspicuous." *See Brown & Williamson*, 778 F.2d at 43. If a "disclosure" on the *face* of an ad can be "inconspicuous"; then one on an entirely separate page is definitely inconspicuous.

Equally perplexing are *Vistaprint's* and *Webloyalty's* utter failure to consider the fact that a plausible claim could be asserted under the *Chandler* line of cases. Those cases hold that when someone is led to believe that a document they are signing is one thing, they cannot be held bound by the boilerplate language in that documents if it turns out to be a contract for something else. 374 F.2d at 136 ("If one's signature is obtained by trick or artifice, unquestionably the alleged contract may be invalidated. … [the issue is] whether plaintiff knew at the time he signed the papers … that they were in fact contractual document"). *See also In re Apple Computer Sec. Litig.*, 886 F.2d at 1114 (holding that material omissions are not "rendered immaterial by the fact that the omitted facts are otherwise available to the public"); *Operating Engineers*, 737 F.2d at 1505 ("he

who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document"); *Dale*, 229 F.2d at 858 (observing that the "availability elsewhere of truthful information cannot excuse untruths or misleading omissions").

Meanwhile, multiple district court cases, including this one, have rightly applied these principles to the Internet cases such as this one. *See In re EasySaver*, 737 F. Supp. 2d at 1172 ("The reasonableness of a particular customer's expectations about shopping on the internet and dealing with pop-up windows offering a thank you gift cannot be determined from the face of this Complaint") *and Grant Connect*, 2011 U.S. Dist. LEXIS 123792, at *50-51; *Keithly v. Intelius Inc*., 764 F.Supp.2d at 1267; *Nordberg*, 445 F.Supp.2d at 1101; *McAfee*, 2010 U.S. Dist. LEXIS 106600 *17-18. Each of these cases recognized that advertising a discount coupon without alerting the consumer that it is in fact a surreptitious authorization for a fee, is a valid claim for fraud and deception, among other things. *See id.*

Accordingly, *Vistaprint* and its progeny are outliers, at best.

### B. *VISTAPRINT* COMPLETELY MISAPPLIED THE CASES IT RESTED ON

*Vistaprint* cited *Pacholec v. Home Depot USA, Inc*., 2007 U.S. Dist. LEXIS 99338, *5 (D.N.J., July 24, 2007) and *Tarallo-Brennan v. Smith Barney*, 1999 U.S. Dist. LEXIS 6787, *3 (S.D.N.Y., May 10, 1999), for the legal proposition that "[a] consumer cannot decline to read clear and easily understandable terms that are provided on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive." This is the principal on which Defendants' entire Motion to Dismiss rests.

Neither of those decisions that *Vistaprint* relies on supports the quoted text, and neither is analogous to the circumstances raised in *Vistaprint*, much less here. In *Pacholec*, the district court was addressing summary judgment and class certification, not a motion to dismiss. 2007 U.S. Dist. LEXIS 99338 at *3. The case involved a plaintiff who did not sign a damages waiver clause in an equipment rental agreement from Home Depot. *Id.* at *4. The court found that the evidence showed that the plaintiff knew he was signing a rental agreement, and that that was the transaction

he negotiated with Home Depo before signing the agreement. *Id.* at *4-5. The Court noted that the plaintiff "acknowledge[d] receiving all pages of the rental agreement but freely admits that he did not read the agreement," and that "if he had read the description of the damage waiver provision he would not have purchased it [.] *Id.* at *6. The court found for defendant because the plaintiff knew he was signing a contract to rent heavy equipment, he should have read it but did not, and had he read it, he would have found the waiver clause.

In *Tarallo-Brennan*, the issue was whether a clause reducing the statute of limitations under a benefits plan that plaintiff had voluntarily entered into was enforceable. 1999 U.S. Dist. LEXIS 6787 at *2-6. The court again observed that plaintiff knew she was reading her benefits plan that could either choose to join, or not choose to join. *Id.* The court found that the contract was enforceable: it was not a contract of adhesion because there was no compulsion or "high pressure tactics," she had plenty of time to read the contract before enrolling, and there was no showing of "***duress, fraud or misrepresentation***." *Id.* at *8-10.

