UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re: EASYSAVER REWARDS LITIGATION, | ) ) ) | Lead Case No.: 09cv2094 AJB (WVG) Consolidated Action |
| | ) ) | FINAL ORDER APPROVING CLASS ACTION SETTLEMENT; GRANTING |
| This document relates to all actions. | ) ) ) | PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND |
| | ) ) | INCENTIVE AWARDS; OVERRULING PERRYMAN'S OBJECTIONS |
| | ) ) | |
| | ) ) | |
| | ) | [Doc. No. 255 and Doc. No. 258] |
| | ) | |

On January 28, 2013, this Court heard plaintiffs Josue Romero, Gina Bailey, Jennifer Lawler, John Walters, Daniel Cox, Christopher Dickey, Grant Jenkins, and Bradley Berentson's (collectively "Plaintiffs") Motion for Final Approval of Settlement (Doc. No. 262) and Motion for (1) Attorneys Fees' and Costs, and (2) Incentive Awards (Doc. No. 255).  This Court reviewed and considered: (a) Plaintiffs' motions and the supporting papers, including the Settlement Agreement and Release ("Settlement Agreement"); (b) defendant Provide Commerce, Inc.'s Statement Of Non-Opposition In Support Of Final Approval of Class Settlement (Doc. No. 263); (c) the objection filed by Brian Perryman ("Perryman")(Doc. No. 258); and (d) oral argument of counsel at the January 28, 2013 hearing.  Based on this review and the findings set forth below, the Court GRANTS Plaintiffs' Motion for Final Approval of Settlement, (Doc. No. 262), and Plaintiffs' Motion for (1) Attorneys' Fees and

1  Costs, and (2) Incentive Awards, (Doc. No. 255). The Court also overrules Perryman's objections for
2  the reasons discussed further below.

3  ***Background***

4  Plaintiffs' factual allegations are extensive, as set forth in the Fourth Amended Complaint.
5  (Doc. No. 221). In sum, they allege that Defendants' practices of enrolling customers in the Rewards
6  Programs are unfair and unlawful. Plaintiffs contend that Provide-Commerce transmits its consumers'
7  private payment information to its third party marketing partners, Defendants Regent Group, Inc., doing
8  business under Encore Marketing International and Encore Marketing International, Inc. (referred to
9  collectively as "Encore"). (*Id.* at ¶ 1.) Encore then uses this information to charge the consumers credit
10 or debit accounts without permission under the guise that the consumers authorized the charges when
11 they supposedly joined saving programs such as EasySaver Rewards, Red Envelope Rewards, or
12 Preferred Buyers Pass, which Encore manages on Provide-Commerce's behalf. (*Id.*)

13 Specifically, when class members completed a purchase on one of Provide Commerce's retail
14 websites, they were presented with a pop-up window offering $15 off their next purchase as a "Thank
15 You" gift, and asking them to enter their zip code and email address and click "Accept" to receive the
16 gift. (*Id.* at ¶¶ 3, 26.) Regardless of whether Class members actually or knowingly provided their zip
17 code and email address and clicked "Accept," Plaintiffs' allege that Provide Commerce transmitted their
18 private payment information to EMI without consent. (*Id.* at ¶ 3.) EMI proceeded to enroll Plaintiffs
19 and Class members in a Rewards Program and charged their credit and debit cards a $1.95 activation
20 fee, followed by a $14.95 monthly fee. (*Id.* at ¶¶ 3, 26.) Plaintiffs allege that the Rewards Programs
21 provided no meaningful benefits and that Class members were enrolled in the Rewards Programs
22 without their knowledge or consent. (*Id.* at ¶ 29.) Plaintiffs challenged Defendants' conduct as
23 violating the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., the California
24 Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq., and the Federal Electronic Funds
25 Transfer Act, 15 U.S.C. § 1693, et seq. (as to EMI only), and Plaintiffs further alleged that the conduct
26 constituted fraud, breach of contract, breach of the implied covenant of good faith and fair dealing,
27 invasion of privacy, unjust enrichment, and negligence.

28

09cv2094

The parties litigated this matter over a period of several years.  Then, on June 13, 2012, Plaintiffs' filed an unopposed Motion for (1) Preliminary Approval of Class Action Settlement, (2) Provisional Class Certification, (3) Distribution of Class Notice, and (4) Scheduling of Fairness Hearing. (Doc. No. 248.)  The Court granted Plaintiffs' Motion on June 26, 2012, (Doc. No. 252), and Plaintiffs' subsequently filed the instant Motion for Attorneys' Fees and Costs, and Incentive Awards on November 26, 2012, (Doc. No. 255.)  On December 7, 2012, class member Perryman filed a response opposing Plaintiffs' Motion for Attorneys' Fees and objecting to the proposed settlement.[1]  (Doc. No. 258.)  Plaintiffs' filed a response to Perryman's objections, (Doc. No. 262), and Defendant Provide Commerce, Inc. submitted a notice of non-opposition to Plaintiffs' Motion for Attorneys' Fees within their brief in support of final approval of the class settlement, (Doc. No. 265.)  As noted above, the Court held a hearing regarding final approval of the settlement and the fees, costs, and incentive award requested by Plaintiffs on January 28, 2013.

### *Proposed Settlement Terms*

The proposed settlement agreement is attached to Plaintiffs' Motion for Preliminary Approval, (Doc. No. 248-3), which the Court granted.  The Court sets forth some of the more significant terms of the settlement below.

**A.  Settlement Class**

The proposed settlement class consists of:

> All persons who, between August 19, 2005 and the date of entry of the Preliminary Approval order, placed an order with a website operated by Provide Commerce, Inc. and were subsequently enrolled by Regent Group Inc. d.b.a. Encore Marketing International, Inc. in one or more of the following membership programs: EasySaver Rewards, RedEnvelope Rewards, or Preferred Buyers Pass.

