THEODORE H. FRANK (SBN 196332)
ADAM E. SCHULMAN (*pro hac vice*) (DC Bar No. 1001606)
Center for Class Action Fairness
1718 M Street NW No. 236
Washington, DC 20036
Voice: (703) 203-3848
Email: tfrank@gmail.com
Email: shuyande24@gmail.com

*Attorneys for Class Member Brian Perryman*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re EasySaver Rewards Litigation | Case No. 3:09-cv-2094-BAS (WVG) |
|  | **OPPOSITION OF BRIAN PERRYMAN TO MOTION FOR FINAL APPROVAL** |
|  | Judge: Honorable Cynthia Bashant |
|  | Courtroom: 4B |
| Brian Perryman,<br>        *Objector.* |  |

Case No. 3:09-cv-2094-BAS (WVG)
OPPOSITION OF BRIAN PERRYMAN TO MOTION FOR FINAL
APPROVAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

Table of Contents ................................................................................................................... ii

Table of Authorities ............................................................................................................... iii

Introduction and Summary of the Argument ....................................................................... 1

I.      Procedural History .................................................................................................... 2

II.     The court has a fiduciary duty to absent class members. .................................... 4

III.    The proposed settlement violates CAFA. ............................................................. 7

IV.     There are independent non-CAFA reasons why this Court must deny final
        approval. .................................................................................................................... 16

V.      Unanswered questions preclude settlement approval; Perryman objects to the
        denial of necessary fact discovery. ...................................................................... 22

Conclusion .............................................................................................................................. 24

PERRYMAN OPPOSITION TO FINAL APPROVAL

## Table of Authorities

*In re Airline Ticket Commission Antitrust Litig.,*
    268 F.3d 619 (8th Cir. 2001) ............................................................................. 21

*Allen v. Bedolla,*
    __F.3d__, 2015 WL 3461537 (9th Cir. Jun. 2, 2015) ........................ 1-2, 5, 16-17

*In re Baby Products Antitrust Litig.,*
    708 F.3d 163 (3d Cir. 2013) ...................................................................... 2, 18, 20

*In re BankAmerica Corp. Secs. Litig.,*
    775 F.3d 1060 (8th Cir. 2015) ............................................................ 2, 18-20, 25

*Beecher v. Able,*
    575 F.2d 1010 (2d Cir. 1978) ......................................................................... 19

*In re Bluetooth Headset Prod. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ....................................................... 1, 5-6, 17, 19

*Christianson v. Colt Industries Operating Corp.,*
    486 U.S. 800 (1988) ....................................................................................... 22

*Churchill Vill., LLC v. Gen. Elec.,*
    361 F.3d 566 (9th Cir. 2004) ............................................................................ 5

*Cox v. Clarus Marketing Group, LLC,*
    No. 11-cv-2711 H (S.D. Cal.) ..................................................................... 23-24

*Dardarian v. Officemax N. Am., Inc.,*
    No. 11-cv-00947,
    2013 U.S. Dist. LEXIS 98653 (N.D. Cal. July 12, 2013) ...................... 7, 9, 15

*Davis v. Cole Haan, Inc.,*
    2013 WL 5718452, 2013 U.S. Dist. LEXIS 151813 (N.D. Cal. Oct. 21, 2013) ...9

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) .............................................. 5-6, 17-18, 20

*In re Dry Max Pampers Litig.,*
    724 F.3d 713, 718 (6th Cir. 2013) ......................................................... 1, 5-7, 17, 24

*In re EasySaver Rewards Litig.,*
    599 Fed. Appx. 274 (9th Cir. Mar. 19, 2015)................................................. 4, 16, 22

*Galloway v. Kan. City Landsmen, LLC,*
    No. 4:11-1020-cv-W-DGK,
    2012 U.S. Dist. LEXIS 147148 (W.D. Mo. Oct. 12, 2012) ....................................8

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ..........................................................................7

*Houck v. Folding Carton Admin. Comm.,*
    881 F.2d 494 (7th Cir. 1989)....................................................................... 21

*Howell v. Jbi, Inc.,*
    298 F.R.D. 649 (D. Nev. 2014) ................................................................. 17

*In re HP Inkjet Printer Litig.,*
    716 F.3d 1173 (9th Cir. 2013)........................................... 1, 5-12, 14-15, 19

*Khatib v. County of Orange,*
    639 F.3d 898 (9th Cir. 2011)......................................................................8

*Klier v. Elf Atochem N. Am., Inc.,*
    658 F.3d 468 (5th Cir. 2011) ..................................................................... 18

*Marek v. Lane,*
    134 S. Ct. 8 (2013)...........................................................................2, 18

*In re Mercury Interactive Corp.,*
    618 F.3d 988 (9th Cir. 2010)................................................................. 4, 24

*Molski v. Gleich,*
    318 F.3d 937 (9th Cir. 2003)......................................................................5

*Monteferrante v. Container Store,*
    2015 U.S. Dist. LEXIS 13212 (D. Mass. Feb. 4, 2015) ....................................... 15

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011)................................................................17-18, 20-21

*In re Online DVD Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015)........................................... 4, 8, 10-13, 22-25

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014).................................... 1-2, 10, 17, 19-20, 25

*Radcliffe v. Experian Info. Solutions*,
    715 F.3d 1157 (9th Cir. 2013)............................................................. 20

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014)........................... 1-2, 6-10, 12, 14, 16-17, 24

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    131 S. Ct. 1885 (2011) .........................................................................7

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    362 F. Supp. 2d 574 (E.D. Pa. 2005) .................................................. 21

*Silber v. Mabon*,
    957 F.2d 697 (9th Cir. 1992)............................................................4-5

*Sobel v. Hertz Corp.*,
    No. 3:06-cv-00545-LRH,
    2011 U.S. Dist. LEXIS 68984 (D. Nev. Jun. 27, 2011) ....................... 15

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003)............................................................5-6

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006)........................................................9, 11-12

*True v. Am. Honda Co., Inc.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010).........................................5, 8, 11, 15

# STATUTES AND FEDERAL RULES

28 U.S.C. § 1712 ................................................................................. 1, 10-11, 15, 23

28 U.S.C. § 1712(a) ...................................................................................... 7, 11, 15

28 U.S.C. § 1712(c) .................................................................................................. 11

28 U.S.C. § 1712(e) ............................................................................................. 15-16

28 U.S.C. § 1714 ...................................................................................................... 22

Fed. R. Civ. Proc. 7.1 ............................................................................................. 25

Fed. R. Civ. Proc. 23 ................................................................................................ 6

Fed. R. Civ. Proc. 23(e) ........................................................................................... 6

Fed. R. Civ. Proc. 23(e)(2) ..................................................................................... 16

Fed. R. Civ. Proc. 23(h) .......................................................................................... 24

I.R.C. § 501(c)(3) ...................................................................................................... 3

# OTHER AUTHORITIES

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE
     (5th ed., Houghton Mifflin Harcourt Publishing Company 2013), *available at*
     http://ahdictionary.com/word/search.html?q=coupon ....................................... 7

American Law Institute,
     *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ................................. 4

American Law Institute,
     *Principles of the Law of Aggregate Litig.* § 3.05 *comment a* (2010) ................... 7

