THEODORE H. FRANK (SBN 196332)
ADAM E. SCHULMAN (*pro hac vice*)
ANNA ST. JOHN (*pro hac vice* pending)
Center for Class Action Fairness
1718 M Street NW No. 236
Washington, DC 20036
Voice: (610) 457-0856
Email: tfrank@gmail.com, shuyande24@gmail.com, annastjohn@gmail.com

*Attorneys for Class Member Brian Perryman*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re EasySaver Rewards Litigation<br><br>Brian Perryman,<br>    *Objector*. | Case No. 3:09-cv-2094-BAS (WVG)<br><br>**DECLARATION OF THEODORE H. FRANK IN SUPPORT OF OPPOSITION OF BRIAN PERRYMAN TO MOTION FOR FINAL APPROVAL**<br><br>Judge: Honorable Cynthia Bashant<br>Courtroom: 4B |

Case No. 3:09-cv-2094-BAS (WVG)
DECLARATION OF THEODORE H. FRANK IN SUPPORT OF OPPOSITION OF BRIAN PERRYMAN TO MOTION FOR FINAL APPROVAL

I, Theodore H. Frank, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as witness, could and would testify competently thereto.

2. My business address is 1718 M Street NW, No. 236, Washington, DC 20036. My telephone number is (703) 203-3848. My email address is tfrank@gmail.com.

3. I founded and run the Center for Class Action Fairness ("CCAF"), which represents Objector Brian Perryman in this matter.

## The Provide Commerce Websites

4. Attached as Exhibit 1 is a true and correct copy of a printout of the homescreen of the ProFlowers.com website as accessed on July 1, 2015. Sixteen of the eighteen items on the front page cost more than $20, and the other two are $19.99.

5. Attached as Exhibit 2 is a true and correct copy of a screenshot of the ProFlowers.com coupon page made on July 1, 2015. Any customer can receive 15% off, $10 off, or 20% off. Because these coupons are not stackable with the "$20 e-credit," the $20 e-credit is therefore worth between $0 and $17 for any given order even if it is redeemed.

6. Moreover, the prices listed on the website are misleading because they do not include standard delivery charges, "care and handling" charges, or taxes. As an example, on July 1, 2015, I purchased "sympathy lilies" on ProFlowers.com for my law professor friend and drinking buddy, Tamara Tabo, whose greyhound tragically died last week. A true and correct copy of a printout of the order review form is attached as Exhibit 3. The lilies and their vase were priced at $57.98; with a 20%-off coupon, I received an $11.60 discount. If I had used the "$20 e-credit" offered to class members in this settlement, I would not have been able to use the freely available 20%-off coupon, and would have only saved $8.40, not $20.00. Moreover, I was charged $15.99 "standard delivery" (which would have been substantially pricier if I had asked for delivery before noon rather than "between 8 am and 6 pm"), $2.99 "Care & Handling," and $5.39 taxes. In short, it is impossible to spend less than $20 on ProFlowers.com because any delivery has at least $18.98 in additional charges. The

Case No. 3:09-cv-2094-BAS (WVG)                                                                                        1
DECLARATION OF THEODORE H. FRANK

Szeliga Declaration (Dkt. 307-1) refers only to "order" prices, and elides the question of the ultimate cost to consumers.

7. Attached as Exhibit 4 is a true and correct copy of a printout of the homescreen of the Berries.com website as accessed on July 1, 2015. Fourteen of the sixteen items on the front page cost more than $20, and the other two are $19.99.

8. Attached as Exhibit 5 is a true and correct copy of a screenshot of the Berries.com coupon page made on July 1, 2015. Any customer can receive $10 off, $15 off, or 20% off. Because these coupons are not stackable with the "$20 e-credit," the $20 e-credit is therefore worth between $0 and $20 for any given order even if it is redeemed.

9. The Berries.com website also charges $14.99 standard delivery and taxes. Thus a "$19.99" order of dipped strawberries will cost $37.87 before any coupons are applied. It is impossible to spend less than $20 on the Berries.com website. Attached as Exhibit 6 is a true and correct copy of an unexecuted sample order for "$19.99" strawberries where Berries.com proposed to charge me $37.87.

10. Attached as Exhibit 7 is a true and correct copy of a screenshot of the PersonalCreations.com coupon page made on July 1, 2015. Any customer can receive 15% off, free shipping, $10 off, or $30 off. Because these coupons are not stackable with the "$20 e-credit," the $20 e-credit is therefore worth between $0 and $18.50 for any given order even if it is redeemed; a class member purchasing something over $100 in value cannot use the $20 e-credit at all without losing money, since she could have instead used the freely available $30-off coupon.