Thus, *Pacholec* and *Tarallo-Brennen* are fully consistent with the *Chandler* line of cases we discuss above. Unlike the plaintiffs in *Chandler*, *Operating Engineers*, *Reid*, or those mentioned in the Restatement of Contracts, the plaintiff in *Pacholec* <u>knew</u> he was signing an equipment lease agreement, and the one in *Tarallo-Brennan* <u>knew</u> she was signing a benefits agreement. In both cases, the plaintiffs simply chose not to read the fine print, even though they had every opportunity to do so. Moreover, *Pacholec* and *Terrallo-Brennan* each acknowledged that had there been an allegation of deception in the formation of the contract, it would have made a material difference, but there was not one. *See Pacholec*, 2007 U.S. Dist. LEXIS 99338 at *3; *Tarallo-Brennan*, 1999 U.S. Dist. LEXIS 6787 at *10.

For that reason, they and *Vistaprint* are inapplicable to the allegations in this case because in neither of those cases did plaintiffs allege they were told one thing about the transaction, but the side-disclosure revealed it was a completely different transaction. Had the "Ad" promoted the EasySaver Rewards club membership, and offered the $15 Off coupon as an inducement, then those cases, and the holding in *Vistaprint* would be applicable.

## C. **ALL OF THE CASES DEFENDANTS RELY UPON ARE DISTINGUISHABLE**

*Vistaprint*, and its follower cases are distinguishable from this case for multiple reasons.

***First***, Defendants contend that this case is similar to *In re Vistaprint*, 2009 U.S. Dist. LEXIS 77509, *5-6. In *Vistaprint*, the crux of plaintiffs' claims was that they "they believed that they could not complete their purchase unless they completed the survey." *Id.* at 15. The court found that allegation implausible since, on the face of the screenshots and the complaint itself, right above where one enters their information, it specifically stated: "By typing your email address below, it will constitute your electronic signature and is your **written authorization to charge/debit** your account according to the Offer Details." *Id.* at *17 (bolding added). Moreover, *Vistaprint's* enrollment page discloses the payment obligation _twice_—both times _above_ the lateral line where one is asked to enter their information. *See* Exhibit 2 Zolna Decl., at Docket no. 173-7.

***Second***, Defendants invite this Court to consider, again, the decision in *Berry v. Webloyalty.com, Inc.*, 2011 U.S. Dist. LEXIS 39581 (S.D. Cal. Apr. 11, 2011). That decision was rendered after this Court published its *In re EasySaver Rewards*, opinion in this case, is neither binding nor even persuasive precedent. Defendants already attempted this before when they moved to "temporarily" stay the case pending the Ninth Circuit's consideration of the *Webloyalty* appeal. *See* Docket No. 151.

Furthermore, the disclosures in *Webloyalty* materially differ from the disclosures alleged to be in play in this litigation. For one, the opinion recounts—pictorially no less—*seven* different disclosures on the enrollment page, five of which disclosed that this was a page that would cause a $12 monthly membership fee if one accepted it, and two of which disclosed that one's payment information would be transferred from the prior website. *See Berry v. Webloyalty.com, Inc.*, 2011 U.S. Dist. LEXIS 39581, *5-8, *12-13. *See also* Exhibit 1 to Zolna Decl. Docket No. 173-7 (copy of enrollment page at issue in *Berry*). The disclosures themselves were immediately above the fields that one has to input their information into, and the button merely states "Yes." This is precisely the grounds that *Berry* distinguished *Keithly*—on which we rely in part—to show why *Berry* could be decided the way it was. *See Berry*, 2011 U.S. Dist. LEXIS 39581 at *14-15 ("there were not as many disclosures in *Keithly* in close proximity to the offer graphics. . . . in *Keithly*, the

only text above the box where the consumer enters his email is 'Please type in your email address below.'"). The *Berry* court further noted that "After the disclosures were presented to him, Plaintiff Berry took **three** affirmative steps to accept the terms of the club membership—he entered his email twice and clicked the 'YES' button. Right below the yes button, he could have clicked "No thanks" to refuse membership." *Id.* at *15 (emphasis added).

Here, by contrast, the enrollment page offered by Defendants (*see* Provide RJN, Doc.# 228-3 Exs. 5—6; Decl. of R. Tucker ISO EMI Motion, Doc.#227-3 Exs. 1 - 3) show only a ***single*** disclosure of the monthly cost of the membership in the lower left hand corner, towards the bottom of the page (which, for anyone who has seen a pop-up, often the bottom of the screen often does not appear at all unless one purposefully scrolls down). Moreover, the statement above the fields say nothing of transferring one's name and credit card information.