(Doc. No. 248-3 at § 1.8.)  The class excludes: (a) Defendants; (b) any entities in which Defendants have a controlling interest or which have a controlling interest in Defendants; (c) the officers, directors, employees, subsidiaries, affiliates, and attorneys of Provide Commerce or EMI; and (d) the Judges

---

[1] Counsel received an additional objection to the proposed settlement from Aaron Meyer in the form of a letter dated October 11, 2012.  (Pls.' Memo., Doc. No. 262-3.)  As an initial matter, Meyer did not file his letter with the Court as instructed in the notice of settlement so it is not properly before the Court.  Moreover, Meyer objects to the settlement based upon the alleged disproportion between the class members' recovery and the requested attorneys' fees and incentive awards.  This is similar to an argument made by Perryman in his properly filed objection to the proposed settlement agreement; as such, it will be addressed by the Court below.

presiding over this action and any of their employees or immediate family members.  (*Id.* at Ex. B - Long Notice Form.)

**B.   Relief to Class**

Defendants have agreed to do the following in exchange for a release of claims and subject to this Court's approval:

(1) Defendants will, via a neutral professional claims administrator selected from among three proposed by the parties, notify all Class members via direct email or U.S. Mail about their rights under the Settlement Agreement.  (Doc. No. 248-3 at § 3.3(a)-(c).)

(2) Provide Commerce will directly email every class member $20 in the form of a merchandise code ("$20 credit").  (*Id.* at § 2.2.)

- Class members are not required to submit a claim to receive the $20 credit.  (*Id.*)

- The $20 credits are fully transferable.  (*Id.*)

- The $20 credits will be valid for one year for online purchases at Proflowers.com, RedEnvelope.com, Berries.com and CherryMoonFarms.com.  (*Id.*)

- The $20 credits are not valid for use from December 17 to 24, 2012, February 4 to 14, 2013, May 1 to 12, 2013, and December 16 to 24, 2013 (and corresponding time periods in 2014 through the expiration date of the $20 credits).  (*Id.*)

- The $20 credits are not combinable with discount or gift codes, cannot be used with email offers or promotions, but may be used to purchase markdown, bundled, or discounted products.  (*Id.*)

- At the time of settlement and at the final approval hearing, Plaintiffs' counsel verified that these websites offered a selection of items under $20.

- The $20 credits may also be applied towards larger purchases.

(3) Defendants will fund a $12.5 million Cash Fund that eligible class members can make claims against for refunds of payments for monthly membership fees.  (Doc. No. 248-3 at § 2.1.)

- To make a claim from the Cash Fund, class members can submit their claim electronically at the neutral Claims Administrator's website, a link is provided to them via the direct email notice, or by U.S. Mail.  (*Id.* at § 3.6.)

- Class members will only be required to submit their contact information and verify that they did not intend to enroll and did not use the benefits of the program (excluding the initial discount code offered for a future Provide Commerce website purchase). (*Id.* at § 2.1(d).)

- Class members will not be required to submit documents, or other proof of having been charged to make a claim.  (*See id.*)

- The Claims Administrator will evaluate and calculate all claims for payment based upon Defendants' records.  (*Id.* at § 3.7.)

- Claims will be paid on a pro rata basis up to the full amount owed.  (*Id.* at § 3.6.)

- The parties must meet and confer in good faith to resolve any disputed claims, with EMI's records being entitled to a rebuttable presumption of accuracy.  (*Id.* at § 3.8.)

- The Cash Fund will also be used to pay attorneys' fees and costs, incentive awards and administration costs.  (*Id.* at § 2.1(a)-(c).)

- The Cash Fund is non-reversionary, and any remaining funds will be distributed as a *cy pres* award, subject to Court approval, to fund higher education projects relating to internet privacy and consumer protection at California State University at San Diego ("San Diego State University"), University of California at San Diego ("UCSD"), and University of San Diego School of Law ("USD Law School").  (*Id.* at § 2.1(e).)

The total settlement will approximate $38 million dollars if the entire class use the credits and make claims for reimbursement.

**C.   Class Representatives' Incentive Payments**

The proposed settlement agreement provides for incentive awards as follows:  a) $15,000 for Class Representatives Romero and Bailey; b) $10,000 for Class Representatives Berentson, Jenkins, Cox and Lawler; and c) $5,000 for, Class Representatives Walters and Dickey.  (Doc. No. 248-3 at § 2.1(b).)

**D.   Attorneys' Fees and Costs**

The settlement provides that class counsel may request fees of up to a total of $8.65 million, plus actual costs up to $200,000.  Class counsel has requested the entirety of these amounts in their pending motion.  (Doc. No. 248-3 at § 2.1(c).)

**E.   Settlement Administration and Notice**

Section 3.3 of the proposed settlement agreement provides the process for notifying the class members of the proposed settlement.  The Court-appointed administrator, Garden City Group, sent direct notice via email and/or U.S. Mail to approximately 1.3 million class members in accordance with the approved plan.  (Pls.' Final Approval Memo., Doc. No. 262 at 8, n. 2.)  On October 11, 2012, the settlement administrator made available an official settlement website and posted the full notice.  (Def. Non-Opp., Doc. No. 265 at 16.)  Also on October 11, 2012, email notice was sent to 1,292,987 class

1   members.  (*Id.*)  Subsequently, postcard notices were sent to 233,414 class members on October 31,

2   2012.  (*Id.*)

3        The notice informed class members who wished to object to the Settlement that they were

4   required to file their objection with the Court by December 10, 2012, and deliver a copy of the objection

5   to counsel for the parties.  (Doc. No. 248-3 at § 3.9, Ex. C - Summary Notice.)  As of this deadline,

6   Perryman is the only class member to have filed an objection to the final settlement approval.  (Doc. No.

7   258.)  Aaron Meyer submitted a letter objecting to the settlement but it was never filed.  (Pls. Final

8   Approval Memo, Doc. No. 265 at 19, n. 5.)

9
10              ***Perryman's Objections to the Proposed Settlement and***
                    ***Opposition to Plaintiffs' Motion for Attorneys' Fees***

11        On December 7, 2012, class member Brian Perryman filed his objection to the proposed final

12   settlement and opposition to Plaintiffs' motion for attorneys' fees.  (Doc. No. 258.)  Perryman does not

13   object to the total value of the settlement.  Rather, Perryman contends that (1) the class counsel has

14   seized a disproportionate share of the recovery in violation of Rule 23(e) and Ninth Circuit law; (2) the

15   fee component does not comply with the Class Action Fairness Act ("CAFA"); and (3) *cy pres* is used

16   impermissibly.[2]

17   **A.**    **Perryman's contention that the $20 credits constitute coupons under CAFA**