American Law Institute,
     *Principles of the Law of Aggregate Litig.* § 3.07 (2010) ........................... 20, 25

American Law Institute,
     *Principles of the Law of Aggregate Litig.* § 3.07(b) (2010) ........................... 18

American Law Institute,
    *Principles of the Law of Aggregate Litig.* § 3.07 *comment b* (2010) ................................ 20

Cacciola, Scott,
    *West Looms as Knicks Keep Going South*, N.Y. TIMES, Nov. 23, 2013 ..................... 9

Federal Judicial Center,
    *Managing Class Action Litig.: A Pocket Guide for Judges* (3d ed. 2010) .................... 14

Hantler, Steven B. & Robert E. Norton,
    *Coupon Settlements: The Emperor's Clothes of Class Actions*,
    18 Geo. J. Legal Ethics 1343 (2005) ..................................................... 15

Krueger, George & Judd Serotta,
    Op-Ed, *Our Class-Action System is Unconstitutional*, WALL ST. J., Aug. 6, 2008 .... 20

Leslie, Christopher R.,
    *A Market-Based Approach to Coupon Settlements in Antitrust*
    *and Consumer Class Action Litigation*,
    49 UCLA L. Rev. 991 (2002).............................................................9-11, 14

Leslie, Christopher R.,
    *The Significance of Silence: Collective Action Problems and Class Action Settlements*,
    59 FLA. L. REV. 71 (2007) ..........................................................................7

Liptak, Adam,
    *Doling out Other People's Money*, N.Y. TIMES, Nov. 26, 2007 .................................. 20

4 Newberg on Class Actions § 11:42 (4th ed. 2009) ..........................................................4

Redish, Martin H., *et al.*,
    *Cy Pres Relief & the Pathologies of the Modern Class Action:*
    *A Normative and Empirical Analysis*, 62 FLA. L. REV. 617 (2010) ......................... 20

S. Rep. No. 109-14 (2005) ........................................................................... 9, 14

Tharin, James & Brian Blockovich,
    *Coupons and the Class Action Fairness Act*,
    18 Geo. J. Legal Ethics 1443 (2005) ..................................................... 15

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988)..............................................7

1

2

Wolfman, Brian, *Judges! Stop Deferring to Class-Action Lawyers*,
    2 U. MICH. J.L. REFORM 80 (2013)..............................................................................7

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PERRYMAN OPPOSITION TO FINAL APPROVAL

**Introduction and Summary of the Argument**

It is telling that not once in the settling parties' supplemental briefs (Dkt. 306 and 307) do they mention how much cash the class will actually receive in this settlement: $225,000 (Dkt. 281 at 47:12), a tiny fraction of the class's attorneys' double lodestar of $8.85 million and three local San Diego educational institutions' *cy pres* of $3 million. Meanwhile, 99.8% of class members get no cash at all, though all are sufficiently ascertainable to give them a coupon. The earlier settlement approval rationalized this upside-down result by finding that the distribution to approximately 1.3 million class members of $20 coupons or "Credits" had a value of twenty dollars each—directly contradicting the Class Action Fairness Act ("CAFA"), which requires such findings to be "based on the value to class members of the coupons that are redeemed." *Contrast* Dkt. 271 *with* 28 U.S.C. §1712; *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ("*Inkjet*"). Even if CAFA's limitations on coupon settlements do not apply, a $20 valuation is unsupportable given that the coupons had restrictions that all but ensured that they would either not be used, or, when used, would be worth far less than $20. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 630-32 (7th Cir. 2014).

A realistic appraisal of the coupon value illuminates an untenable settlement that affords class counsel "preferential treatment" at the expense of absent class members. *See In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013) ("*Pampers*"); *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014) ("attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel."); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) ("*Bluetooth*") (recognizing "a disproportionate fee award" as hallmark of an unfair settlement); *Allen v. Bedolla*, __F.3d__, 2015 WL 3461537, at *5 n.4 (9th Cir. Jun. 2, 2015) (following *Bluetooth* and reversing settlement approval where class counsel negotiated a $1.1 million fee award and class members were set to receive less than $375,000). The ratio here is far more egregious than in *Allen*.

There exists a second independent reason why this settlement cannot be approved: the

PERRYMAN OPPOSITION TO FINAL APPROVAL

roughly $3 million unclaimed remainder of the cash fund has been earmarked as *cy pres* to San Diego universities, including the *alma mater* of class counsel, contrary to the Ninth Circuit's holding in *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011). That the $3 million goes to third parties when there are undercompensated class members (including 99.8% of the class that received zero in cash) is especially objectionable. It violates the "last resort" rule which requires that distributions to class members have priority over distributions to *cy pres* when such distributions are feasible. *See, e.g., In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1064-65 (8th Cir. 2015); *Pearson*, 772 F.3d at 784.[1] Here, the class members are directly ascertainable: there is a planned distribution of coupons to them. There is no reason there could not also be a cash distribution to the class other than class counsel's preference for his *alma mater* and local institutions over his clients, a nationwide class.

## I.   Procedural History

In late 2011, plaintiffs filed the operative complaint in this case against the three defendants alleging that their practices of enrolling customers in their Rewards Programs after luring them with the promise of worthless coupons called "Thank You Gifts" are unfair and unlawful under federal and state law. Dkt. 221. Half a year later, before the plaintiffs had filed a motion for class certification, the parties proposed a settlement of the putative class action. Dkt. 248-3 ("Settlement"). Fundamentally, the settlement is bifurcated into two components. The first is a $12.5 million cash fund, the bulk of which would go toward class counsel's reserved $8.85 milllion attorney award. Settlement § 2.1. The other component is an

---

[1] This Court's earlier evaluation of the settlement was undertaken without the benefit of much intervening precedent on the hot-button indicators of abuse packaged together here: coupons, *cy pres*, and a claims-made mechanism. *E.g., In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (*cy pres*); *Redman*, 768 F.3d 622 (coupons and claims-made); *Pearson*, 772 F.3d 778 (*cy pres* and claims made); *Inkjet*, 716 F.3d 1173 (9th Cir. 2013) (coupons and claims-made); *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ("*Baby Products*") (*cy pres* and claims-made); *Allen*, 2015 WL 3461537 (claims-made); *see also Marek v. Lane*, 134 S. Ct. 8 (2013) (Roberts, C.J., respecting the denial of certiorari) (*cy pres*).

automatic email dissemination of "$20 Credits" to the approximately 1.3 million class members. Settlement §§ 2.2, 3.13.