11. Like other Provide Commerce websites, PersonalCreations.com charges exorbitant amounts for shipping and care & handling. Thus, it is impossible to spend less than $20 on the website. Attached as Exhibit 8 is an example of this, a true and correct copy of an unexecuted July 1 sample order for a "$16.99" personalized mug where PersonalCreations.com proposed to charge me $28.97 for delivery twelve days from the July

Case No. 3:09-cv-2094-BAS (WVG)　　　　　　　　　　　　　　　2
DECLARATION OF THEODORE H. FRANK

1st order date. If I had requested a more reasonable delivery time, the order would have been even more expensive.

12. Attached as Exhibit 9 is a true and correct copy of a printout of the homescreen of the CherryMoonFarms.com website as accessed on July 1, 2015. All sixteen items on the front page cost at least $24.99.

13. Attached as Exhibit 10 is a true and correct copy of a screenshot of the CherryMoonFarms.com coupon page made on July 1, 2015. Any customer can receive 15% off, 20% off, $10 off, or $15 off. Because these coupons are not stackable with the "$20 e-credit," the $20 e-credit is therefore worth between $0 and $16.40 for any given order even if it is redeemed. If a consumer buys the $149.99 gift basket advertised on the front page, she would be $10 worse off using the "$20 e-credit" than the regular 20% off coupon freely available.

14. Like other Provide Commerce websites, CherryMoonFarms.com charges exorbitant amounts for shipping and care & handling. Thus, it is impossible to spend less than $20 on the website. Attached as Exhibit 11 is an example of this, a true and correct copy of an unexecuted July 1 sample order that charges $16.99 for "standard delivery."

15. In April 2015, I received in the mail a catalog from ProFlowers.com. A true and correct copy (with my address redacted) is attached as Exhibit 12. The catalog has 65 different SKUs, and every single item in the catalog is priced between $24.99 and $69.99 despite the fact that many items are on sale. Using a "$20 e-credit" with the "$24.99" potted pink roses on page 7 would cost a Texas consumer $25.95 after delivery, handling, and taxes.

16. My assistant and I compiled a list of the SKUs from Exhibit 12 in a spreadsheet, and then calculated the price (including standard delivery, handling, and 8.25% Texas sales tax) using both the standard 15% or 20% coupon freely available and the "$20 e-credit." The results are attached as Exhibit 13. On average across the 65 SKUs in the catalog, the "$20 e-credit" is worth only $12.95 when redeemed compared to using a freely available coupon instead, and $1 to $3 less than that if one also purchases a vase.

17. I have repeatedly checked (and occasionally used) Provide Commerce websites during the pendency of this objection and appeal. Every time I did so, with the possible exception of the Valentine's Day season (when e-credits cannot be used), a 20%-off coupon was freely available to any customer.

## Walmart.com

18. *In re Online DVD Antitrust Litigation* held that the gift cards available for use on Walmart.com were not coupons, in part, because of the wide range of products available on Walmart.com.

19. Attached as Exhibit 14 is a true and correct copy of an October 15, 2013 article from *Internet Retailer*. The article reports that Walmart.com offered 2 million SKUs in 2012 and increased that number to 5 million SKUs in 2013.

20. Attached as Exhibit 15 is a true and correct copy of an October 31, 2014 article from *Internet Retailer*. The article reports that Walmart.com has increased its offerings for the 2014 holiday season to 7 million SKUs, compared to 150,000 SKUs in a brick-and-mortar store.

21. Attached as Exhibit 16 is a true and correct copy of page 6 of Walmart's 2014 10-K report filed with the SEC. That annual report announces that Walmart.com offers 5 million SKUs.

22. Attached as Exhibit 17 is a true and correct copy of page 3 of Walmart's 2015 10-K report filed with the SEC. That annual report announces that Walmart.com has increased its offerings to 8 million SKUs.

23. On July 1, 2015, I searched Walmart.com for clothing items that cost less than $12, the value of the coupon in *Online DVD*, using the URL http://www.walmart.com/browse/clothing/5438?facet=price:0+-+%2410&min_price=0&max_price=12. There were 24,304 different items I could purchase for less than $12 on Walmart.com.