***Next***, Defendants ask this court to consider *Baxter v. Intelius*, 2010 U.S. Dist. LEXIS 104218. There, the court first noted that plaintiffs' complaint had not adequately pled the factual grounds for their claims. *Id.* at *10 ("Plaintiffs omit essential details from their description of the interstitial webpage."). Thus, the court did not even reach the legal sufficiency of the plaintiffs' theory of liability. *Id.* Moreover, the court observed that in order to enroll, one has to enter their email address twice, and above and below each of those is the disclosure that "**By typing your e-mail address below, that will constitute your electronic signature and is your *written authorization to charge/debit your account* according to the Offer Details to the right**." *Id.* at *11 (emphasis added). "The language above the email entry boxes referred to the Offer Details disclosure. ***Twice***." *Id.* at *12 (emphasis added); s*ee also* Exhibit 3, Zolna Decl. Docket No. 173-7.

***Finally***, Defendants invoke the decision in *Hook v. Intelius, Inc*., 2011 U.S. Dist. LEXIS 31879. There, the court noted that "Plaintiff was informed ***five times*** before he entered his payment information and clicked 'Confirm the Purchase and Show My Report' that he was signing up for a free trial, that the free trial would end and he would be billed $19.95 a month for the service until he canceled." *Id.* at *24 (emphasis added). There are no such disclosures on the EMI page.

Taken individually or together, these cases are as either inapposite because they misapply longstanding doctrines; or they as irrelevant today as they were before because of the particular facts before them.

## VI. PLAINTIFFS' THEORY OF LIABILITY IS SO PLAUSIBLE THAT CONGRESS HAS SINCE MADE IT A FEDERAL OFFENSE TO ENGAGE IN DEFENDANTS' SCHEME ON THE INTERNET

Defendants halted their enrollment scheme in 2010 because Congress outlawed it. Since this Court's decision on the motion to dismiss in August 2010, the Federal Government passed the "*Restore Online Shoppers Confidence Act*" (ROSCA) signed into law on December 29, 2010. The Congressional findings specifically noted, among other things, that describe that third party sellers "acquired consumers' billing information from the initial merchant through data pass, millions of consumers were unaware they had been enrolled in membership clubs." ROSCA § 2(6). Congress also found that "in exchange for 'bounties' and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as 'data pass.' These third party sellers used aggressive, misleading sales tactics to charge millions of American consumers for membership clubs the consumers did not want." ROSCA § 2(4).

ROSCA specifically declares it "unlawful for any post-transaction third party seller to charge or attempt to charge any consumer's [account] for any service … unless" they have received "the express informed consent from the consumer" which can only be accomplished by "obtaining from the consumer the full account number of the account to be charged and the consumer's name and address and a means to contact the consumer[.]" ROSCA § 3(a)(2). The use of passing a consumer's account information to another merchant is absolutely prohibited, no exception, under section 3(b) of ROSCA. It is important to recognize that neither of these provisions rests on the adequacy of disclosure—quite the contrary, the *only* way to get a customer's consent is to ask them for, and obtain, their complete billing information.

Thus, in enacting ROSCA, Congress expressly recognized that the *enrollment process*

itself is capable of deceiving without regard to whether there were any, if not sufficient, disclosures when the customer does not have to put in their payment information, when their payment information is transferred, and when they are enrolled in a "negative option" plan that they have to cancel to avoid being charged. *See* e.g., ROSCA § 2(4)-(8).

This is precisely the enrollment process that plaintiffs' claim is deceptive and caused their damages. *See* Sbaiti Decl. at Ex. 2 [Klein Tr. 208:1-209:5 (Q. ████REDACTED██████ ████████████████████████████████████."); 359:15 to 360:1 (Q. ██REDACTED██████████████████████████████████████ ███████ 191:2-192:22, 201:6-20 (describing enrollment process using data pass) (emphasis added)]. This begs the question: How can Defendants credibly contend that Plaintiffs' theory of deception is not "plausible" when their scheme now violates federal, not just state, law?