18        As an initial matter, Perryman contends that the $20 credits are, for all intents and purposes, a

19   coupon.  Perryman considers the credits to be "particularly pernicious" coupons for two reasons: (1) the

20   credits are not available for use during three flower-giving holidays of Valentine's Day, Mother's Day,

21

22        [2] Plaintiffs contend that Perryman lacks standing to object to the final approval inasmuch as the

23   attorneys' fees requested do not impact his recovery under the terms of the settlement.  The Court finds
Plaintiffs' argument to be unsupported.  The notice to class members invited them to file objections to

24   the proposed final settlement and did not place restrictions on those portions of the agreement to which
they could object.  Perryman properly filed his objection with the Court and, therefore, has complied

25   with the requirements set forth in the notice.  Furthermore, despite Plaintiffs' suggestion that *Zucker v.
Occidental Petroleum Corp.* supports a finding that Perryman lacks standing, the Court interprets

26   *Zucker* differently.  192 F.3d 1323, 1326 (9th Cir. 1999) *cert. denied* 120 S. Ct. 1671 (2000).  Plaintiffs
suggest that *Zucker* determined that an objector lacked standing to contest attorneys' fees when the

27   amount did not affect the objector's award under the settlement.  In fact, *Zucker* did not find that the
objector to the attorneys' fees lacked standing; rather, the court determined that the issue of standing

28   was irrelevant as the district court had "inherent authority to assure that the amount and mode of
payment of attorneys' fees are fair and proper."  *Id.* at 1328.  Insomuch as Perryman has properly filed
his objections to the requested attorneys' fees and the attorneys' fees are a relevant part of the proposed
settlement agreement at issue, the Court will address Perryman's objections.

09cv2094

1  and Christmas, and (2) the settlement bars "stacking" the credits with other promotions and coupons,

2  which serves to reduce the value of the $20 credit as the websites often have promotions available.

3  (Doc. No. 258 at 13.)  Accordingly, Perryman contends that the $20 credits are actually coupons with a

4  significantly lower value than $20, which inflates the overall proposed settlement award and the

5  requested attorneys' fees are disproportionately high as result.

6      **1.   Legal Standard**

7      Special considerations arise in cases involving coupon settlements.  CAFA allows a court to

8  approve coupon settlements "only after a hearing to determine whether, and making a written finding

9  that, the settlement is fair, reasonable, and adequate for class members."  28 U.S.C. § 1712(e).  Although

10  this "fair, reasonable, and adequate" standard is identical to that contained in Rule 23(e)(2), "several

11  courts have interpreted section 1712(e) as imposing a heightened level of scrutiny in reviewing such

12  [coupon] settlements."[3]  Likewise, Rule 23 itself may require closer scrutiny of coupon settlements.[4]

13  Accordingly, before granting final approval, the court "must discern if the value of a specific coupon

14  settlement is reasonable in relation to the value of the claims surrendered."  *True*, 749 F. Supp. 2d at

15  1069.  Although CAFA defines various other terms, it does not define what constitutes a "coupon."  *See*

16  28 U.S.C. § 1711.

17      **2.   Analysis**

18      Having considered Perryman's objections along with the relevant case law considering coupon

19  settlements under CAFA, the Court concludes that the $20 credit in addition to the cash reimbursement

20  fund provides fair, reasonable, and adequate relief to class members based on the nature of Plaintiffs'

21  claims and status of the case.  While Perryman objects to the alleged "coupon" offered in the settlement,

22  he largely ignores the fact that there is also a cash fund that provides reimbursement to class members.

23

24

25      [3] *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069 (C.D. Cal. 2010) (citing *Synfuel*

26  *Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007)).

27      [4] *Shames v. Hertz Corp.*, 2012 WL 5392159, *16 (S.D. Cal. Nov. 5, 2012) (citing Fed. R. Civ. P.

28  23(h), 2003 Advisory Committee Notes ("Settlements involving non-monetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class.")); *see also Sobel v. Hertz Corp.*, 2011 WL 2559565, *6 (D. Nev. June 27, 2011).

1    The proposed settlement is thus not entirely a "coupon" settlement and distinguishable from other cases

2    involving coupons or vouchers without an accompanying cash fund.[5]

3           Moreover, there is authority suggesting that CAFA does not apply where class members can opt

4    between cash and credits like the ones objected to by Perryman.  In *Shames v. Hertz*, the Court found

5    "[p]ersuasive authority . . . that CAFA does not apply to settlements, such as this one, that offer the

6    option between cash and vouchers for free products (as opposed to *discounts* on products where class

7    members are required to purchase the products and pay the difference between the full and

8    coupon-discounted price)."  *Shames v. Hertz Corp.*, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012)

9    (emphasis in original) (citing *CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 Fed. Appx. 617,

10   619 (9th Cir. 2012)).  In a recent, unpublished memorandum, the Ninth Circuit noted that a settlement

11   giving "every class member the option to receive its share of the settlement proceeds in cash or

12   cash-equivalent forgiveness of indebtedness already incurred" is not a "coupon settlement" and

13   therefore does not trigger the Class Action Fairness Act of 2005's limitations on contingent fees awarded

14   in connection with such settlements.  *CLRB Hanson Indus., LLC,* 465 Fed. Appx. at 619.

15          Significantly, and unlike the situation in *Shames* and *CLRB Hanson*, the proposed settlement in

16   this instance does not require class members to choose between cash reimbursement or the $20 credit;

17   they are entitled to both.  The two forms of relief are tailored the nature of Plaintiffs' claims and the

18   alleged harm caused by Defendants' programs.  Specifically, the cash fund reimburses class members

19   for the allegedly impermissible credit card charges and the $20 credit serves as a replacement for the

20   $15 "Thank you" gift credit that led to their allegedly unauthorized entry into the membership programs.