The "$20 Credits" are distinguishable from the "Thank You Gifts" that the plaintiffs repeatedly called "coupons" in their complaint only in that they have more limitations. *E.g.,* Dkt. 221 at 2, 3, 7, 12, 14, 18, 25, 33. The "$20 Credits" were good for use only on four of Provide's websites and only for certain products; expired after one year; and were not valid during Christmas week, the ten days before Valentine's Day, or the first two weeks of May (Mother's Day). Settlement § 2.2. Moreover, the coupons were not "stackable" (a customer could not combine two $20 coupons to receive $40 off); nor could they be used in conjunction with any other offer—and Provide regularly made "20% off" coupons freely available. *Id.*; Dkt. 258-1 at ¶¶ 11-12 & Exhibit 1. Finally, the coupons were not "crackable"—they could only be used in a single transaction: if a class member purchased something costing less than $20 on Provide's websites, there would be no change or credit given for the balance of the coupon. *Id.* The settlement prohibited defendants from taking a position on the total settlement value or the value of the coupons. *Id.*

Class member Brian Perryman filed an objection to this settlement and appeared through *pro bono* counsel at the fairness hearing in early 2013. Dkts. 258, 281. He protested that the settlement impermissibly favored class counsel over the class: because the vast majority of the coupons would not be used (and would not be worth $20 when used because of the stackability limitations and the regular presence of freely available 25%-off coupons) and because the parties used a claims process instead of direct payments. By reference, Perryman incorporates those previous objection and the arguments made in his Memorandum on Reopening of Case (Dkt. 304). Supporting his opposition here, he relies upon his previously-filed declarations (Dkts. 258-1, 268) as well as the contemporaneously-filed declaration of his attorney Theodore H. Frank ("Frank Decl.").

Perryman is represented by the Center for Class Action Fairness ("CCAF"), a 501(c)(3) public interest law firm that represents class members when class counsel employ unfair class

action procedures to benefit themselves at the expense of the class. *See generally* Frank Decl. ¶¶ 39-40.

After the Court approved the settlement in 2013, Perryman timely appealed, posting a $15,000 appeal bond that has yet to be repaid. Dkts. 278, 292, 293; *see* No. 13-55373 (9th Cir.). The parties conducted expeditious merits briefing in 2013. Shortly before the scheduled oral argument date arrived in February 2015, the Ninth Circuit issued an order staying argument pending the disposition of *In re Online DVD Rental Antitrust Litig.*, No. 12-15705 (9th Cir.) ("*Online DVD*"). *Online DVD* was decided later that month. 779 F.3d 934. Less than a month later, the Ninth Circuit resubmitted the appeal in this case without oral argument and vacated the settlement approval, remanding for proceedings consistent with *Online DVD. In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. Mar. 19, 2015). Plaintiffs petitioned for rehearing of that decision, under the theory that *Online DVD*'s conclusion that Wal-Mart gift cards are not CAFA coupons entailed that Provide Commerce e-credits are also not coupons. Plaintiffs' petition was denied in under twenty-four hours.

The settling parties have filed supplemental memoranda in support of final approval. Dkts. 306 ("Pl. Supp. Mem.), 307 ("Def. Supp. Mem."). As this Court ordered on May 21, 2015 (Dkt. 305), Objector Brian Perryman submits the following opposition to the settling parties' renewed motion for final approval.

## II.    The court has a fiduciary duty to absent class members.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations. And thus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Pampers*, 724 F.3d at 715.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994–95 (9th Cir. 2010) (internal quotation and citation omitted). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mahon,* 957 F.2d 697, 701 (9th Cir. 1992).

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. Am. Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord* American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*"); *Pampers*, 724 F.3d at 718 (compiling cases and authorities).

 "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (internal quotation omitted); *accord Allen*, 2015 WL 3461537, at *4. "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). Settlement valuation "must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Id.* at 868. It is error to exalt fictions over "economic reality." *Allen*, 2015 WL 3461537, at *5.

While satisfaction of the eight *Churchill Village*[2] fairness factors is necessary for approval under Rule 23, it is not sufficient. *Bluetooth*, 654 F.3d at 946; *see also Inkjet*, 716 F.3d 1173 (reversing for non-compliance with CAFA without mentioning *Churchill Village*). Perryman is not asking for a reweighing of the *Churchill Village* factors, which go to the merits

---

[2] *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

of the underlying litigation and the total size of the settlement benefit. Defendants are entitled to settle for the approximate $13 million that this settlement is worth if the parties in good faith believe that that is an adequate weighing of the risks and merits of the underlying lawsuit. But Rule 23 does not permit class counsel to negotiate for itself a disproportionate $8.85 million share of the settlement benefit with another $3 million going to local third parties instead of a nationwide class.

"[B]ecause the interests of class members and class counsel nearly always diverge, courts must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Inkjet*, 716 F.3d at 1178 (internal quotation omitted). The Court's oversight role does not end at making sure that the settling parties engaged in properly adversarial arm's length settlement negotiations. "In class-action settlements, the adversarial process—or what the parties here refer to as their 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members. For the economic reality [is] that a settling defendant is concerned only with its total liability, and thus a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense.… And that means the courts must carefully scrutinize whether [class counsel's and the named representatives'] fiduciary obligations have been met." *Pampers*, 724 F.3d at 717-18 (internal quotations omitted); *accord Bluetooth*, 654 F.3d at 948 948 ("the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations.") (*quoting Staton*, 327 F.3d at 960); *Dennis*, 697 F.3d at 864 ("courts 'must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations'" (quoting *Bluetooth*, 654 F.3d at 947)).

The parties emphasize the paucity of objections, but this is irrelevant. The "statement that 'the fact that the vast majority of class members—over 99.99%—have not objected to

the proposed settlement or opted out suggests that the class generally approves of its terms and structure' is naïve, as is … basing confidence in the fairness of the settlement on its having been based on 'arms-length negotiations by experienced counsel.'" *Redman*, 768 F.3d at 628. A low number of objections "hardly shows 'acceptance' of the proposed settlement: rather it shows oversight, indifference, rejection, or transaction costs." *Id.* (discussing meaning of number of claims). *Accord ALI Principles* § 3.05 *comment a* at 206; Brian Wolfman, *Judges! Stop Deferring to Class-Action Lawyers*, 2 U. MICH. J.L. REFORM 80 (2013). Just as it is uneconomic to bring class-action litigation as individual litigation, it is even more uneconomic to object to an unfair class-action settlement. Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007); *see also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812-13 (3d Cir. 1995). There will never be a large number of objectors in a class-action settlement, so the absence of thousands of objectors says nothing about the fairness of a settlement. *Cf. also Pampers*, 724 F.3d at 716-17 (reversing approval of abusive settlement though only three objectors and single appellant in much larger class).

## III.    The proposed settlement violates CAFA.

CAFA sets forth special rules for fee calculation and settlement valuation "[i]f a proposed settlement in a class action provides for recovery of coupons to a class member." 28 U.S.C. § 1712(a). Congress did not define the term "coupon" anywhere in CAFA. "Where a statute does not define a key term, [courts] look to the word's ordinary meaning." *Inkjet*, 716 F.3d at 1181 (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011)). A coupon is "a code or detachable part of a ticket, card, or advertisement that entitles the holder to a certain benefit, such as a cash refund or a gift." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed., Houghton Mifflin Harcourt Publishing Company 2013), *available at* http://ahdictionary.com/word/search.html?q=coupon. "A coupon may be defined as a certificate or form 'to obtain a discount on merchandise or services,'" and "Webster's also defines coupons as 'a form surrendered in order to obtain an

article, service or accommodation.' Coupons are commonly given for merchandise for which no cash payment is expected in exchange." *Dardarian v. Officemax N. Am., Inc.*, No. 11-cv-00947, 2013 U.S. Dist. LEXIS 98653, at *6-*7 (N.D. Cal. July 12, 2013) (quoting Webster's Ninth New Collegiate Dictionary (1988)).