Case No. 3:09-cv-2094-BAS (WVG)                                                                                  4
DECLARATION OF THEODORE H. FRANK

24. On July 1, 2015, I performed similar searches in other categories on Walmart.com. There were 27,452 different items in the "beauty" category that cost less than $12; 126,508 different items in the "electronics" category that cost less than $12; 109,059 different items that cost less than $10 in the "crafts" category; 100,808 different items that cost less than $10 in the "home improvement" category; 36,763 different items that cost less than $10 in the "toys" category; 25,420 different items that cost less than $10 in the "sports & outdoors" category; 59,146 different items that cost less than $10 in the "office" category; 20,242 different items that cost less than $10 in the "music" category; 54,008 different items that cost less than $10 in the "movies and TV" category; 151,161 different items that cost less than $10 in the "books" category; and several other categories I had not searched. In short, Walmart.com offers more goods—and a wider array of goods—for under $12 than the Provide Commerce websites offer at any price.

**The Transferability and Market Value of the Provide Commerce Coupons**

25. Provide Commerce has marketing arrangements where it distributes transferable $10 and $15 coupons largely indistinguishable from the "$20 credits" in this case. It is possible to purchase these coupons at discounts of 80% or 90% or more from face value on Ebay.

26. For example, attached as Exhibit 18 is a true and correct copy of a printout of a listing for five coupons: a $10 coupon at Berries.com, a $10 coupon for Cherry Moon Farms, and three other coupons. One can "buy it now" by paying $1.95 including shipping. Minus a 49-cent stamp and not counting the transactions-cost burden of spending time mailing the coupons, the seller hopes to net $1.46 for $20 worth of Provide Commerce coupons (a 93% discount) **plus** three other coupons—and still has no takers.

27. Attached as Exhibit 19 is a true and correct copy of a printout for a listing for a successful sale of a $15 "ecoupon" at ProFlowers.com. The ecoupon is superior to the coupons in this case, because it is not prohibited from use during Christmas; it sold for $2.99, an 80% discount. Other $15 ProFlowers and Provide Commerce ecoupons have sold on

Ebay in the last two months for $3.49, $3.89, $5, and $5.50, a discount of over 63% to 76%, but these ecoupons were again superior to the "$20 Credits" in this case, because they could be used on Mother's Day and Christmas.

28.  Twenty-dollar coupons good on ProFlowers.com have sold on Ebay in the last two months for between $2.25 and $10.00, a discount of 50% to 89%.

29.  It is not clear whether the coupons and ecoupons and gift cards and promo codes on sale at Ebay are "stackable" or "crackable," but if they are, they are superior to the "$20 Credit" coupons in this case.

30.  I note that there have been several sales on Ebay in the last two months where people have paid real money for product codes such as the "25% off" coupon available for free on every Provide Commerce website.

31.  When one searches for "ProFlowers coupons" on Ebay, the Ebay search engine returns listings for, among other things, the ecoupons superior to the "$20 Credits" in this case.

### Offer of Proof

32.  The evidence above, combined with the material differences in the restrictiveness of the Provide Commerce "e-credits" and the *Online DVD* "gift cards," demonstrates conclusively that the "e-credits" are "coupons" under *Online DVD*. This Court held that further discovery was not necessary. We agree that additional discovery is not necessary if the Court rejects the settlement. But if the Court is inclined to value the "$20 e-credit" coupons at face value or assume a redemption rate greater than 2%, we believe it would be reversible error for the Court to approve the settlement without requiring the production of the following information in the defendants' possession, and we provide this offer of proof to preserve the appellate issue.

33.  Defendants have not produced the percentage of customer purchases on the Websites that totaled less than $20, including shipping and delivery charges. Defendants also have data on what purchases consumers made with "$15 Thank You Gifts," and how many

of those coupons were used as discounts and how many were used to purchase whole products. We believe that that number, if not zero, is less than 1%, and would demonstrate that the "e-credits" are designed to be discounts, rather than opportunities to purchase "whole products."

34. Defendants have not provided information how frequently 20% coupons are freely available to the public. On information and belief, if that information was provided, it would conclusively demonstrate that, during the non-holiday time periods in which the e-credits can be used, the e-credits act to nullify freely-available 20%-off coupons, and are thus worth considerably less than their $20 face value.

35. Plaintiffs' complaint repeatedly refers to "$15 Thank You Gifts" offered to class members during the class period between 2005 and 2012 as "coupons." Defendants have data how frequently these coupons were redeemed, and this would provide conclusive evidence that the "e-credits" in this case will not have a 100% redemption rate, and should not be valued at face value, whether or not they are deemed to be "coupons."