## VII. PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO ASSERT CLAIMS AGAINST EMI UNDER THE UCL AND CLRA ON BEHALF OF NON-CALIFORNIA PLAINTIFFS AND CLASS MEMBERS

EMI contends that it is a Maryland defendant and is not a California resident, and that it cannot be liable under the UCL and CLRA to any non-California resident plaintiffs or class members because "[n]owhere in the fourth Amended Complaint do the Non-Resident Plaintiffs allege that they purchased any produce or service from EMI in California or suffered any injury in California.". *See* EMI Motion at 23. There are multiple reasons why this reasoning is flawed.

*First*, to the extent EMI contends that there is a "choice of law" problem, a 12(b)(6) motion is not the proper vehicle for doing so, and EMI has not properly raised the question. The Supreme Court has clearly ruled that the law of the forum presumptively applies to a class action, and that the proponent of another forum's law bears the burden of showing that there are material differences between the forum state and other states' laws necessitating the enquiry. *See Phillips Petroleum Corp. v. Shutts*, 472 U.S. 797, 822 (1985) ("We must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this

suit."); *see also Harmsen v. Smith*, 693 F.2d 932, 946-947 (9th Cir. 1982) (finding California law applied to national class where defendants did not shoulder burden to demonstrate otherwise); *Washington Mut. Bank v. Superior Court*, 24 Cal.4th 906, 921 (2001).[5] This Court has already rejected EMI's prior attempt at a poorly-raised choice of law dispute at the 12(b)(6) stage. *See In re EasySaver*, 737 F.Supp.2d at n.7 (dismissing EMI's choice of challenge because "EMI has not suggested that the elements of a contract action are different in Maryland than they are in California.").

 **_Second_**, EMI has not demonstrated a failure to state a claim and, thus, the argument fails at the 12(b)(6) stage. EMI's own cases prove that, indeed, a plausible claim for damages by a non-California plaintiff against a non-California defendant can be made under the UCL and the CLRA. In *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999), the court held that non-California plaintiffs could sue Norwest, a Minnesota company, under the UCL (and even certified a class) because the general rule is that "State statutory remedies may be invoked by out-of-state parties ***when they are harmed by wrongful conduct occurring in California.***" (emphasis added). The court then certified a UCL class of non-California plaintiffs against Norwest. Therefore, Norwest actually defeats, rather than supports EMI's argument. EMI also cites *Morgan v. Harmonix Music Sys.*, No. C08-5211, 2009 U.S. Dist. LEXIS 57528 (N.D. Cal., July 7, 2009). There, the Northern District first observed the legal rule that "California courts have extended state-created remedies to out-of-state parties harmed by wrongful conduct only when that conduct occurs in California." *Id.* at *6 (citing *Norwest*). The Court, however, dismissed the out-of-state plaintiffs' statutory claims not on that basis, but because the "complaint fails to allege what conduct of the defendants, if any, that violated the CLRA took place in California [.]." *Id.* at *7.

 On the other hand, by incorporating the False Advertising Law, the UCL specifically makes actionable (A) any false or misleading statement "disseminated or caused to be

---

[5] Under the California's three-part governmental interest choice of law test, even if the proponent demonstrates a material conflict, the movant must further demonstrate that the foreign jurisdiction has an interest in its law applying to plaintiff's claims and that that interest is greater than *California's. Washington Mut. Bank*, 24 Cal.4th at___.

disseminated from this state before the public in any state," and in particular (B) "any advertisement over the Internet, soliciting the [purchase] of a product or service…that requires as a condition of sale, the [purchase] of a different product or service…shall conspicuously disclose in the advertisement the price of all those products or services." *See* Cal. Bus. & Prof. Code § 17500. *See* Cal. Bus. & Prof. Code § 17200 ("As used in this chapter, unfair competition shall mean and include … any act prohibited by [section 17500])."); *id.* at § 17500; *id.* at 17509. Thus, Plaintiffs' allegations that the Ad, which was disseminated from California on Provide Commerce's webpage, was misleading, clearly states a claim regardless of where a plaintiff lives.