21   Based on the nature of the claims and the alleged harms, the Court concludes that cash fund

22   reimbursement combined with the automatic $20 credit provided to every class member offers real and

23

24

25          [5] *Sobel v. Hertz Corp.*, 2011 WL 2559565 (D. Nev. June 27, 2011) (case involves "strictly a coupon settlement" without an accompanying "settlement fund or any provisions for cash payments");
*In re HP Inkjet Printer Litigation*, 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011 (e-credits for HP
26   products treated as coupons where settlement was limited to e-credits and injunctive relief without an accompanying cash fund); *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73 (D.D.C. 2011)(relief
27   awarded in the form of vouchers for future Envision programs with any remaining funds to be distributed to *cy pres* beneficiaries); *Fernandez v. Victoria Secret Stores, LLC*, 2008 WL 8150856 (C.D.
28   Cal. July 21, 2008)(class members who submit a valid claim will receive a gift card from Victoria's Secret)

1   substantial value in relation to class members' injuries, and that the settlement as a whole is fair,

2   reasonable, and adequate.

3        Furthermore, Perryman acknowledges that "there is no *per se bar* on coupon relief in

4   settlements," but asks that the Court "apply rigorous scrutiny" to the alleged coupon settlement in order

5   to comply with CAFA requirements.  Assuming *arguendo* that the credits constitute coupons under

6   CAFA, the Court has undertaken the "rigorous scrutiny" that Perryman requests.  Specifically, the Court

7   has satisfied CAFA's requirement that a hearing be held and the Court's findings be in writing.  *See* 28

8   U.S.C. § 1712(e).  Moreover, after careful consideration of the parties' arguments, Perryman's

9   objections, and the nature of the settlement compared to Plaintiffs' allegations, the Court finds that the

10  $20 credits, regardless of their classification as coupons or credits, provide an actual value of $20 to the

11  class members despite the blackout dates and inability to combine the credits with coupons and

12  promotions.[6]  Certainly, these types of restrictions may be problematic in some coupon settlements;

13  however, the $20 credits here are transferrable and may be used to purchase entire items without

14  requiring the class members to spend additional money.[7]  Most importantly, the $20 credits are in

15  addition to the cash fund reimbursement available to all class members.

16       For these reasons, the Court finds that the restrictions imposed on the $20 credits do not

17  significantly alter the value of the credit to the class members.  The Court further finds that the relief

18  offered by the $20 credits serves a specific purpose that is narrowly tailored to reflect the nature of

19  Plaintiffs' allegations, specifically class members will receive a usable $20 credit of the type that was

20  offered by the websites initially and subsequently caused them to be enrolled in the membership

21  programs.  Accordingly, the Court concludes that the class members will receive $20 in value with these

22  $20 credits.  Thus, Perryman's objection to the $20 credits and their provisions is overruled.

---

23       [6] It is worth noting that Defendants' counsel offered a reasonable explanation for the inclusion of

24  the blackout dates at the hearing on the instant motions.  Counsel explained that flower distributors find
    it difficult to fulfill the number of flower orders received during these time periods.  In order to achieve

25  settlement, it was thus important for Defendants to negotiate blackout dates in order to protect
    themselves during these time periods from have to fulfill orders beyond their fulfillment capacity.

26  Defendants' counsel suggested that this term was material to Defendants' negotiation of the settlement,
    and it is therefore afforded significant weight by the Court.

27

28       [7] Counsel for the parties have represented to the Court that there are a number of items available
    for purchase under $20, so the credits do not have to serve as discounts on larger purchases.  (*See* Pls.
    Memo., Doc. No. 262 at 7-8; Defs. Memo., Doc. No. 265 at 18.)

**B.   Perryman's objection to the *cy pres* component of the proposed settlement agreement**

The settlement designates three institutions as cy pres recipients in order to fund programs regarding internet privacy and security: San Diego State University, UCSD, and USD Law.  Perryman argues that the cy pres distribution of the remainder of the $12.5 million cash fund is defective for the following three reasons: 1) there is an intolerable conflict of interest for class counsel owing to a preexisting relationship with a *cy pres* beneficiary;  2) there is an impermissible geographic discontinuity between the composition of the class and the location of the *cy pres* recipients; and 3) *cy pres* is improper when it is feasible to make further distributions to class members, at least when such distributions do not result in a legal windfall.  The Court will address each of these arguments individually below.

**1.   Legal Standard**

Several recent Ninth Circuit cases provide valuable insight into the proper application of *cy pres* distributions.  To ensure that the settlement retains some connection to the plaintiff class and the underlying claims, a *cy pres* award must qualify as "the next best distribution" to giving the funds directly to class members.  *Dennis v. Kellogg Co.*, 687 F.3d 858, 865 (9th Cir. 2012) (citing *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 2011) (internal quotation marks omitted)).  Not just any worthy recipient can qualify as an appropriate *cy pres* beneficiary.  *Id.*  To avoid the "many nascent dangers to the fairness of the distribution process," we require that there be "a driving nexus between the plaintiff class and the *cy pres* beneficiaries."  *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011).  A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers*, 904 F.2d at 1308-09.  Thus, in addition to asking "whether the class settlement, taken as a whole, is fair, reasonable, and adequate to all concerned," we must also determine "whether the distribution of the approved class settlement complies with our standards governing *cy pres* awards."  *Nachshin*, 663 F.3d at 1040 (internal quotation marks omitted).

To remedy growing concerns regarding *cy pres* distribution including the occasional appearance of impropriety by judges and counsel when choosing recipients, the Ninth Circuit held in *Six Mexican*

1   *Workers* that *cy pres* distribution must be guided by (1) the objectives of the underlying statute(s) and

2   (2) the interests of the silent class members.  *Id.* (citing *Six Mexican Workers*, 904 F.2d at 1307).

3   **2.  Analysis**

4          Here, the proposed settlement designates three academic institutions as *cy pres* recipients,

5   specifically San Diego State University, UCSD, and USD School of Law School.  (Proposed Settlement,

6   Doc. No. 248-3 at § 2.1(e).  The money awarded to the *cy pres* recipients will fund education programs

7   or professorship positions regarding internet privacy or internet data security.  (*Id.*)  These provisions

8   clearly tie the *cy pres* award to the policies of the statutes underlying Plaintiffs' claims such that the

9   general nature of the distribution does not pose an obstacle to final settlement approval.  However,

10   Perryman makes three specific objections to the *cy pres* objections that the Court turns to now.

11                      **a.  Appearance of Impropriety**

12          First, Perryman objects to the fact that three of the attorneys in this action graduated from USD

13   Law School - lead plaintiffs' counsel James Patterson, associate class counsel Alisa Martin, and defense

14   counsel Michelle Doolin.  This is not particularly surprising given that this case was filed in San Diego,