At issue in this case are the "$20 credits" that are emailed to every class member in the form of a merchandise code. These are coupons. The codes entitle class members to a "benefit": a $20 discount on merchandise. That they are called "credits"[3] is irrelevant; the legal effect of the relief "is a question of function, not just labeling." *Khatib v. County of Orange*, 639 F.3d 898, 905 (9th Cir. 2011) (interpreting "jail" where RLUIPA was silent.). Myriad courts have correctly rejected the argument that the parties can evade CAFA through semantics and applied CAFA notwithstanding settling parties using a label other than "coupon."[4] *See also Online DVD*, 779 F.3d at 952 ("District courts are more than capable of ferreting out the deceitful coupon settlement that merely co-opts the term "gift card" to avoid CAFA's requirements."). Perhaps most tellingly, plaintiffs' complaint repeatedly uses the phrase "coupon" and "gift code" interchangeably to refer to the $15 "Thank You Gifts" at issue in the litigation. Dkt. 221 at 2 ("coupon gift code," "coupon or gift code"); *id.* at 18 (defining class to include those who "clicked on a coupon offer…to receive a gift code"); *id.* at 12 ("coupon"); *id.* at 14 (same); *id.* at 25 ("savings coupon"); *id.* at 33 ("coupons"); *id.* at 8 (describing coupon offer as a "gift code"); *id.* at 11 (same). Indeed, if one searches for "ProFlowers coupons" on Ebay, the website's search engine knows to provide the searcher with listings selling ProFlowers gift codes similar to those in this settlement. Frank Decl. ¶ 31.

---

[3] In the first go-around, the parties called them "credits," but plaintiffs now favor the term "gift codes," *e.g.* Pl. Supp. Mem. 2, presumably because *Inkjet* held that "e-credits [are] a euphemism for coupons." 713 F.3d at 1176.

[4] *See, e.g., Inkjet,* 713 F.3d at 1176 ("e-credits"); *Redman*, 768 F.3d at 635 ("vouchers"); *True,* 749 F. Supp. 2d 1052 (same); *Galloway v. Kan. City Landsmen, LLC*, No. 4:11-1020-cv-W-DGK, 2012 U.S. Dist. LEXIS 147148, at *10 (W.D. Mo. Oct. 12, 2012) ("certificates").

The parties argue (*e.g.* Pl. Supp. Mem. 7) that because the "credits" can be used to purchase an entire product that they are not really coupons. This argument has no basis in any dictionary definition, nor in the statutory text or the legislative history, the latter of which cites multiple cases where class members received entire products. *See Inkjet*, 716 F.3d at 1179 (citing S. Rep. No. 109-14 (2005), which includes examples such as a free crib repair kit, free spring water, free golf gloves or golf balls, $15 vouchers for Cellular One products—which would conceivably include items such as cables and cases and styluses that cost less than $15); *compare Davis v. Cole Haan, Inc.*, 2013 WL 5718452, 2013 U.S. Dist. LEXIS 151813, at *7-*8 (N.D. Cal. Oct. 21, 2013) (citing legislative history and concluding that $20 vouchers to Cole Haan stores constituted a CAFA coupon) *with* Pls. Supp. Mem. 6 (asserting that none of the Senate Report's examples "remotely resemble the relief offered here"). Section 1712 was born of the recognition that "[c]ompensation in kind is worth less than cash of the same nominal value." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). "[T]he idea that a coupon is not a coupon if it can ever be used to buy an entire product doesn't make any sense, certainly in terms of the Act." *Redman*, 768 F.3d at 635.

Contemporary usage supports this conclusion. A Google query for the phrase "Coupon for a free" returns over 430,000 hits (searched Jun. 18, 2015). Publications such as the *New York Times* use the word "coupon" to describe vouchers for free products. *E.g.*, Scott Cacciola, *West Looms as Knicks Keep Going South*, N.Y. TIMES, Nov. 23, 2013 ("when Smith misfired on a pair of free throws, everyone in attendance received a coupon for a free chicken sandwich as part of a fan promotion"). Thus, there should be no controversy. At least in modern parlance, "[c]oupons are commonly given for merchandise for which no cash payment is expected in exchange." *Dardarian*, 2013 U.S. Dist. LEXIS 98653, at *7.

Moreover, the "whole product" argument ignores the primary problem with coupons; that they "mask[] the relative payment of the class counsel as compared to the amount of money actually received by the class members." *Inkjet*, 716 F.3d at 1179 (*quoting* Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action*

*Litigation*, 49 UCLA L. Rev. 991, 1049 (2002)). "[C]ourts aim to tether the value of an attorneys' fees award to the value of the class recovery… Where both the class and its attorneys are paid in cash, this task is fairly effortless… But where class counsel is paid in cash, and the class is paid in some other way, for example, with coupons, comparing the value of the fees with the value of the recovery is substantially more difficult." *Inkjet*, 716 F.3d at 1178-79.

In just this manner, coupons are deployed here to mask what is really a $13 million total settlement value ($10 million if the *cy pres* is excluded as it should be, *see Pearson*, 772 F.3d at 781), of which class counsel is disproportionately seizing more than two thirds. Class counsel's fee request and earlier award here were faultily premised on the nearly face value of the coupons, allowing precisely "the inequities" that "§ 1712 intended to put an end to." *Inkjet*, 716 F.3d at 1179. "This point cannot be overemphasized for we can only properly interpret CAFA's text if we keep the statute's purposes clearly in mind." *Id.*

Finally, even if the parties were correct (notwithstanding the rejection of their argument in *Online DVD* and *Redman*) that credits that could purchase a "whole product" are not coupons because they are not discounts, Perryman disputes that the gift codes are intended to be used to purchase "whole products" rather than providing discounts. Provide Commerce sells thousands of different items, but admittedly can only identify fifteen scattered across its websites that cost less than $20. Declaration of Laura Szeligain ¶ 2 (Dkt. 307-1). But even this pathetic showing is a misleading exaggeration: Provide Commerce websites charge $11.98 to $18.98 for standard delivery and handling (and more if one wants something other than "standard" delivery, which can take as long as twelve days), and it is impossible to complete an order on a Provide Commerce website using a $20 gift code without paying Provide Commerce money. Frank Decl. ¶¶ 4-16 and Exhibits 1-13.

Previously, this Court held that because "there is also a cash fund that provides reimbursement to class members…[t]he proposed settlement is . . . not entirely a 'coupon' settlement and distinguishable from other cases involving coupons or vouchers without an

accompanying cash fund." Dkt. 271 at 6-7. The Court drew a distinction that makes no difference under the statute. Whether or not the settlement includes a cash fund, adding coupons on top "provides class counsel with the opportunity to puff the perceived value of the settlement so as to enhance their own compensation." *Inkjet*, 716 F.3d at 1179; *see also* Leslie, *supra*, at 1049.