36. Defendant Provide Commerce, Inc., recently settled the class action of *Cox v. Clarus Marketing Group, LLC*, No. 11-CV-02711-H (RBB) in the Southern District of California; as part of the settlement, the class there received "20% off" and "$15 credit" coupons similar to the "e-credit" coupons in this case. The *Cox* settlement was approved on April 29, 2013, without objection or appeal, and the *Cox* settlement coupons would have expired in 2014. Provide Commerce, Inc. has not disclosed the redemption rate of the *Cox* settlement coupons, and has not disclosed how they were used when redeemed, which would be probative as to whether the "e-credit" coupons in this case should be valued at face value, and, on information and belief, would conclusively demonstrate that the actual value to the class is less than 10% of face value, and likely less than 2% of face value because of an expectedly low redemption rate and because they nullify existing coupons.

37. Defendant Provide Commerce, Inc., has not disclosed whether it has made internal projections of the internal cost of the coupons in this settlement. On information

Case No. 3:09-cv-2094-BAS (WVG)                                           7
DECLARATION OF THEODORE H. FRANK

and belief, Provide Commerce, Inc., reasonably expects that the e-credits will cost it less than $2 million before they expire, and has documents in its possession making that projection.

### The Center for Class Action Fairness

38. It is our experience that class counsel, rather than address the merits of our legal and factual arguments, will attempt false *ad hominem* attacks that are cut and pasted from other briefs without investigation; it has happened repeatedly in this case. We recite the following facts for the record in anticipation of the boilerplate attacks we regularly see in the hopes we will not need to request a need to supplement the record. If the Court correctly disregards these attacks, or class counsel refrains from them, there will be no need to review our defense to them below.

39. CCAF, a 501(c)(3) non-profit public-interest law firm founded in 2009, represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. It has won acclaim from judges and the national press in doing so. *See, e.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780, 787 (7th Cir. 2014) (Posner, J.) ("Theodore Frank and the other objectors flagged fatal weaknesses in the proposed settlement"); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed, and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12 (calling me "[t]he leading critic of abusive class-action settlements").

40. Through its efficient work as a watchdog, CCAF has won class members millions of dollars. *See, e.g, McDonough v. Toys "R" Us,* No. 06-cv-00242, 2015 U.S. Dist. LEXIS 7510, at *141 (E.D. Pa. Jan. 21, 2015) ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re*

*Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel … at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

41. In discussing class counsel's *ad hominem* attacks in its attempt to discredit Mr. Perryman's objection and his counsel, it is relevant to distinguish CCAF's mission from the agenda of those who are termed "professional objectors." A "professional objector" is a specific legal term referring to for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees. Some courts presume that such objectors' legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n.150 (2003). This is not CCAF's modus operandi. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF requires its clients to agree that they do not wish to settle their objections for money, refuses to engage in *quid pro quo* settlements, and has never withdrawn an objection in exchange for payment to CCAF. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees.

42. The difference between a so-called "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a public-interest objector such as myself has to triage dozens of requests for *pro bono* representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF objects to only a small fraction of the

Case No. 3:09-cv-2094-BAS (WVG)                                                                                                  9
DECLARATION OF THEODORE H. FRANK

number of unfair class action settlements it sees; indeed, I personally object to only a fraction of the number of unfair class action settlements where I am a class member. (While one district court called me a "professional objector" in the broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012).)

43. Mr. Perryman is willing to stipulate to an injunction forbidding him from settling his objection for anything of value if it will allay any concern about his motives.

44. CCAF has no interest in pursuing baseless objections, because every objection we bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious objection in another case. CCAF turns down the opportunity to represent class members wishing to object to settlements or fees when CCAF believes the underlying settlement or fee request is relatively fair.

45. Class counsel has claimed that my "organization's ideological agenda is to end class actions, not improve them." Dkt. 262 at 14. This is false. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of my prized childhood possessions), and read every issue of *Consumer Reports* from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and this role as a way to fulfill my childhood dream of being a consumer advocate. I have publicly stated my support for the class-action mechanism as a means of aggregating litigation of similarly situated class members, including in multiple declarations under oath, and in a nationally-broadcast C-SPAN panel discussing CCAF's work. On multiple occasions, successful objections brought by CCAF have resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class. *See also* Susan Beck, "Man on a class action mission," *American Lawyer* S16 (Jun. 2011) (quoting me defending class actions). Plaintiffs have done extensive research into my writings and press coverage, and have surely

seen other filings I have made where I refute this canard, yet they repeatedly make this misstatement to this Court and the Ninth Circuit and refuse to correct it.