Furthermore, several cases have held that alleging in-state activity that contributed to causing out-of-state injuries was sufficient to avoid dismissal under 12(b)(6). *See Norwest*, 72 Cal. App. 4th at 222; *In re Mattel, Inc*., 588 F. Supp. 2d 1111 (C.D. Cal. 2008) (denying a Rule 12(b)(6) motion and rejecting argument that no California UCL or CLRA claims could be asserted by out-of-state plaintiffs against an out-of-state defendant; "Plaintiffs have adequately alleged that Mattel['s] conduct occurred, if at all, in – or had strong connections to–California."); *Wang v. OCZ Tech. Group, Inc*., 276 F.R.D. 618 (N.D. Cal. 2011) (finding that "misleading marketing, advertising, and product information are conceived, reviewed, approved or otherwise controlled from their headquarters in California" created sufficient nexus to state claim under California law); *Keilholtz v. Lennox Hearth Prods.,* 268 F.R.D. 330, 340 (N.D. Cal. 2010) (holding that allegations of substantial activity occurring in California sufficient to deny motion to dismiss); *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1122 (C.D. Cal. 2009) (holding that out-of-state defendant proper subject of nation-wide UCL class because affiliated business unit that caused the injuries operated out of California; *Clothesrigger Inc. v. GTE Co.*, 191 Cal. App. 3d 605, 617 (1987) (rejecting challenge to out of state defendants' UCL and CLRA standing, and certifying national CLRA and UCL classes against out-of-state defendant because "the alleged fraudulent misrepresentations forming the basis of the claim of every [class member] nationwide emanated from California").

Thus, not only EMI has not cited a single case holding that an out of state defendant cannot, as a matter of law, be liable under the UCL or CLRA to an out of state plaintiff; but the cases Plaintiffs cite hold the exact opposite.

***Third***, Plaintiffs have adequately alleged facts raising a plausible case for applying the CLRA and UCL to EMI on behalf of non-California residents because of (1) the inherent nature of the misleading enrollment process, and its connection to Provide Commerce's activities, which were in California; and (2) the partnership / agency / conspiratorial relationship between EMI and Provide Commerce. These allegations are found throughout the Fourth Amended Complaint's allegations, for example:[6]

- Provide Commerce's terms and conditions, the only contract Plaintiffs <u>do not</u> dispute applies in this case, specifically contained a choice of law provision selecting California law for "any and all legal actions … regardless of conflict of law principles" (¶16);

- Provide Commerce's entire operation is centered in California and all of the acts it took to cause Plaintiffs' harm occurred in California (¶¶ 7, 16);

- Encore *partnered* with Provide Commerce to create a membership club which is the subject of this lawsuit, as part of its "revenue enhancement solutions" it offers to its clients (¶ 17);

- 100% of the plaintiffs were enrolled in EasySaver Rewards by first making a purchase on a Provide Commerce website, and then were shown a "pop-up" or "Ad" on the Provide Commerce webpage (¶¶ 1, 2, 3, 6, 20, 25, 28, 33-36, 44, 47);

---

[6] In fact, this Court also previously held that "the Court accepts the truth of the allegations that customers thought they were dealing with ProFlowers as they completed their purchase of flowers and offered a coupon on their next purchase." *In re EasySaver*, 737 F.Supp.2d at 1777. The court also noted the litanty of allegations supporting the conclusion that Provide and EMI were jointly responsible:

Provide describes the EasySaver Rewards Policy as 'our' program and describes EMI as a 'partner.' Compl. ¶ 32. The Complaint adequately alleges Provide's role in transmitting Plaintiffs' financial information to EMI without their knowledge or permission. *E.g., id.* ¶ 15 ("Provide-Commerce contracted with Encore explicitly to create and implement the EasySaver Rewards and to jointly promote and operate the EasySaver Program"); *id.* ¶ 31 ("Provide-Commerce and Encore together engaged, and continue to engage, in systematic nationwide practice of making unauthorized charges to consumers' credit cards, debit cards and PayPal accounts under the guise of the EasySaver Rewards program."); *id.* ¶ 32 ("Provide-Commerce is equally complicit in this scam and liable for the damages it caused because, among other things, Defendants jointly operated and profited from the EasySaver Rewards program.").

*Id.* at 1173.