15   counsel and their law firms are located in San Diego, and obviously USD Law School is located in San

16   Diego as well.  As support for his objection, Perryman relies upon several cases in which courts voiced

17   concern regarding the appearance of impropriety based upon connections with the proposed *cy*

18   *pres* beneficiaries.  The Court has reviewed these cases and finds that each contained a more significant

19   relationship with the proposed *cy pres* beneficiaries than the alma mater connections here.[8]  In contrast

20

21          [8] *Houck on Behalf of U.S. v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502-503 (7th Cir.
22   1989)(On remand for other reasons, the Seventh Circuit found it would be appropriate for the district
     court to consider a broader nationwide use of its *cy pres* discretion.  The previous award named two law
23   schools as the recipients in order to fund class action and antitrust research projects, and the court
     suggested that the Federal Judicial Center Foundation might be a good alternative recipient in a
24   footnote); *Weeks v. Kellogg, Co.*, 2011 U.S. Dist. LEXIS 155472, *69-70 (C.D. Cal. Nov. 23, 2011)
     (One of the firms representing plaintiffs had an ongoing relationship with the Westside Food Bank. All
25   the attorneys volunteer annually at the charity and a printout of the website of the Westside Food Bank
     lists the firm as among the "organizations that have continually offered their support.");  *In re*
26   *Linerboard Antitrust Litigation*, 2008 WL 4542669, *5 (E.D. Pa. Oct. 3, 2008) ("The Court agrees that
     PILCOP is a well respected public legal services organization in the Philadelphia area and, in general, is
27   a deserving recipient of cy pres funds. However, because an attorney formerly associated with this case
     currently serves in a lead role at PILCOP, the Court does not deem it appropriate to direct any of the *cy*
28   *pres* distribution to PILCOP, and takes no position on whether the Bar Foundation [the other *cy pres*
     recipient] should do so."); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 362 F. Supp. 2d 574, 577 n.
     2 (E.D. Pa. 2005) ("In connection with the University of Pennsylvania, the Court is sensitive to the

to these cases, the appearance of impropriety is not substantial in this instance.  There are no allegations of significant relationships with USD Law School beyond it being the alma mater of three attorneys out of the many associated with the case.  There is no suggestion that counsel has any further relationship with the school than simply graduating from there.  Significantly, USD Law School is one of the three proposed recipients and is not entitled to any greater award than the others.  There is a rational connection between the chosen recipients and the nature of the settlement.  Furthermore, simply by virtue of it being a law school, USD Law School may be in the best position to develop and research the legal issues associated with internet privacy and security underlying Plaintiffs claims.  For these reasons, the Court does not find a significant appearance of impropriety such that it would necessitate replacing the recipients negotiated and agreed upon by the parties.

### b.  Geographic Distribution

With regard to the geographic distribution of the funds, Perryman contends that the recipients of the *cy pres* award are limited to San Diego, and the *cy pres* distribution is therefore impermissible as it fails to account for the nationwide scope of the class.  (Perryman Obj., Doc. No. 258-19.)  As support for this proposition, Perryman contends that the Ninth Circuit found local distributions to constitute reversible error in *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011).

In *Nachshin,* the class included more than 66 million AOL subscribers throughout the United States, and the settlement distributed two-thirds of the donations to local charities in Los Angeles, California.  *Id.*  The Ninth Circuit found that this did not account for the broad geographic distribution of the class.  *Id.*  However, this was not the full extent of the Ninth Circuit's basis for finding that the *cy pres* distributing failed to target the plaintiff class, or provide reasonable certainty that any member would be benefitted.  The court continued as follows:

> Even among the small percentage of plaintiffs located in Los Angeles, there is also no indication that any would benefit from donations to the Boys and Girls Clubs of Los Angeles and Santa Monica or Los Angeles Legal Aid. The proposed donation to the Federal Judicial Center Foundation at least conceivably benefits a national organization, but this organization has no apparent relation to the objectives of the underlying statutes, and it is not clear how this organization would benefit the plaintiff class. ...

appearance of conflict in selecting as the beneficiary of the fund an institution with long-established ties to the Eastern District Bench.");

> We are also not persuaded by the parties' claims that the size and geographic diversity of the plaintiff class make it "impossible" to select an adequate charity. It is clear that all members of the class share two things in common: (1) they use the internet, and (2) their claims against AOL arise from a purportedly unlawful advertising campaign that exploited users' outgoing e-mail messages. The parties should not have trouble selecting beneficiaries from any number of non-profit organizations that work to protect internet users from fraud, predation, and other forms of online malfeasance.

*Id.* at 1040-41. Having considered the entirety of the Ninth Circuit's analysis, it appears distinguishable from the *cy pres* distribution at issue here. Unlike the settlement in *Nachshin*, the *cy pres* distribution in this case is directly tied to the statutes underlying Plaintiffs' claims. In *Nachshin*, the benefits from *cy pres* distributions to the Los Angeles Boys and Girls Clubs and Legal Aid would be unlikely to flow to silent class members outside of the Los Angeles area. While those organization certainly provide a tangible benefit within local communities, they provide direct service to local community members with a more limited geographic impact. These two problematic aspects of the settlement in *Nachshin* are not present here.

Significantly, the recipients at issue here are not as limited in geographic scope as the recipients considered in *Nachshin*. As counsel argues, the internet is not limited by geographic boundaries, and the educational impact of the funded academic programs will have a nation-wide impact. By giving the money to academic institutions, counsel contends that the funds will directly contribute to the national academic dialogue involving internet privacy and security. The Court agrees insomuch as these schools serve a diverse student population of students from many states, issue widely-distributed publications, and engage in the overall national academic discourse. Moreover, the required use of the *cy pres* funds targets the class members and will benefit silent class members because the class members are all internet consumers. Regardless of their physical location, programs furthering the goals of internet security and privacy will benefit users of the internet everywhere.