Indeed, as 28 U.S.C. § 1712 shows, a coupon does not morph into a non-coupon because it is accessorized with a cash fund. Subsection (a) discusses "the **portion** of any attorney's fee award… that is attributable to the award of coupons" (emphasis added). Thus, CAFA itself has determined that settlements that create non-coupon value in addition to coupon value (*i.e.* those where a separate **portion** of the attorney's fee award is attributable to non-coupon relief) still fall within its ambit. *See also* 28 U.S.C. § 1712(c) (discussing fees in settlements involving both coupon and injunctive relief); *True*, 749 F. Supp. 2d at 1069 n.20 (rejecting argument that proposed settlement was not a "coupon settlement" since "other relief" was involved.) Pragmatically, the argument reduces to absurdity. If plaintiffs could circumvent CAFA by merely adding a subsidiary cash fund, we would start to see a lot of "Coupons + $1" settlements—and the 1.3 million members of the class are averaging less than $0.20 each in this settlement because 99.8% receive no cash.

This Court erroneously analogized this settlement to others where class members had the option to choose *between* cash and coupons. Dkt. 271 at 8; *see generally Online DVD*, 779 F.3d 934, 952 (That claimants "had the option of obtaining cash instead of a gift card" further "undercut[] the argument that the settlement force[d] them to buy from the defendant.").[5] Plaintiffs and Defendants go so far as to claim this is better than that the cash-option arrangement because class members could get cash and coupons. Pl. Supp. Mem. 7; Def. Supp. Mem 12. They are sorely mistaken as they neglect the crucial fact that not one of

---

[5] CAFA has no statutory exemption for coupons chosen in lieu of cash, so it's not clear that this has much legal significance. *See Synfuel*, 463 F.3d at 649 (treating relief as coupon-like even though class members could choose between cash and a coupon).

1.3 million class members here selected $20 coupon relief over an alternative cash option. In *Online DVD*, the entire net common fund could have been claimed in cash if class members so preferred. Here, by contrast, the maximum amount of cash that could have been claimed by class members was just over $3 million of the illusory $38 million fund, just over 1/3 of the amount class counsel negotiated for its own fees. Without any expression of class member interest, a face value of $25.5 million in coupons will be disseminated automatically to email addresses that the defendants have on file.

*Online DVD* held that Wal-Mart.com gift cards were not "coupons" for CAFA purposes, reasoning that Congress's animating concern in enacting CAFA was settlements that leave class members with "little or no value." *Id.* at 950. "Affording over 1 million class members $12 in cash or $12 to spend at a low priced retailer does not leave them with 'little or no value.'" *Id.* (observing that class members can choose from "any item carried on the website of a giant, low-cost retailer"). Distinguishing *Synfuel*, the Ninth Circuit again emphasized the fact the *Online DVD* gift cards allowed "use on [class members'] choice of a large number of products from a large retailer" and were permitted under the settlement to obtain cash in lieu of a gift card if they so preferred *Id.* at 952.

*Online DVD* expressly confined its holding to Wal-Mart.com gift cards "without making a broader pronouncement about every type of gift card that might appear." *Id*; *see also Redman*, 768 F.3d at 636 (per se rule that whole-product vouchers can never constitute "coupons" is "untenable"). In fact, *Online DVD* recognizes that some CAFA coupons can be used to purchase whole products. 779 F.3d at 592 (distinguishing Wal-Mart.com gift cards from *Inkjet* CAFA coupons that could be used to purchase a whole product, because the former allow "the ability to purchase one of many different types of products."). The reason that *Online DVD* created an exception to the statutory language in CAFA was because the gift cards were so similar to fungible cash and had so few of the limitations associated with coupons. The gift codes at issue in this settlement have none of the advantages of the Walmart.com gift cards:

|  | *Online DVD* | *EasySaver* |
|---|---|---|
| Face Value | $12 | $20 |
| Blackout Dates | None | Yes[6] |
| Expiration Date | None | One year after distribution |
| Usable in conjunction with other coupons | Yes | No |
| Crackable (*i.e.*, can value be retained over multiple purchases) | Yes | No |
| Reedemable for cash | No | No |
| Elected by class members in lieu of cash | Yes | No |
| Permits purchase of other gift cards | Yes | No |
| Duplicative of deals freely available outside the settlement | No | Yes |
| Number of items that can be purchased at least in part | 5 million-8 million[7] | Undisclosed[8] |
| Number of items that can be purchased in whole (excluding service charges and taxes) | Over 700,000[9] | 15[10] |

Along almost every dimension, the *Online DVD* gift cards are more cash-like and less coupon-like than the credits here. The terms and conditions here entail significantly less

---

[6] The coupons cannot be used the week before Christmas, ten days before Valentine's Day or ten days before Mother's Day. Settlement § 2.2. These are the three holidays most likely to induce purchases of the flowers or gifts sold by Provide Commerce websites.

[7] Frank Decl. ¶¶ 18-22 & Exh. 14-17.

[8] In their joint remand memorandum, the settling parties implausibly claimed that the defendant's settlements had "more product options" than Walmart.com. Dkt. 303 at 7.

[9] Frank Decl. ¶¶ 23-24.

[10] See discussion on page 10 above.

value. *See, e.g.*, Leslie, *Coupon Settlements*, 49 UCLA L. Rev. at 1025 ("Perhaps the clearest example of restricting settlement coupons to inferior goods is the imposition of blackout dates on the… Coupons… The blackout dates significantly reduced the coupons' value to the average class member."); *Inkjet*, 716 F.3d at 1179 ("coupon settlements involve variables that make their value difficult to appraise, such as redemption rates and restrictions. For instance, a coupon settlement is likely to provide less value to class members if, like here, the coupons are non-transferable, expire soon after their issuance, and cannot be aggregated.") (internal citation omitted); Federal Judicial Center, *Managing Class Action Litig.: A Pocket Guide for Judges*, 34 (3d ed. 2010) ("If similar discounts are provided to consumers outside of the class, the benefit to the class might be less than the face amount of the coupon—or perhaps no benefit at all."); *Redman*, 768 F.3d at 636 (observing that class members' choices are burdened when "the buyer would receive no change" if purchasing an item for less than the voucher's face value). Burdens like this are a principal reason that "CAFA requires greater scrutiny of coupon settlements." *Inkjet*, 716 F.3d at 1178 (quoting S. Rep. No. 109-14, at 27). Indeed, other gift codes marketed by Provide Commerce with *fewer* limitations than the gift codes in this settlement sell on Ebay at discounts of as much as 93% to face value. Frank Decl. ¶¶ 25-29 & Exhibits 18-19.

The fact that the "gift code" coupons here cannot be used in conjunction with freely-available 20%-off coupons, moreover, means that the "$20" face value will never actually be realized. A non-class member purchasing a $60 flower arrangement can use a free 20%-off coupon, and pay $48. A class member using the $20 gift code coupon cannot use the 20%-off coupon, and will pay $40 for the same flower arrangement. In such a scenario, the coupon is worth $8, not $20: the $20 face value is offset by the opportunity cost of being unable to use a 20%-off coupon worth $12. Frank Decl. ¶¶ 4-16 & Exhibits 1-13. Indeed, there are numerous items available for sale where use of the $20 gift-code coupon results in the class member paying *more* for Provide Commerce's goods than if they had not used the gift-code coupon. *Id.* ¶¶ 10, 13.