46. Plaintiffs have previously relied upon the plaintiffs' brief in *True v. Honda* that falsely claims that I "would likely be against virtually *any* consumer litigation," (Dkt. 262 at 15) but failed to mention that those statements were falsified by a declaration I filed in the case (*True* Dkt. No. 158-2), and that the *True* court explicitly rejected plaintiffs' argument. 749 F. Supp. 2d at 1079-80. I have represented class action plaintiffs seeking recovery against a defendant in consumer class action litigation; I have made public offers to be the lead plaintiff in TCPA class-action litigation; this, combined with my own writings repeatedly defending the class action device and speaking out only against the abuse of it, demonstrates that I am not "against virtually *any* consumer litigation."

47. CCAF's track record speaks for itself. We have won millions of dollars for class members. We have won twelve of the fifteen cases that have been decided on the merits by federal intermediate courts of appeals as of July 2, 2015, including five out of six appeals submitted or argued to the Ninth Circuit on behalf of CCAF clients. (I have also personally argued and won a seventh appeal in the Ninth Circuit on behalf of a non-CCAF objector in a case I did not brief.) If CCAF had a "history of making baseless objections," CCAF would not have such appellate success. The one Ninth Circuit case CCAF lost, *Frank v. Netflix*, CCAF lost on very narrow grounds, and even then, the decision created a circuit split with a Seventh Circuit decision that I had previously won, *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014).

48. Other class counsel have criticized CCAF in other cases because I, acting in my private capacity, provided paid legal advice to "professional objectors" as part of my private legal practice. I only did so in cases where CCAF did not have a client, and where the objections were consistent with CCAF's position that class action settlements should not unfairly favor class counsel at the expense of the class. I refused to work on cases that I did not believe to be meritorious. On the two occasions where I made appellate argument on

behalf of a private client who had objected to a settlement and the appeals court reached the merits, my clients won the appeal and the appeals court vacated the settlement approval. If being paid to write meritorious briefs and make winning arguments on behalf of a private client is scandalous, there are very few litigators who would be above reproach. For the record, over the course of my legal career, I have also performed legal work for such unseemly clients as disgraced financier Victor Posner, General Motors Corp., Arnold Schwarzenegger, and Sarah Palin; and I was once co-counsel to Johnnie Cochran, who represented murderer O.J. Simpson. Generally, one does not ascribe the sins of one's clients or co-counsel to an attorney.

49. Plaintiffs have previously characterized *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 773, 785 (N.D. Ohio 2010) as "describing objector Frank's brief as 'long on ideology and short on law.'" But *Lonardo* was criticizing *one particular argument* as "ideolog[ical]"; it otherwise held that "the Court is convinced that Mr. Frank's goals are policy-oriented as opposed to economic and self-serving." 706 F. Supp. 2d at 804. The *Lonardo* court even awarded CCAF about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Id.* at 813-17. Yet plaintiffs falsely represent that *Lonardo* "discredited" me. Dkt. 262 at 14 n.6. Further, CCAF was ultimately successful in the Seventh and Ninth Circuits on the single argument *Lonardo* criticized as supposedly "short on law." Even if *Lonardo* was correct in 2010 that CCAF's policy-based argument was "short on law," it is no longer correct after *In re Bluetooth Headset Prod. Liab. Litigation*, 654 F.3d 935 (9th Cir. 2011), agreed that reversionary clauses are a problematic sign of self-dealing.

50. Class counsel has previously baselessly accused Mr. Perryman of not being a "*bona fide*" objector. I did not contact Mr. Perryman. Mr. Perryman contacted me in July 2012 after reading about the settlement, and invited me to represent him in an objection to the settlement. His July 2012 email to me was the first time we had corresponded. I agreed to represent him only after determining that his interest was to benefit the class as a whole, consistent with CCAF's non-profit mission. Mr. Perryman is an experienced attorney with a

national practice who has ably participated in his objection, including providing edits to this declaration.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on July 2, 2015, in Houston, Texas.

                                            */s/ Theodore H. Frank*
                                            Theodore H. Frank

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically served the foregoing on all CM/ECF participating attorneys at their registered email addresses, thus effectuating electronic service under S.D. Cal. L. Civ. R. 5.4(d).

DATED this 2d day of July, 2015.

*(s) Theodore H. Frank*
Theodore H. Frank