- Every time someone enrolled in the program, both Defendants shared the profits that came from it (¶¶ 22, 25, 114, 141, 157, 182);

- Provide Commerce described EMI as its "Third Party Marketing Partner … who manages *our* EasySaver Rewards Program"—thus making EMI and Provide Commerce the "agent, servant, joint venturer, and representative of" the other, "with the knowledge, consent, and permission of" the other (¶ 21);

- The Defendants worked collaboratively on all aspects of the enrollment process including creating, implementing, and operating the membership programs (¶¶ 2, 20-22, 25, 29, 72, 86, 89, 100, 127, 134, 141, 160, 163, 169);

- Defendants' scheme included their agreement to jointly implement the system by which Provide Commerce's customers would unwittingly be enrolled (¶ 22), and this amounted to a conspiracy to take advantage of the Plaintiffs and the class members (¶ 21, 22);

- The Defendants continuously aided and abetted the other's actions in the form of setting up the systems whereby the customer would be linked to EMI's landing page from Provide Commerce's "pop up" coupon, Provide Commerce would provide EMI the customers' private financial information, etc. (¶ 20).

EMI never argues why these allegations are not enough.

Accordingly, the pleadings support the claim that EMI is liable under the CLRA and UCL for conduct that indisputably occurred in California—which is all that is necessary at the 12(b)(6) stage. *See In re Mattel*, 588 F.Supp.2d at 1114 (denying motion to dismiss because "Plaintiffs have adequately alleged that Mattel['s] conduct occurred, if at all, in – or had strong connections to – California."). *See also Norwest*, 72 Cal. App. 4th at 222; *OCZ Tech. Group, Inc.*, 276 F.R.D. at 621; *Keilholtz,* 268 F.R.D. at 340; *Solid Host*, 652 F. Supp. 2d at 1122.

## VIII.    THE ROSCA VIOLATIONS ARE ACTIONABLE VIA INCORPORATION

EMI contends that it cannot violate the Restore Online Shoppers' Confidence Act, Public Law 111-345, or "ROSCA" because ROSCA does not create a private cause of action. But

California's Unfair Competition Statute, Business & Professions Code § 17200 et seq., provides

that "unfair competition shall mean and include any unlawful … business act or practice."

It is well-established that an act that violates another law may be actionable under the

UCL, even if the underlying law creates no private cause of action. *See Washington Mut. Bank,*

*FA v. Superior Court*, 75 Cal. App. 4th 773, 787 (1999) (determining that plaintiffs could assert

a claim under Section 17200, notwithstanding that predicate federal law violation did not provide

for a private right of action); *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co*., 20

Cal.4th 163, 180 (1999) (holding that UCL "unlawful" prong allows one to 'borrow' violation of

other laws); *Hangarter v. Paul Revere Life Ins. Co.*, No. C 00-5286 JL, 2002 WL 31526543, at

*28-29 (N.D. Cal. Nov. 12, 2002).[7]

The question is whether the Fourth Amended Complaint alleges a violation of ROSCA. It

did. ROSCA §§ 3 and 5 makes it a *per se* "deceptive and misleading" practice to:

> **[C]harge** or ***attempt to charge*** any consumer's credit card, debit card, bank
> account, or other financial account for any good or service sold in a
> transaction effected on the Internet unless—
>     (1) before obtaining the consumer's billing information, the post-
> transaction third party seller has clearly and conspicuously disclosed to the
> consumer all materials terms of the transaction ….
>     (2) the post-transaction third party seller received the express informed
> consent for the charge from the consumer … by (A) obtaining from the
> consumer (i) the full account number of the account to be charged and (ii)
> the consumer's name, address and a means to contact the consumer…[.]
> (Emphasis added).

*See* ROSCA § 3(b). Subsection 3(d) expressly outlaws "data pass." Plaintiffs here allege that

Defendants violated ROSCA by charging accounts without complying with ROSCA's

requirements. *See Fourth Amended Complaint* ¶¶ 186-191. Any "charge" to a consumer account

---

[7] Notably, EMI, which is located in Maryland, would at the very least be subject to the Maryland Consumer Protection Act, Md. Code § 13-301 et seq. The MCPA prohibits any person from engaging in unfair or deceptive practices in the sale, or offer for sale, of consumer goods, consumer realty, or consumer services. Md. Code § 13-303. The MCPA incorporates any act declared to violate the FTC Act as a violation. Md. Code § 13-305. ROSCA expressly makes a violation of the terms therein, a per se violation of the FTC Act. See ROSCA § 5(a). Much like UCL claims, MCPA claims, unlike common law fraud claims, do not require proof of intent to deceive or defraud. *Golt v. Phillips*, 517 A.2d 328, 332 (Md. 1986); *accord Legg v. Castruccio*, 642 A.2d 906, 912 (Md. 1994).

after December 29, 2010, ROSCA was passed is a violation of ROSCA, and Defendants are directly liable for all such charges under the UCL. For instance, all charges Plaintiff Grant Jenkins received in 2011 because of this very scheme were violations. *See id.* at ¶ 46.