On the whole, the location of the recipient is less important than "whether the projects funded will provide 'next best' relief to the class."[9] *In re Lupron Marketing and Sales Practices Litigation*, 677

---

[9] The following excerpt from *In re Lupron Marketing and Sales Practices Litigation*, 677 F.3d 21, 36 (1st Cir. 2012), provides some valuable insight into the geographic distribution consideration:

> First, the Samsell plaintiffs argue that the "next best" requirement is not met because the *cy pres* recipient, DF/HCC, is in Boston while the injuries are to a national class. This objection

F.3d 21, 36 (1st Cir. 2012). Indeed, it appears that the overall impact from the proposed *cy pres* distributions will not be limited to San Diego. All internet users will benefit from the proposed funding of ideas and research relating to consumer protection. Therefore, having reviewed the proposed distribution and considered the rationale offered for its structure, the Court concludes that the *cy pres* remedy bears a direct and substantial nexus to the interests of absent class members and thus properly provides for the "next best distribution" to the class despite the location of the proposed beneficiaries being limited to San Diego. *See Lane v. Facebook*, 696 F.3d 811, 821 (9th Cir. 2012). Significantly, the settlement is not required to provide the "ideal" *cy pres* recipients. *Id.* at 820-21. Accordingly, the Court finds that the geographic distribution in this instance satisfies (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members. As such, Perryman's objection to the geographic aspect of the distribution is overruled.

### c. Disproportionate Attorneys' Fees Award

In addition to his first two objections, Perryman objects to the settlement including a *cy pres* distribution at all. Rather, Perryman asks the Court to distribute the *cy pres* leftovers to the class members in addition to the cash settlement fund reimbursements and $20 credits. Defendants raise a persuasive argument that this would constitute an impermissible windfall for the claimant class members at the expense of the silent class members. The settlement already authorizes class members to recover the entirety of any unauthorized charges and further awards a $20 credit worth $5 more than the original "thank you gift" leading to Plaintiffs' claims. In this way, class members may recoup their losses while also receiving some additional benefit through the $20 credit. While class members who avail themselves of both forms of recovery have arguably been made whole by their recovery, silent class members would not benefit from a further distribution to the claimant class members. Silent class

fails. It is not the location of the recipient which is key; it is whether the projects funded will provide "next best" relief to the class. DF/HCC is required to do work which will have benefits well beyond Boston. The DF/HCC proposal uses a venture capital model to invest in high-impact, high-risk research projects across the globe, with the expectation that promising results will attract grants from more traditional funding sources. DF/HCC says it intends to be a catalyst for large-scale research collaboration by providing incentives to teams of researchers to join forces at the national and international levels. Moreover, the grants will be awarded by an Oversight Board composed of nationwide leaders in prostate cancer research.

members will receive greater benefit from the remaining funds if they are distributed to schools for the creation of internet privacy and security programs benefitting internet consumers such as themselves. For this reason, the Court declines Perryman's invitation to cancel the *cy pres* distributions in favor of claimant class members.

///

///

### d.   Conclusion

In sum, the Court finds that the *cy pres* distribution in the proposed settlement agreement meets the standards in *Six Mexican Workers*.  The nature of the distribution and the proposed recipients are sufficiently tied to the objectives of the statutes underlying Plaintiffs' claims and to the interests of silent class members.  Accordingly, and for the reasons set forth above, Perryman's objections to the *cy pres* distributions in the proposed settlement agreement are overruled.

## C.   Perryman's objection to the requested attorneys' fees and costs

In addition to the objections already discussed, Perryman further contends that the proposed settlement agreement inequitably enriches class counsel and the named Plaintiffs at the expense of the absent class members.  In particular, Perryman contends that two of the various indicia that may suggest class counsel is improperly attuned to their own interests rather than those of the class are present here:  (1) there is a disproportionate distribution of the award to class counsel, and (2) there is a clear sailing agreement in which opposing counsel agreed not to contest class counsels' requested attorneys' fees.

To the extent that Perryman objects to the amount of requested attorneys' fees based upon their disproportionate relationship with the total settlement award, the Court disagrees with his assessment of the situation.  In this instance, class counsel has certainly achieved a favorable result for the class members.  As previously noted, there is a significant cash fund for class member claimants plus automatic $20 credits for every class member that add significant value to the overall settlement award . Pursuant to these terms, class members may recover the entirety of their losses as well as achieve the additional benefit of the credit.  As evidenced by the record, this case has been hotly contested over a

period of several years.  Understandably, class counsel put in a significant number of hours in order to achieve a beneficial result for the class.  So long as the requested amount fits within the appropriate method for determining reasonable attorneys' fees, the Court can find no other basis for finding the requested fees to be unreasonable.  Based on these considerations, the Court does not find that class counsels' requested fees are out of proportion to settlement achieved.

Perryman also objects to the inclusion of a clear sailing agreement in the proposed settlement.  Clear sailing agreements are not prohibited as a general matter, but they may be viewed with suspicion in certain instances.  In *In re Bluetooth Headset Products Liability Litigation*, the Ninth Circuit noted that certain types of clear sailing agreements may indicate that class counsel "allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  654 F.3d 935, 947 (9th Cir. 2011).  Particularly, the court objected to the situation in which the "parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class.'"  *Id.* (quoting *Lobatz v. U.S. W. Cellular of CA, Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000).  Similarly, the court found it problematic "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.*  Significantly, however, neither of the situations found problematic in *In re Bluetooth Headset Products* are found here.  The payment of attorneys' fees is incorporated into the final settlement of the entire action, and the funds for attorneys' fees are not held separate from the class funds.  Attorneys' fees are to be taken directly from the cash fund established for class member reimbursement, and any remaining funds will be distributed to the *cy pres* beneficiaries.  Moreover, there is no evidence suggesting that the parties reached this settlement as a result of collusion or self-interest.  There were numerous settlement proceedings, several of which were presided over by well-respected retired district court judges and magistrate judges.  By all accounts, the settlement resulted from an arms-length negotiation process with the benefit of the class members in mind.

For all of these reasons, the Court finds little merit in Perryman's argument that the proposed settlement inequitably enriches class counsel and the named representatives at the expense of the absent class members.  Accordingly, Perryman's objection in this regard is overruled.

**D.     Conclusion**

When determining whether to approve the proposed settlement agreement, the Court must evaluate its fairness as a whole, rather than assessing its individual components.  *See Lane*, 696 F.3d at 818-19. The Ninth Circuit does not require perfection in the view of the Court, but rather an overall determination that the settlement is fundamentally fair.  *Id.*  Here, the Court is convinced that the proposed settlement is "fair, adequate, and free from collusion."  *Id.*  Accordingly, Perryman's objections are overruled, and the Court approves the final settlement agreement proposed by the parties.