Perhaps the most pronounced distinction with *Online DVD*, however, is that all 744,202 recipients of a Wal-Mart.com gift card specifically requested that gift card in lieu of an identical cash payment. Such individuals have reason to redeem their credits. By contrast, the $20 credits here will be distributed to class members without any expression of interest. This reflects the typical coupon scenario where "redemption rates are tiny" "mirror[ing] the annual corporate issued promotional coupon redemption rates of 1-3%." James Tharin & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443, 1445, 1448 (2005). Coupon redemption rates "may be particularly low in cases involving low value coupons." *Sobel v. Hertz Corp.*, No. 3:06-cv-00545-LRH, 2011 U.S. Dist. LEXIS 68984, at *35 (D. Nev. Jun. 27, 2011) ($10 discount "certificate" for car rental). Cases abound in which few class members claim or redeem their coupons.[11]

Because the credits are CAFA coupons, fees attributable to the credits can only be awarded as a percentage of those redeemed. 28 U.S.C. § 1712(a)[12]; *Inkjet*. For purposes of the

---

[11] *See, e.g., True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1074-75 (C.D. Cal. 2010) (rebuffing witness's suggested redemption rate and citing two cases with redemption rates under 2%); *Monteferrante v. Container Store*, 2015 U.S. Dist. LEXIS 13212 (D. Mass. Feb. 4, 2015) (claims rate of 1.8% for a $10 coupon); *Davis v. Cole Haan, Inc.*, 2013 WL 5718452, 2013 U.S. Dist. LEXIS 151813, at *5-*6 (claims rate below 1% for a $20 voucher) (N.D. Cal. Oct. 21, 2013); *Dardarian v. OfficeMax N. Am., Inc.*, 2014 U.S. Dist. LEXIS 178463, at *5 (N.D. Cal. Dec. 30, 2014) (reflecting upon a redemption rate of under 7% of the face value of $10 and $5 distributed to class members); Steven B. Hantler & Robert E. Norton*, Coupon Settlements: The Emperor's Clothes of Class Actions*, 18 Geo. J. Legal Ethics 1343, 1347 (2005) (noting one settlement where only 2 of more than 96,000 coupons were redeemed).

[12] Coupon valuations based on clairvoyance not only violate § 1712(a), as interpreted by the *Inkjet* majority and dissent, they also implicitly contravene § 1712(e). Section 1712(e) authorizes the district court to "require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties" but stipulates that such secondary distribution "shall not be used to calculate attorneys' fees under this section." It would be utterly irrational if the § 1712 legislative scheme permitted fees to be paid on the value of

Rule 23(e)(2) fairness inquiry, however, CAFA permits the Court to make a realistic justified valuation of the likelihood of redemption. *Redman*, 768 F.3d at 634. If one generously assumes a redemption rate of ten percent despite the complete lack of evidence of any likelihood that any coupons would be redeemed, and one generously assumes that the average redeemed value of a $20 credit is $13 (Frank Decl. ¶¶ 15-16), then the actual value of the coupons would be only $1.7 million. If the redemption rate is the more typical 1 to 3%, then the coupons are worth only $170,000 to $510,000. And if one makes the not-unreasonable assumption that the redemption rate for the coupons is equal to the claims rate in this case—0.2%—the coupons are worth less than $35,000—a far cry from the finding of $26 million.

## IV.    There are independent non-CAFA reasons why this Court must deny final approval.

Regardless of how this Court resolves the discrete CAFA coupon issue, the settlement must fall for other reasons. *See EasySaver*, 599 Fed. Appx. at 275 ("[C]lass settlement is a package deal that must stand or fall in its entirety…") (internal quotation omitted).

*First,* even if the $20 credits are not subject to § 1712's prescriptions on attorneys' fees, the minimal expected redemption value of that credit usage means that the settlement—as judged in "economic reality" —affords unduly preferential treatment to class counsel at the expense of absent class members. *Allen*, 2015 WL 3461537, at *5. Not only are the gift codes exceedingly likely to expire without ever being used, but even when they are used, they will not provide the consumer with $20 of benefit. Any use of a gift code precludes a class member from using a freely-available 20%-off coupon eligible for use for the vast majority of purchases on Provide Commerce's websites. Because of the freely-available 20%-off coupon, a "$60" bouquet that would cost $40 with use of the $20 gift code would cost only $48

---

unclaimed coupons that reverted to the defendant, but not on the value of those unclaimed coupons that were redistributed to a third-party charity.

without the gift code—meaning that the gift code is worth $8, not $20, in that instance. Indeed, the surest way to tell that class counsel does not actually believe the coupons are worth $20 each would be to ask if they would be willing to accept 500,000 transferable coupons with the same limitations as those in the settlement (which, by class counsel's claims, would be worth $10 million) instead of $8.85 million of cash.[13] Almost certainly not, given that holders of sets of Provide Commerce coupons find themselves unable to sell them on Ebay even at a 90% discount to face value. Frank Decl. ¶¶ 25-26 and Exhibit 18.

To satisfy Rule 23(e) and (h), the fee award must be "commensurate" with the class's recovery. *Pampers*, 724 F.3d at 720. A settlement that allocates to class counsel well in excess of the Ninth Circuit's 25% benchmark is presumptively unfair. *See, e.g, Dennis*, 697 F.3d at 868 (38.9% fee would be "clearly excessive"); *Allen*, 2015 WL 3461537, at *5 (fee award that exceeds class recovery by a factor of three is disproportionate); *Pearson*, 772 F.3d at 781 (69% fee is "outlandish"); *Redman*, 768 F.3d at 630-32 (55%-67% allocation unfair); *Howell v. Jbi, Inc.,* 298 F.R.D. 649, 658 (D. Nev. 2014) (denying settlement approval where class was only allotted 58.3% of the gross settlement); *see also Bluetooth*, 654 F.3d at 947-49. The fee provision here allocates nearly $9 million to class counsel, and forbids the defendant from opposing that request or even taking a position on the value of the $20 credits that supposedly justifies the fee. Settlement § 2.1(c); *see Redman*, 768 F.3d at 637 (explaining why such clear-sailing clauses deserve "intense critical scrutiny"). This settlement, which affords class counsel more than 40 times as much cash as class members, cannot survive the rigorous review necessitated for pre-certification and coupon agreements.

*Second*, the *cy pres* component of the settlement (Settlement §2.1(e)) distribution is unlawful for three independent reasons: (1) *cy pres* is improper when it is feasible to make further distributions to class members; (2) there is an intolerable conflict of interest for class counsel owing to a preexisting relationship with a *cy pres* beneficiary; and (3) there is an

---

[13]   Perryman has no objection to class counsel receiving $75,000 in cash as a proportionate award for the $225,000 in cash the class is receiving.

impermissible geographic discontinuity between the composition of the class (nationwide) and the locus of the *cy pres* recipients (San Diego).[14]

"[A] *cy pres* distribution…is permissible *only* when it is not feasible to make further distributions to class members…except where an additional distribution would provide a windfall to class members with *liquidated*-damages claims that were 100 percent satisfied by the initial distribution." *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015); *accord Pearson*, 772 F.3d at 784 (denying "validity" of *cy pres* award where it was feasible to remit more money to actual class members); *ALI Principles* § 3.07(b). This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

"Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *In re Baby Prods. Antitrust Litig.*, 708 F.3d at 174. "Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *Id.* Here, *cy pres* accounts for more than ten times the amount of actual class recovery. *See* Dkt. 281 at 6. This settlement is more lopsided than any of those listed above. At a minimum, it is inappropriate to award class counsel attorneys' fees

---

[14] The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). Imported to the class action context, it has become an increasingly popular method of distributing settlement funds to non-class third parties in lieu of class members, a "growing feature" that raises "fundamental concerns." *Marek v. Lane*, 134 S. Ct. 8, 9 (2013) (Roberts, C.J., respecting the denial of certiorari). Non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *See e.g., Dennis*, 697 F.3d at 868 (*cy pres* settlement can easily become "a paper tiger"); *Nachshin*, 663 F.3d at 1038 ("[A] growing number of scholars and courts have observed, the cy pres doctrine…poses many nascent dangers to the fairness of the distribution process") (citing authorities).

for the $3 million *cy pres* component, even if the recipients didn't already reflect an inappropriate indirect benefit to class counsel. *Pearson*, 772 F.3d at 781.