## IX. MARYLAND INDEED RECOGNIZES AN ACTION FOR GOOD FAITH AND FAIR DEALING AS A SPECIES OF CONTRACT CLAIM

EMI suggests to this Court that Maryland recognizes no claim for breach of the duty of good faith and fair dealing. But EMI gets this one wrong too. The correct statement of the law is that in Maryland, "[i]n every contract there exists an implied covenant that the parties to the contract will act in good faith when dealing with each other." *See Educational Testing Service v. Hildebrant*, 923 A.2d 34, 41 (Md. 2007). Thus, while Maryland does not recognize bad faith as a separate tort claim, it does recognize it as a species of contract claim. *See Magnetti v. Univ. of Maryland*, 909 A.2d 1101, 1105 (Md. 2005) ("The State of Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing; the allegations making up such a claim should be pursued under a plaintiff's breach of contract claim."); *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 794 (D. Md. 2002) (finding that the duty of good faith and fair dealing "is merely part of an action for breach of contract.").

The cases EMI cites at most raise this latter distinction, yet EMI plays on semantics in presenting them to the Court. Therefore, Plaintiffs' "good faith and fair dealing" count against EMI would merely be a second count for breach of contract. There is nothing wrong or improper with dissecting causes of actions into specific theories of recovery under the pleading rules. Thus, there is nothing for this Court to do on this issue except deny EMI's frivolous argument.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny the Motions to Dismiss in their entirety.

**Respectfully submitted this 13th Day of February, 2011.**

By: ___/s/ *Mazin A. Sbaiti*_____
    Mazin A. Sbaiti (SBN 275089)
    BARON & BUDD, P.C.
    3102 Oak Lawn Avenue, Suite 1100
    Dallas, Texas 75219
    Tel: (214) 521-3605
    Fax: (215) 520-1181
    msbaiti@baronbudd.com

    *On Behalf of Plaintiffs' Interim Co-Lead Counsel*

| | |
|---|---|
| James R. Patterson, (SBN 211102) | Bruce Steckler (*pro hac vice*) |
| THE PATTERSON LAW GROUP | BARON & BUDD, P.C. |
| 402 West Broadway, 29th Floor | 3102 Oak Lawn Avenue, Suite 1100 |
| San Diego, CA 92101 | Dallas, Texas 75219 |
| Telephone: (619) 756-6990 | Tel: (214) 521-3605 |
| Facsimile: (619) 756-6991 | Fax: (215) 520-1181 |
| jim@pattersonlawgroup.com | bsteckler@baronbudd.com |
| alisa@pattersonlawgroup.com | |
| | |
| Jennie Lee Anderson, (SBN 203586) | Isam C. Khoury, (SBN 58759) |
| ANDRUS ANDERSON LLP | COHELAN KHOURY & SINGER |
| 155 Montgomery Street, Suite 900 | 605 C Street, Suite 200 |
| San Francisco, CA 94104 | San Diego, CA 92101 |
| Telephone: (415) 986-1400 | Telephone: (619) 595-3001 |
| Facsimile: (415) 986-1474 | Facsimile: (619) 595-3000 |
| jennie@andrusanderson.com | ikhoury@ckslaw.com |

## **PROOF OF SERVICE**

I, the undersigned, say: I am over 18 years of age, employed in Dallas County, Texas in which the within-mentioned service occurred; and that I am not a party to the subject cause. My business address is 3102 Oak Lawn Avenue, Suite 1100, Dallas, Texas 75252. I hereby certify that on **February 13, 2012**, I caused the forgoing instrument to be served by electronic mail transmission through the Southern District of California's CM/ECF system to each such person at the e-mail address listed on the Court's service list of persons registering for such service.


_____*/s/ Mazin A. Sbaiti*_____
Mazin A. Sbaiti, Esq.