### ***Plaintiffs' Request for the Imposition of an Appellate Bond Against Perryman***

In Plaintiffs' memorandum in support of final approval of the settlement, Plaintiffs' ask that the Court require Perryman to post a bond in the amount of $60,000 should he appeal the final settlement approval.  District courts "may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." *Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950, 954–55 (9th Cir. 2007) (citing Fed. R. App. P. 7).  "[T]he purpose of [an appellate bond] is to protect an appellee against the risk of nonpayment by an unsuccessful appellant."  *Fleury v. Richemont N. Am., Inc.*, 2008 WL 4680033, at *6 (N.D. Cal. Oct. 21, 2008) (quotations and citations omitted).

In light of the circumstances, the Court declines to impose an appeal bond as the Court has no indication, as of yet, that Perryman intends to appeal the final settlement.  While there is case law supporting the imposition of an appeal bond against objectors appealing final settlement approval in certain circumstances, the appeal bonds in those cases were only issued following the objectors' filing notices of appeal.[10]  This suggests, and the Court agrees, that the imposition of an appeal bond prior to

---

[10] *See Fleury*, 2008 WL 4680033 at *6–7 (imposing a $5,000 bond for appeal of the final settlement approval after objector filed notice of appeal); *see also Miletak v. Allstate Ins. Co.*, 2012 WL 3686785, *1 (N.D. Cal. Aug. 27, 2012)(imposed a $60,000 bond for appeal of the final settlement approval after objector filed notice of appeal); *In re MagSafe Apple Power Adapter Litigation*, 2012 WL 2339721, *1 (N.D. Cal. May 29, 2012)(imposing a $15,000 bond on both objectors who filed a notice of appeal); *Embry v. ACER America Corp*., 2012 WL 2055030, *1 (N.D. Cal. June 5, 2012)(imposing a $70,650 bond for appeal of the final settlement approval while appeal was pending); *Yingling v. eBay, Inc.*, 2011 WL 2790181, *1 (N.D. Cal. July 05, 2011)(imposing a $5,000 bond for appeal of the final settlement approval after objector filed notice of appeal); and *In re Wachovia Corp. Pick-A-Payment*

Perryman filing a notice of appeal would be premature.  Should Perryman file a notice of appeal in this action, Plaintiffs may file a renewed motion for an appeal bond.  At this time, however, Plaintiffs' request for an appeal bond is denied.

### *Conclusion*

Having overruled Perryman's objections and reviewed the proposed settlement agreement, the Court makes the following findings:

**1.**      Unless otherwise specified, capitalized or defined, terms in this Order have the same definition as the same terms in the Settlement Agreement.

**2.**      This Court has jurisdiction over the subject matter of this Action, all parties to the Action, and all Class Members who have not timely and validly requested exclusion.

**3.**      Defendants Provide Commerce, Inc. ("Provide Commerce") and Regent Group, Inc. dba Encore Marketing International, Inc. ("EMI" or "RGI") (Provide Commerce and EMI collectively, "Defendants") provided notice to Class Members in compliance with Section 3.3 of the Settlement Agreement, due process, and Rule 23 of the Federal Rules of Civil Procedure. Notice was provided on the Internet at the web address of www.membershipprogramsettlement.com. Summary notice was provided by email to each Class Member at the email address that EMI maintains for each Class Member, including persons that had previously indicated that they do not wish to be contacted by EMI. Summary notice was provided by postcard via U.S. mail to all Class Members to whom notice by direct email was not deliverable and for whom EMI had a facially valid postal address, including persons that had previously indicated that they do not wish to be contacted by EMI. The notice: (i) fully and accurately informed Class Members about the lawsuit and settlement; (ii) provided sufficient information so that Class Members were able to decide whether to accept the benefits offered, opt-out and pursue their own remedies, or object to the proposed settlement; (iii) provided procedures for Class Members to file written objections to the proposed settlement, to appear at the hearing, and to state

---

*Mortg. Marketing and Sales Practices Litigation*, 2011 WL 3648508, *1 (N.D. Cal. Aug. 18, 2011)(imposing a $15,000 bond for appeal of the final settlement approval after objector filed notice of appeal).

objections to the proposed settlement; and (iv) provided the time, date and place of the final fairness hearing, which the Court subsequently changed and was noted on the settlement website.

4.     Defendants gave notice on June 22, 2012, pursuant to 28 U.S.C. § 1715(b).  (See Doc. No. 250.)  The notice substantively complies with the requirements of 28 U.S.C. § 1715(b) and was sent to the appropriate state and federal officials.

5.     For the reasons stated in the Order Granting Preliminary Approval of Class Settlement and Provisional Class Certification (Doc. No. 252), and having found nothing that would disturb these previous findings, this Court finds and determines that the proposed Class, as defined below, meets all of the legal requirements for class certification, for settlement purposes only, under Federal Rule of Civil Procedure 23(a) and (b)(3).

6.     The Parties have adequately performed their obligations under the Settlement Agreement to date.

7.     Upon review of the record pursuant to the factors identified in *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), the Court hereby finds that the terms and provisions of the Settlement Agreement have been entered into in good faith, and are fair, reasonable, and adequate as to, and in the best interest of, each of the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the Rules of the Court, due process, and any other applicable law. With respect to the determination that the Settlement Agreement is fair, reasonable, and adequate, the Court specifically notes that (a) whether the outcome on the merits would result in a ruling in Plaintiffs and the Class's favor is substantially uncertain, *see*, *e.g.*, *Berry v. Webloyalty.com, Inc.*, No. 10-CV-1358-H (CAB), 2011 WL 1375665 at *4-6 (S.D. Cal. Apr. 11, 2011) (holding similar enrollment webpage for other subscription-based membership program was not deceptive);[11] (b) the

---

[11]   *Accord Hager v. Vertrue, Inc.*, No. 09-11245-GAO, 2011 WL 4501046, at*6-7 (D. Mass. Sept. 28, 2011); *Hook v. Intelius, Inc.*, No. 10-CV-239 (MTT), 2011 WL 1196305 (M.D. Ga. Mar. 28, 2011); *Baxter v. Intelius, Inc.*, No. SACV 09-1031 AG (MLGx), 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010); *In re Vistaprint Corp. Mktg. & Sales Prac. Litig.*, MDL 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009), *aff'd, Bott v. Vistaprint USA, Inc.*, No. 09-20648, 2010 WL 3303692 (5th Cir. Aug. 23, 2010).

parties had nearly completed discovery including, but not limited to, the exchange of a large number of documents, numerous depositions, and expert disclosures; (c) the Settlement Agreement was reached through negotiations with experienced and informed counsel; (d) the consideration provided to the Class reflects substantial benefits to the Class in light of the circumstances of the Action; (e) there are no governmental objectors; and (f) less than a fraction of one percent of the class objected to the settlement.