Previously, this Court accepted the parties' justification for the *cy pres*—that further payouts to the class "would constitute an impermissible windfall for the claimant class members at the expense of the silent class members." Dkt. 271 at 14. Immediately, this rationale overlooks the possibility of employing methods that would compensate those absent class members who had not yet submitted any claim (*e.g.,* supplemental notice and outreach, sampling for lottery payout, or a direct distribution). It is thus both legally and factually erroneous in the absence of a showing that the 99.8% of class members who did not make claims had no claims to be made—an argument that directly contradicts the class allegations in the complaint.[15]

A settlement need not obtain each measure of relief sought to be adequate. Nevertheless, a settlement is unfair if it rewards non-party organizations before fully satisfying the class' claims. Class counsel and class representatives have a fiduciary duty to

---

[15] Furthermore, the settling parties complain of a windfall, but full compensation of claimants is not to be judged vis-à-vis the amount offered in the settlement agreement. *BankAmerica*, 775 F.3d at 1065 (citing *Klier*, 658 F.3d at 480). Rather, it can only be determined by comparing the relief obtained to the full measure of legal damages sought in the complaint. *cf. Bluetooth*, 654 F.3d at 945 n.8 (examining whether relief obtained in settlement matched theory of the complaint); *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978) (no windfall or unjust enrichment to redistribute to class members when alleged damages are greater than the sum after redistribution). In the plaintiffs' operative Fourth Amended Complaint, their theory of damages included statutory, general, special and exemplary or punitive damages, and compiled interest, each in addition to the restitution of ill-gotten gains. Dkt. 221 at 46. Yet, the settlement payments to class members contemplate only refunds—and even that is short of restitution, with no compensation for the time-value of money or interest expenses class members may have accrued on the improper credit-card charges. Any notion of equating class members walking away with more than $0 with a windfall is wholly ironic. As *Inkjet* recognized, the real and present concern is that "class counsel [will] walk[] away from a case with a windfall, while class members walk away with nothing." *Inkjet*, 716 F.3d 1185.

absent class members, and it is betrayed when they negotiate a settlement that gratuitously favors outside parties before the fiduciaries when it is feasible to compensate the fiduciaries. *E.g.,* Martin H. Redish *et al., Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis,* 62 FLA. L. REV. 617, 666 (2010). By adopting the presumption in favor of class distributions espoused by *Pearson, BankAmerica,* and *ALI Principles* § 3.07, this Court can help to cabin unfettered use of *cy pres* and again make class members the "foremost beneficiaries" of class settlements. *Baby Prods.,* 708 F.3d at 179.

Even if *cy pres* is acceptable here, the choice of recipients is not. "Cy pres distributions present a particular danger" that "incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations." *Dennis,* 858 F.3d at 867. "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Radcliffe v. Experian Info. Solutions,* 715 F.3d 1157, 1167 (9th Cir. 2013) (internal quotation omitted).

Lead plaintiffs' counsel James Patterson and defense counsel Michelle Doolin are both graduates of *cy pres* beneficiary USD Law, a fact that has not been disclosed in the class notice. "A *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." *ALI Principles* § 3.07 cmt. (b). As the leading law review article notes, such *cy pres* awards "can also increase the likelihood and absolute amount of attorneys' fees awarded without directly, or even indirectly, benefitting the plaintiff." Redish, *supra* at 661. The Ninth Circuit has specifically suggested that the *alma mater* dispensation is a type of conflict that is objectionable. *Nachshin,* 663 F.3d at 1039 (citing George Krueger & Judd Serotta, Op-Ed, *Our Class-Action System is Unconstitutional,* WALL ST. J., Aug. 6, 2008 ("Judges…have occasionally been known to order a distribution to some place like their own alma mater …")); Adam Liptak, *Doling out Other People's Money,* N.Y. TIMES, Nov. 26, 2007 ("Lawyers and judges have grown used to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like.")); *see*

*also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 362 F. Supp. 2d 574, 577 n.2 (E.D. Pa. 2005) (noting appearance of impropriety in selecting a beneficiary with long-established ties to Eastern District of Pennsylvania bench).

Another dispositive deficiency of the *cy pres* award is its failure to account for the "broad geographic distribution of the class." *Nachshin*, 663 F.3d at 1040. *Nachshin* reversed settlement approval where two thirds of the donations were made to local institutions. *Id.* In *Nachshin*, this Court planted its flag with the Seventh and Eighth Circuit by requiring geographic congruence between the class and the *cy pres* beneficiary. *Id.* (*citing In re Airline Ticket Commission Antitrust Litig.*, 268 F.3d 619, 625-26 (8th Cir. 2001) (concluding that the distribution of unclaimed funds to Minnesota **law schools** and charities was an abuse of discretion); *Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989) (invalidating settlement agreement, in a national antitrust class action, that made a *cy pres* distribution to **local law schools**, and directing the district court to "consider to some degree a broader nationwide use of its cy pres discretion")).

It follows *a fortiori* from *Nachshin* that it is impermissible that each and every *cy pres* recipient is local. This Court previously accepted the idea that the local centralization was permissible because the recipients engage in a nationwide dialogue and place students from across the country. Dkt. 271 at 13-14. The defendant's own record submissions undermined this very claim by demonstrating 92.5% of San Diego State undergraduate enrollees are from in-state. Dkt. 265-2. Even if student enrollment or faculty employment were more geographically diffuse, it would do nothing to distinguish this award from the ones to local universities that the Seventh and Eighth Circuit unanimously rejected in *Houck* and *Airline Ticket Comm'n* respectively. In *Houck*, for example, the *cy pres* proposed was to "research projects in the area of class actions, and particularly antitrust law," research that theoretically would have a nationwide benefit to all consumers interested in antitrust enforcement. 881 F.2d at 502. But that didn't prevent the Seventh Circuit from reversing on account of the concentration at schools local to Chicago. *Id.* By preventing unjustifiable localizations of

benefit, geographical restrictions on *cy pres* work in conjunction with CAFA. 28 U.S.C. §1714 (proscribing favoritism toward segments of the class based on geographic proximity to the court).