8.      The Court also finds that extensive arm's-length negotiations have taken place, in good faith and free from collusion, between Class Counsel and Defendants' Counsel resulting in the Settlement Agreement. Parts of these negotiations were presided over by Magistrate Judge William Gallo, and other parts of the negotiations were presided over by the experienced mediators Hon. Leo S. Papas (ret.) and Hon. Edward A. Infante (ret.).

9.      The arguments of objector Brian Perryman do not preclude approval of the settlement. The primary relief provided in the Settlement Agreement is the availability of the cash payment; each Class Member had the opportunity to make a claim for a cash payment; and secondarily a $20 Credit was provided which not only provided the Class with a substantial benefit, but was more than the $10 to $15 off gift code that was being offered as part of the enrollment process at issue in this Action. The objector has not shown that the proposed *cy pres* recipients have a significant connection, ongoing or past, with Class Counsel or Defendants' Counsel, or that any of them stand to benefit from any distribution to the *cy pres* recipients. Further, the proposed *cy pres* recipients have the appropriate geographic scope given their enrollment and job placement statistics and the fact that this Action and the subject matter of the *cy pres* funds involve the internet, which lacks geographic scope. The benefits of the proposed *cy pres* recipients extend beyond San Diego County. Finally, the parties' agreement that Defendants would not oppose Class Counsel's request for attorneys' fees up to $8.65 million and costs up to $200,000 does not demonstrate self-dealing by Plaintiffs or Class Counsel.

10.     **Attorneys' Fees.**  An award of $8,650,000 in attorneys' fees and of $200,000 in costs to Class Counsel is fair and reasonable in light of the nature of this case, Class Counsel's experience and efforts in prosecuting this Action, and the benefits obtained for the Class.

09cv2094

The Court used the common-fund method to calculate the attorneys' fees award, which is reasonably calculated by dividing the total fee award ($8.650,000) by the reasonable value of the settlement fund ($38,000,000).  The value of the settlement fund is supported by the $12.5 million cash fund and the value of $20 Credits, which are fully transferrable and can be used to purchase items under $20 on a number of Provide Commerce's websites.  *See, e.g., Fernandez v. Victoria Secret Stores*, LLC, 2008 U.S. Dist. LEXIS 123546, at *38-40 (C.D. Cal. 2008) and *Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269, at *22, 28 (N.D. Cal. 2007).  Applying this method, the fee awarded constitutes 22.7% of the settlement value, and is within the Ninth Circuit's attorneys' fees benchmark of 25% of the settlement value.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  The attorneys' fees are also reasonable and supported when applying a lodestar cross-check.  Using the lodestar method, the Court finds that Class Counsel's hours and expenses were reasonable.  The Court has considered the appropriate factors to determine that a multiplier of 2.1 is reasonable and appropriate given the results achieved and the risks undertaken by Class Counsel.

**11.** **Enhancement Awards.**  An enhancement award of $15,000 each to plaintiffs Josue Romero and Gina Bailey, of $10,000 each to plaintiffs Bradley Berentson, Grant Jenkins, Daniel Cox, and Jennifer Lawler, and of $5,000 to plaintiffs John Walters and Christopher Dickey is fair and reasonable in light of: (a) Plaintiffs' respective risks (including financial, professional, and emotional) in commencing this action as the class representatives; (b) the time and effort spent by the respective Plaintiffs in litigating this action as the class representatives; and (c) Plaintiffs' public interest service.

**12.** **Settlement Payments.**  Defendants, through the Claims Administrator, must make Settlement Payments from the Net Cash Fund to Authorized Claimants according to Section 2.1(d) of the Settlement Agreement by mailing Settlement Payments to Authorized Claimants no later than twenty-five (25) calendar days after the Final Settlement Date, which is defined under Section 1.11 of the Settlement Agreement.

**13.** **Remainder.**  Any unclaimed portion of the Net Cash Fund after mailing of Settlement Payments to Authorized Claimants and after any mailed Settlements are returned to the Claims Administrator as undeliverable must be paid on an equal basis to the following non-profit college or

university academic institutions located in San Diego County, California, with the payments specified to be used for a chair, professorship, fellowship, lectureship, seminar series or similar funding, gift or donation program developed and coordinated between Provide Commerce and the respective institutions (depending on the amount of the remainder) regarding internet privacy or internet data security: California State University at San Diego (San Diego State University), University of California at San Diego, and University of San Diego School of Law.  Defendants, through the Claims Administrator, must mail or wire the payments from the Net Cash Fund according to the timeline set forth in Section 2.1(e) of the Settlement Agreement.

**14.    Objection Overruled.**  The objection of Brian Perryman is overruled for the reasons stated above.

**15.    Appeal Bond.**  Pursuant to Rule 7 of the Federal Rules of Civil Procedure, in a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to insure that any appellants have the ability to pay Plaintiffs' costs and fees should opposing an appeal be necessary.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001); *See also* Fed. R. App. P. 7 ("Rule 7").  Given that Perryman has not filed a notice of appeal or provided the Court with any indication that he intends to appeal the final approval of the settlement, the Court finds an appeal bond to be untimely under the circumstances.  Should Perryman file a notice of appeal in this action, Plaintiffs may file a renewed motion for an appeal bond.  Accordingly, Plaintiffs' request for an appeal bond is DENIED.

**16.    Court's Jurisdiction**.  Pursuant to the parties' request, the Court will retain jurisdiction over this action and the parties until final performance of the Settlement Agreement.

**IT IS SO ORDERED.**

DATED:  February 4, 2013

_____
Hon. Anthony J. Battaglia
U.S. District Judge