Courts should not countenance grossly disproportionate concentrations of *cy pres* proceeds within a single municipality. Similar to state and sub-state governmental organizations, San Diego-area universities primarily serve their local constituency; the vast majority of their students are California residents, and the *cy pres* money that belongs to the nationwide class will be spent in the San Diego area. A distribution to exclusively San Diego-area schools is too concentrated for a nationwide class.

The settling parties ask this Court to ignore the *cy pres* issue because it was ruled upon by the district court in the initial decision approving the settlement. The Ninth Circuit vacated the district court's settlement approval; it is not inconsistent with the Ninth Circuit's decision for this Court to correct the earlier order's legally incorrect decision on *cy pres*. *EasySaver*, 599 Fed. Appx. at 275 ("[C]lass settlement is a package deal that must stand or fall in its entirety…"). While it is unfortunately inefficient that the Ninth Circuit chose not to reach the issue when squarely presented with it, there is no good reason to refuse to adjudicate the *cy pres* question and require a second Ninth Circuit reversal, as much as the settling parties would like to avoid review of their indefensible *cy pres* provisions. "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance," especially when the earlier decision was "clearly erroneous" as the district court's was here. *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1988).

## V. Unanswered questions preclude settlement approval; Perryman objects to the denial of necessary fact discovery.

The Ninth Circuit's remand calls for further proceedings consistent with *Online DVD*. 599 Fed. Appx. at 275. Publicly-available evidence demonstrates conclusively that the e-credits in this case are nothing like the *sui generis* Walmart.com gift cards that had no expiration or blackout dates in *Online DVD*, could be used to buy millions of products

without limitation, and were thus deemed to have sufficient cash-like qualities to be a judicially-created exception to Section 1712. Thus, the Ninth Circuit could reject plaintiffs' petition for rehearing in this case overnight. Yet the settling parties continue to insist beyond all plausibility that the $26 million face value coupons are not coupons and are actually worth $26 million to the class—but refuse to produce the data to back these assertions up.

If the Court is not to reject the settling parties' argument out of hand or to draw the appropriate adverse inference from the parties' refusal to volunteer dispositive evidence in their possession, Perryman maintains that discovery is necessary to perform the fact-intensive inquiry *Online DVD* requires to discern whether certain relief constitutes a CAFA coupon. Among other information, he seeks to know (1) the percentage of customer purchases on the relevant websites that totaled less than $20, including tax, shipping and delivery expenses; (2) the average customer purchase price on the websites; (3) what other promotional offers the defendants routinely offer to the general public; (4) the percentage of "$15 Thank You Gifts" that were redeemed within one year of issuance; (5) the average price of customer purchases for which $15 Thank You Gift was redeemed; (6) the total number of products for sales on the relevant websites and how many can be obtained with the $20 credits without additional out of pocket expenditures (including, tax, shipping, handling or other charges). In addition to the requests listed in the letter, Perryman also wishes disclosure of the redemption rates and usage statistics of the "20% Off Codes" and "$15 Credits" that were distributed as part of the settlement in a recent companion case, *Cox v. Clarus Marketing Group, LLC*, No. 11-cv-2711 H (S.D. Cal.), where Provide Commerce was a defendant. In his remand memorandum, Perryman suggested that the Court set a discovery schedule. Dkt. 303. The Court declined to do so. Dkt. 305.

This evidence would all further demonstrate that the coupons in this case are indeed subject to CAFA under *Online DVD*. Frank Decl. ¶¶ 32-37 (offer of proof). The parties in their final approval papers have answered none of the above questions, the closest revelation being that 15 products are currently available for under $20 (exclusive of service charges and

PERRYMAN OPPOSITION TO MOTION FOR APPROVAL

tax). Dkt. 307-1. Fifteen!—compared to the hundreds of thousands of free products (exclusive of service charges and tax) available at Walmart.com. The lack of transparency is not surprising. The truth would reveal the self-dealing class counsel committed in this settlement, and the settlement itself prohibits defendants from taking a position on the total settlement value or the value of the $20 Credit (Settlement §2.1(c)). The harm of this premium clear-sailing agreement was particularly prejudicial here: because Provide offered $15 coupons to induce people to unwittingly be billed by its EasySaver program, it thus surely had data about historical redemption rates in its possession. Additionally, as a named defendant in *Cox v. Clarus*, *supra*, it has presumably has the most directly analogous redemption data possible.

The above information is necessary before the Court can grant approval. *See Redman*, 768 F.3d at 636 (lamenting the lack of data "on how often a $10 coupon would be used in a RadioShack store to buy an item costing $10 or less rather than to obtain a discount on a pricier item," "how many items in the typical RadioShack store cost exactly $10" and "how many of each of the low-priced products the average RadioShack store carries."). The parties have not carried their burden of proof and encourage now this Court to commit reversible error. *See Pampers*, 724 F.3d at 719 (reversing settlement approval where parties did not produce germane information within their possession); *cf. also In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) ("The Advisory Committee Notes [to Rule 23(h)] further contemplate that, in appropriate cases, the court will permit an objector discovery relevant to the objections.") (internal quotation omitted). The Court should draw the appropriate adverse inference.

Currently, the Court has sufficient information to reject the settlement, but insufficient information to approve it under the law.

## Conclusion

*Online DVD* involved a *sui generis* gift-card that was without expiration, without blackout dates, stackable, crackable, voluntarily chosen by class members instead of cash, and

could purchase millions of items, including hundreds of thousands of items for free. The "gift codes" or "e-credits" in this case are nothing of the sort, severely diminished in value because they preclude the use of other freely-available coupons, and are worse than the coupons in *Inkjet*—even if one ignores the fact that double-digit "standard delivery" charges mean that it is impossible to purchase anything for free from Provide Commerce[16] with the coupons. *Online DVD* does not save this settlement, and correct valuation of the coupons shows that class counsel is receiving several times as much as the class, of whom 99.8% receive nothing but a coupon unlikely to be redeemed. In no circumstance can this Court approve the settlement without demanding additional disclosure.

Since the first settlement approval, several appellate courts have rejected the *cy pres* reasoning of the district court; that the Ninth Circuit has punted once is no reason to require Perryman to take that issue to the Ninth Circuit again, when the *cy pres* in this settlement cannot satisfy *BankAmerica* or *Pearson* or § 3.07, and is reason enough by itself to reject the settlement.

Dated: July 2, 2015             Respectfully submitted,

*/s/ Theodore H. Frank*
Theodore H. Frank (SBN 196332)
Adam E. Schulman (*pro hac vice*)
Anna St. John (*pro hac vice* pending)
Center for Class Action Fairness
1718 M Street NW No. 236
Washington, DC 20036
tfrank@gmail.com
shuyande24@gmail.com
annastjohn@gmail.com
(703) 203-3848

*Attorneys for
Objector Brian Perryman*

---

[16] On December 31, 2014, Provide Commerce, Inc. became a fully-owned subsidiary of FTD, Inc., but there has been no new Fed. R. Civ. Proc. 7.1 disclosure by defendants.

# CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically served the foregoing on all CM/ECF participating attorneys at their registered email addresses, thus effectuating electronic service under S.D. Cal. L. Civ. R. 5.4(d).

DATED this 2d day of July, 2015.

_(s) Theodore H. Frank_
Theodore H. Frank
